UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
THE BRONX HOUSEHOLD OF FAITH,          :
ROBERT HALL, and JACK ROBERTS,         :
                                       :
              Plaintiffs,              :
                                       :
         -against-                     :
                                       :
BOARD OF EDUCATION OF THE CITY OF       :
NEW YORK and COMMUNITY SCHOOL          :
DISTRICT NO. 10,                       :
                                       :
              Defendants.              :
-----------------------------------x



01 Civ. 8598 (LAP)

OPINION

LORETTA A. PRESKA, U.S.D.J.:

## INTRODUCTION

The liberty afforded by the First Amendment of the Bill of
Rights to pursue religious expression free of government
molestation was presciently observed by the Framers of the
Constitution to be among the most divisive and factious to
imperil societal harmony. See The Federalist No. 10, at 41-42
(James Madison) (Terence Ball ed., 2003) ("A zeal for different
opinions concerning religion . . . ha[s] . . . divided mankind
into parties, inflamed them with mutual animosity, and rendered
them much more disposed to vex and oppress each other than to co-
operate for their common good."); U.S. Const. amends. I, XIV.  In
fact, this inherent tension recently was evidenced by the Supreme
Court's seemingly divergent rulings regarding public display of
the Ten Commandments. McCreary County, Ky. v. ACLU of Ky., 125 S.

Ct. 2722, 2733 n.10 (2005) (prohibiting display of the Ten Commandments in county courthouses and noting that "Establishment Clause doctrine lacks the comfort of categorical absolutes"); Van Orden v. Perry, 125 S. Ct. 2854 (2005) (permitting display of the Ten Commandments in public space outside the Texas State Capitol).

Thus, it is perhaps not surprising that the Supreme Court's jurisprudence has evolved throughout our history from sometimes unabashed support of religion, see, e.g., Church of the Holy Trinity v. United States, 143 U.S. 457, 458, 471 (1892) (holding that a statute making it unlawful for any person "in any manner whatsoever, to prepay the transportation" or otherwise import an alien "to perform labor or service of any kind in the United States" could not have been intended to apply to a church's contracting for a pastor from England: "If we pass beyond these [historical] matters to a view of American life as expressed by its laws, its business, its customs and its society, we find everywhere a clear recognition of the same truth . . . that this is a Christian nation."), toward a requirement of neutrality toward religion, see, e.g., Everson v. Bd. of Educ. of the Twp. of Ewing, 330 U.S. 1, 18 (1947) (permitting government funding for children's transportation to school, both public schools and religious schools: "Th[e First] Amendment requires the state to be a neutral in its relations with groups of religious believers and non-believers; it does not require the state to be their

2

adversary. State power is no more to be used so as to handicap religions than it is to favor them.") and Agostini v. Felton, 521 U.S. 203, 231 (1997) (reversing its earlier decision and finding no Establishment Clause violation in a federally funded program providing remedial instruction to children on a neutral basis: "[W]here the aid is allocated on the basis of neutral, secular criteria that neither favor nor disfavor religion, and is made available to both religious and secular beneficiaries on a nondiscriminatory basis . . . the aid is less likely to have the effect of advancing religion."). It is that requirement of neutrality that prescribes the outcome in this case.

The Bronx Household of Faith, Robert Hall, and Jack Roberts ("Plaintiffs") brought this action against the Board of Education of the City of New York (the "Board") and Community School District No. 10 (the "School District," collectively, "Defendants"), alleging that Defendants' refusal to rent space in a New York City public middle school to the Bronx Household of Faith (the "Church"), a Christian church, for Sunday morning meetings that include worship violated the First Amendment, the Equal Protection Clause, and Sections 3, 8, and 11 of Article I of the New York Constitution. Plaintiffs and Defendants now cross-move for summary judgment. For the reasons set forth below, Plaintiffs' motion for summary judgment is granted, and Defendants' motion is denied.

3

The factual and procedural history of this action is set
forth in detail in my June 26, 2002 Opinion granting Plaintiffs'
motion for a preliminary injunction. 226 F. Supp. 2d 401
(S.D.N.Y. 2002) ("Bronx II"). Accordingly, only those facts
relevant to the instant motions are set forth below.

In September 1994, the School District denied the request
of the Church to rent space in Public School M.S. 206B, Anne
Cross Merseau Middle School ("M.S. 206B" or the "School") for
Sunday morning meetings that include religious worship. The
denial was based on the Board's Standard Operating Procedure
§ 5.9 (1993) ("Former SOP § 5.9") and New York Education Law
Section 414 (McKinney 2000), both of which prohibited rental of
school property for the purpose of religious worship. In 1995,
Plaintiffs brought an action in this Court challenging the School
District's denial on constitutional grounds. See Bronx Household
of Faith v. Cmty. Sch. Dist. No. 10, No. 95 Civ. 5501 (LAP), 1996
WL 700915 (S.D.N.Y. Dec. 5, 1996). I found that the School
District had created a limited public forum and that its
regulations were reasonable and related to a legitimate
government interest. Thus, I denied Plaintiffs' motion for
summary judgment and granted Defendants' cross-motion for summary
judgment. In 1997, the Court of Appeals affirmed the judgment,
127 F.3d 207 (2d Cir. 1997) ("Bronx I"), and in 1998, the Supreme
Court denied certiorari. 523 U.S. 1074 (1998).

Employing reasoning similar to its reasoning in Bronx I, the Court of Appeals affirmed the District Court's grant of summary judgment in favor of the defendant school district in The Good News Club v. Milford Cent. Sch., 202 F.3d 502 (2d Cir. 2000). The Good News Club is "a community-based Christian youth organization" that sought to use Milford Central School facilities for after-school meetings of children involving "'singing songs, hearing Bible lesson[s], and memorizing scripture.'" Id. at 504, 507. The majority found that the Good News Club is "focused on teaching children how to cultivate their relationship with God through Jesus Christ[,]" a pursuit that is "quintessentially religious" "under even the most restrictive and archaic definitions of religion." Id. at 510. Thus, the Court concluded, the Milford School District properly excluded the Good News Club on the basis of "content, not viewpoint." Id. at 511.

In a dissenting opinion, Judge Jacobs faulted the majority for distinguishing between groups that teach secular morality and those that teach morality that stems from religious beliefs. "The fallacy of this distinction is that it treats morality as a subject that is secular by nature, which of course it may be or not, depending on one's point of view." Id. at 515 (Jacobs, J., dissenting). Furthermore, Judge Jacobs observed, "[e]ven if one could not say whether the Club's message conveyed religious content or religious viewpoints on otherwise-permissible content, we should err on the side of free speech.

The concerns supporting free speech greatly outweigh those supporting regulation of the limited public forum." Id.

The Supreme Court granted certiorari, 531 U.S. 923 (2000), and reversed the decision of the Court of Appeals, 533 U.S. 98 (2001). The majority accepted the parties' agreement that the school had created a limited public forum but disagreed with the Court of Appeals' characterization of the Good News Club's activities, particularly its characterization of religious activities as different from other activities in the school relating to the teaching of moral values. Id. at 106, 110-11. The Court noted:

> Despite our holdings in Lamb's Chapel and Rosenberger, the Court of Appeals, like Milford, believed that its characterization of the Club's activities as religious in nature warranted treating the Club's activities as different in kind from the other activities permitted by the school.

Id. at 110-11 (citation omitted).

The Court went on to reject definitively the treating of "quintessentially religious" activities as different in kind from the teaching of character and morals from a particular viewpoint:

> We disagree that something that is "quintessentially religious" or "decidedly religious in nature" cannot also be characterized properly as the teaching of morals and character development from a particular viewpoint. See 202 F.3d at 512 (Jacobs, J., dissenting) ("When the subject matter is morals and character, it is quixotic to attempt a distinction between religious viewpoints and religious subject matters"). What matters for purposes of the Free Speech Clause is that we can see no logical difference in kind between the invocation of

6

> Christianity by the Club and the invocation of
> teamwork, loyalty, or patriotism by other
> associations to provide a foundation for their
> lessons.

Id. at 111.

The Court further disagreed with the Court of Appeals'
implicit finding that "reliance on Christian principles taints
moral and character instruction in a way that other foundations
for thought or viewpoints do not." Id. Ultimately, the Court
held that "Milford's exclusion of the Club from use of the
school, pursuant to its community use policy, constitute[d]
impermissible viewpoint discrimination." Id. at 112.

Shortly after the Supreme Court issued its opinion in
Good News Club, Plaintiffs in this case contacted the School
District to renew their request to meet at M.S. 206B from 10:00
a.m. to 2:00 p.m. each Sunday to engage in singing, the teaching
of adults and children from the viewpoint of the Bible, and
social interaction among members of the Church to promote their
welfare and that of the community. Pagliuca Decl., Ex. A.[1]  On
August 16, 2001, an attorney for the Board informed Plaintiffs'
counsel that Defendants "were denying [the application] because
the meetings would violate the defendants' policy prohibiting
religious services or instruction in the school buildings."

---

[1]"Pagliuca Decl." refers to the Declaration of Frank
Pagliuca sworn to on December 5, 2001.

Compl. ¶ 15.[2]  The policy to which the Board referred was SOP
§ 5.11 (2001) ("Enjoined SOP § 5.11") (precedently Former SOP
§ 5.9), which provided:

> No outside organization or group may be
> allowed to conduct religious services or
> religious instruction on school premises after
> school.  However, the use of school premises
> by outside organizations or groups after
> school for the purpose of discussing religious
> material or material which contains a
> religious viewpoint or for distributing such
> material is permissible.

Enjoined SOP § 5.11.

Shortly after receiving Defendants' refusal letter,
Plaintiffs filed the Complaint on September 24, 2001.  On July 3,
2002, in light of the Supreme Court's decision in Good News Club,
I granted Plaintiffs' motion for a preliminary injunction.  I
found the deprivation of Plaintiffs' First Amendment rights to
constitute irreparable harm. 226 F. Supp. 2d at 412.  Turning to
Plaintiffs' likelihood of success on the merits, I found that
Plaintiffs' proposed activities amounted to more than "mere
religious worship" in that they included singing, teaching,
socializing, and eating--"activities benefitting the welfare of
the community, recreational activities and other activities that
are consistent with the defined purposes of the limited public
forum." Id. at 414-15.  I also found that Defendants' argument
that worship is different in kind from other activities was
precluded by Good News Club. Id. at 416.  Even if, arguendo,

---

[2]"Compl." refers to the Complaint filed on Sept. 24, 2001.

there were discernible categories of worship and non-worship, it would be futile to attempt to distinguish "religious content from religious viewpoint where morals, values and the welfare of the community are concerned." Id. at 418. Moreover, "the government may not, consistent with the First Amendment, engage in dissecting speech to determine whether it constitutes worship." Id. at 423. In response to Defendants' claim that their viewpoint discrimination was justified in light of their asserted compelling interest in avoiding an Establishment Clause violation, I held that permitting Plaintiffs to use space in the School would not lead to such a violation because Plaintiffs meet during nonschool hours, the meetings are obviously not endorsed by the School District, and the meetings are "open to all members of the public." Id. at 426.

The Court of Appeals affirmed the preliminary injunction on June 6, 2003, acknowledging "the factual parallels between the activities described in Good News Club and the activities at issue in the present litigation." 331 F.3d 342, 354 (2003) ("Bronx III"). The Court of Appeals

> f[ou]nd no principled basis upon which to
> distinguish the activities set out by the
> Supreme Court in Good News Club from the
> activities that the Bronx Household of Faith
> has proposed for its Sunday meetings at Middle
> School 206B. Like the Good News Club
> meetings, [Plaintiffs intended to] . . .
> combine preaching and teaching with such
> "quintessentially religious" elements as
> prayer, the singing of Christian songs, and
> communion.

9

Id. Because the Board opened its schools for other social, civic, and recreational meetings so long as those uses are non-exclusive and open to the public, the Court found a substantial likelihood that Plaintiffs would be able to demonstrate that Defendants' refusal of Plaintiffs' permit application constitutes unconstitutional viewpoint discrimination. Id. The Court again noted the similarity of the instant facts to those in Good News Club and upheld the finding in Bronx II that Defendants were not justified in refusing Plaintiffs' application because allowing Plaintiffs to conduct their activities in the School would not give rise to an Establishment Clause violation. Id. at 356. The Court of Appeals did not reach the further determination that worship cannot be treated as a distinct activity, noting that this view contradicts the Court's position as expressed in Bronx I and was not explicitly rejected in Good News Club. Id. at 355.

Plaintiffs thereafter applied for, and were granted, permission to use P.S. 15 located at 2195 Andrews Avenue, Bronx, New York ("P.S. 15"), on Sundays from 10:00 a.m. to 2:00 p.m. See Grumet Decl. I, Ex. F.[3] On March 23, 2005, the Board of Education announced its plans to modify Enjoined SOP § 5.11 to read as follows:

> No permit shall be granted for the purpose of holding religious worship services, or otherwise using a school as a house of

_____

[3]"Grumet Decl." refers to the Declaration of Lisa Grumet executed on April 11, 2005.

10

worship. Permits may be granted to religious
clubs for students that are sponsored by
outside organizations and otherwise satisfy
the requirements of this chapter on the same
basis that they are granted to other clubs for
students that are sponsored by outside
organizations.

Pl. Rule 56.1 Stmt. ¶ 53.[4]

To clarify that the revised policy presents an actual
case or controversy, on August 17, 2005, Defendants notified
Plaintiffs that

Plaintiffs' use of P.S. 15 for the Bronx
Household of Faith's regular worship services
is prohibited under the revised section 5.11.
Defendants are not currently enforcing the
revised section 5.11 (or advising the field of
this change) because of the preliminary
injunction Order that was entered in this
case. Should defendants prevail in their
motion for summary judgment and the
preliminary injunction Order be vacated, then
any future application by plaintiffs to hold
their worship services at P.S. 15 or any other
school will be denied.

Letter from Lisa Grumet to Jordan Lorence and Joseph Infranco
(August 17, 2005).

On March 18, 2005, the parties were granted permission to
cross-move for summary judgment, and they have done so. Amicus
briefs were filed by the United States in support of Plaintiffs'
motion and by The Association of the Bar of the City of New York
in support of Defendants' motion. In addition, Agudath Israel of

---

[4]"Pl. Rule 56.1 Stmt." refers to Plaintiffs' Local Rule 56.1
Statement of Material Facts dated April 8, 2005.

11

America previously filed an amicus brief in support of Plaintiffs' position.

Plaintiffs seek to convert the July 2002 preliminary injunction into a permanent injunction by way of their motion for summary judgment and contend that the present SOP § 5.11 (2005) ("Present SOP § 5.11") is unconstitutional in the same manner as was the Enjoined SOP.

Defendants argue that their refusal to rent space to Plaintiffs for Sunday morning meetings does not violate Plaintiffs' First Amendment rights and that, even if such refusal infringes on the First Amendment rights of Plaintiffs, the infringement is necessary so that Defendants can avoid a violation of the Establishment Clause.

## DISCUSSION

### I.    Summary Judgment Standard and Record

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute and that one party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Because summary judgment searches the record, Bayway Ref. Co. v. Oxygenated Mktg & Trading A.G., 215 F.3d 219, 225 (2d Cir. 2000), the affidavits submitted on the preliminary injunction motion also may be considered.  "[A] party opposing a

12

properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). "Factual disputes that are irrelevant or unnecessary" cannot defeat a motion for summary judgment. Id. at 248. All ambiguities must be resolved, and all reasonable inferences drawn, against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1982)). Only if it is apparent that no rational finder of fact "could find in favor of the nonmoving party because the evidence to support its case is so slight" should summary judgment be granted. Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

I note at the outset that despite Defendants' repeated urging that the facts have changed since the preliminary injunction was entered, the record reflects otherwise. The record is larger, but much of the material submitted is speculative, that is, based on what might (or might not) happen in the future. For example, Defendants contend that disclaimers are difficult to enforce and people "who are not part of a congregation may have contact with congregation members . . .," Def. Mem. in Support at 19[5] (emphasis added); "worship in schools

---

[5]"Def. Mem. in Support" refers to Defendants' Memorandum of (continued...)

13

<u>can</u> be highly visible . . .," Def. Mem. in Support at 21

(emphasis added); "community members <u>may</u> hold school officials

responsible for the congregation's actions . . .," Def. Mem. in

Support at 25 (emphasis added). Much of the material in the now-

larger record also is irrelevant to the issues at hand. For

example, at oral argument, Defendants' counsel stated:

> The situation we have here is based on the
> past two to three years. Most of the groups
> that we know have come in after the Second
> Circuit decision, and plaintiffs themselves
> have expressed an interest in having churches
> in all 1,200 of the city's public schools.
> <u>They have talked about the importance of this</u>
> <u>for church planting and for establishing new</u>
> <u>churches</u>.

Tr. 33:24-34:6[6] (emphasis added).

I am unable to appreciate the legal relevance of

Plaintiffs' statements about church planting and establishing

additional churches operating out of schools in the future. Just

as the Supreme Court did in <u>Good News Club</u>, I look past any

labels, <u>see</u> 533 U.S. at 112, n.4 ("Regardless of the label

Justice S[outer] wishes to use, what matters is the substance of

the Club's activities . . . .") and motivations. Instead, I look

to the substance of the Church's activities which, it is

undisputed, consist of: "(1) singing of songs and hymns to honor

---

[5](...continued)
Law in Support of their Motion for Summary Judgment dated April
11, 2005.

[6]"Tr." refers to the transcript of the oral argument held on
August 11, 2005.

14

and praise the Lord Jesus Christ, (2) teaching and preaching from the Bible, (3) sharing of testimonies from people attending the meeting, (4) fellowship and social interaction with others, (5) celebrating the Lord's supper (communion), in which the members share bread and grape juice which reminds them of the body and blood of Christ given to them on the Cross," Pl. Rule 56.1 Stmt. ¶ 44 (citing First Affidavit of Robert Hall, sworn to on December 13, 2001, ¶¶ 3-4 ("First Hall Aff.")), the same activities that were proposed at the preliminary injunction stage. Thus, with the exception of the modification of Enjoined SOP § 5.11, which is discussed below, the record appears to be substantially the same as it was at the preliminary injunction stage. Although not dispositive, I note that the parties concede that there are no material facts in dispute. Tr. 6:12-7:20.

## II.    Free Speech

### A.    The Forum

The first step in analyzing the constitutionality of a state's restriction on private speech in a public forum is to determine the nature of the forum. Good News Club, 533 U.S. at 106 (citing Perry Educ. Ass'n. v. Perry Local Educators' Ass'n., 460 U.S. 37, 44 (1983)). In Bronx I, the Court of Appeals confirmed that the Board had created a limited public forum by restricting access to school buildings to certain speakers and subjects. 127 F.3d at 212, 214. While Plaintiffs argue that the

15

Board has created an open or designated forum, Pl. Br. 18-19,[7]
the Board argues that Plaintiffs are precluded from relitigating
the issue of the type of forum created by the Board, see Def.
Mem. in Support at 4.

Just like the facts regarding Plaintiffs' activities
during their Sunday meetings, the facts supporting the Court's
characterization of the forum opened by the Board as a limited
public forum have not changed.[8] The Board continues to offer
school space for use by student and community groups, permitting
"social, civic and recreational meetings and entertainments, and
other uses pertaining to the welfare of the community, so long as

[7]"Pl. Br." refers to Plaintiffs' Brief in Support of Motion
for Summary Judgment dated April 8, 2005.

[8]Defendants argue that the individual school at issue, here
M.S. 206B that plaintiffs applied to use or P.S. 15 which they
actually use, is the appropriate forum to be considered, not the
School District or the City. E.g., Tr. 14:23; 15:11-12; 22:4-5.
While each school has its own students within a geographic
boundary, the proximity of schools to each other within the City
certainly makes other schools relevant to the present analysis.
Tr. 30:21-23 ("[W]ithin 1.9 miles of P.S. 15 . . . there are 149
schools available."). The policies at issue are the policies of
the Board applicable citywide. Compl. ¶¶ 9, 20. Permits are
applied for and ultimately issued by the Board based on those
citywide policies. Grumet Decl., Ex. F. Also, Defendants do not
seem to suggest that the Board's policy should be litigated on a
school-by-school basis (or that the policy differs from one
school to another) and, indeed, Defendants have submitted
citywide data in support of their motion in addition to anecdotal
data relating to schools other than P.S. 15. While consideration
of evidence relating to individual schools, including but not
limited to M.S. 206B and P.S. 15, is appropriate, cabining
consideration only to a single school is not appropriate. Thus,
I also have considered citywide evidence. Whether limited to
evidence as to M.S. 206B or P.S. 15 or expanded to evidence of
citywide statistics, there is no question that the forum opened
by the Board is a limited public forum.

16

these uses are non-exclusive and open to the public." <u>Bronx III</u>,
331 F.3d at 354; <u>see</u> SOP 5.6.2.  Accordingly, there is no reason
to depart from the prior holding that the Board has established a
limited public forum.

### B.  Viewpoint Discrimination

It is well established that in a limited public forum
such as that presented here, the Board may not impose
restrictions on private speech that discriminate on the basis of
viewpoint. <u>Good News Club</u>, 533 U.S. at 106-07 (citing <u>Rosenberger
v. Rector & Visitors of Univ. of Va.</u>, 515 U.S. 819, 829 (1995)).
Defendants' pertinacious argument that Present SOP § 5.11 (and
Defendants' prior exclusion of Plaintiffs pursuant to Enjoined
SOP § 5.11) does not amount to unconstitutional viewpoint
discrimination is astonishing in light of the Supreme Court's
clear holding in <u>Good News Club</u>. 533 U.S. at 112 ("[S]peech
discussing otherwise permissible subjects cannot be excluded from
a limited public forum on the ground that the subject is
discussed from a religious viewpoint.").  The Court squarely held
that "teach[ing] moral lessons from a Christian perspective
through live storytelling and prayer," <u>id.</u> at 110, characterized
by the Court of Appeals as "quintessentially religious," 202 F.3d
at 510, and by Justice Souter as "an evangelical service of
worship," 533 U.S. at 138 (Souter, J., dissenting), also may
constitute "the teaching of morals and character development from
a particular viewpoint," <u>id.</u> at 111.  The Supreme Court in <u>Good
News Club</u> expressly found that "the Club's activities do not

constitute mere religious worship, divorced from any teaching of
moral values." Id. at 112 n.4. Thus, the Supreme Court
"conclude[d] that Milford's exclusion of the Club from use of the
school . . . constitutes impermissible viewpoint discrimination."
Id. at 112. In Bronx III, the Court of Appeals "f[ou]nd no
principled basis upon which to distinguish the activities set out
by the Supreme Court in Good News Club from the activities that
the Bronx Household of Faith has proposed for its Sunday meetings
at Middle School 206B," Bronx III, 331 F.3d at 354,[9] and, as

---

[9]The Court of Appeals' discussion on this topic in Bronx III
is as follows:

> We find no principled basis upon which to
> distinguish the activities set out by the
> Supreme Court in Good News Club from the
> activities that the Bronx Household of Faith
> has proposed for its Sunday meetings at Middle
> School 206B. Like the Good News Club
> meetings, the Sunday morning meetings of the
> church combine preaching and teaching with
> such "quintessentially religious" elements as
> prayer, the singing of Christian songs, and
> communion. The church's Sunday morning
> meetings also encompass secular elements, for
> instance, a fellowship meal during which
> church members may talk about their problems
> and needs. On these facts, it cannot be said
> that the meetings of the Bronx Household of
> Faith constitute only religious worship,
> separate and apart from any teaching of moral
> values. 533 U.S. at 112 n.4.
>
> Because the Board of Education has authorized
> other groups, like scout groups, to undertake
> the teaching of morals and character
> development on school premises, there is a
> substantial likelihood that plaintiffs would
> be able to demonstrate that the Board cannot
> exclude, under Supreme Court precedent, the
> church from school premises on the ground that
> the church approaches the same subject from a

(continued...)

18

noted above, the activities proposed are the activities actually undertaken. The Sunday activities of the Church do not fall within a separate category of speech, are not "mere religious worship," 533 U.S. at 112 n.4, and, accordingly, may not constitutionally be prohibited from the limited public forum the Board has established.

Defendants argue that I should define the nature of the expression engaged in by the Bronx Household on Sundays not based on the descriptions of the substance of the activities in the record but by relying on the Church members' characterization of their activities as "services." Def. Mem. in Support at 10.  As I held at the preliminary injunction stage, this argument is precluded by Good News Club. Bronx II, 226 F. Supp. 2d at 416. The majority in Good News Club responded to Justice Souter's characterization of the Club's activities as "an evangelical service of worship" by saying:  "Regardless of the label Justice S[outer] wishes to use, what matters is the substance of the Club's activities, which we conclude are materially

---

⁹(...continued)

> religious viewpoint.    Additionally,   the defendants' school building use policy permits social, civic and recreational meetings and entertainments, and other uses pertaining to the welfare of the community, so long as these uses are non-exclusive and open to the public. Therefore, there is a substantial likelihood that plaintiffs would be able to demonstrate that the defendants cannot bar the church's proposed activities without engaging in unconstitutional viewpoint discrimination.

Bronx III, 331 F.3d at 354.

indistinguishable from the activities in Lamb's Chapel and Rosenberger." Good News Club, 533 U.S. at 112 n.4. Accordingly, Defendants' evidence regarding labels applied to Plaintiffs' activities is irrelevant. As noted above, the substance of the Church's activities remains the same as it was at the preliminary injunction phase: singing songs and hymns; teaching from the Bible; sharing testimonies from people in attendance; socializing; eating; engaging in prayer; and communion. Bronx II, 226 F. Supp. 2d at 414; Pl. Rule 56.1 Stmt. ¶ 44; First Hall Aff. ¶¶ 3-4. The record is clear that Plaintiffs are not engaged in "mere religious worship, divorced from any teaching of moral values." See Good News Club, 533 U.S. at 112 n.4. Accordingly, I cannot adopt a conclusion contrary to that reached in Good News Club and Bronx III, viz., Plaintiffs seek to continue using the School to engage in activities that, while in part quintessentially religious, amount to the teaching of moral values from a religious viewpoint. Defendants' discrimination against Plaintiffs on the basis of this religious viewpoint is, therefore, a violation of Plaintiffs' First Amendment rights.

III.    The Establishment Clause

        Defendants attempt to excuse their viewpoint discrimination by arguing that it is necessary to avoid the kind of excessive entanglement that violates the Establishment Clause. See Def. Mem. in Support at 23; Tr. 11:23-12:5. However, the Establishment Clause is not violated where the policy at issue

20

has a secular purpose, and does not, in its principal or primary effect, advance or inhibit religion or foster an excessive government entanglement with religion. Widmar v. Vincent, 454 U.S. 263, 271 (1981) (citing Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971)).

A.    Secular Purpose

The policies of the Board regulating the use of school space are set out in its SOPs and are clearly secular in purpose. SOP § 5.3 provides:  "The primary use of school premises must be for Board of Education programs and activities." Grumet Decl., Ex. A.[10]  Similarly, SOP § 5.5 provides:  "After Board of Education programs and activities, preference will be given to use of school premises for community, youth and adult group activities." Grumet Decl., Ex. A.  SOP § 5.6.2 allows school premises to be used "[f]or holding social, civic and recreational meetings and entertainments, and other uses pertaining to the welfare of the community; but such uses shall be non-exclusive and open to the general public." Grumet Decl., Ex. A.

The policies are neutral toward religion.  The object of the Board quite clearly is to provide a forum for Board programs and activities and for students and community members to engage in a variety of social, civic, recreational, and entertainment activities and "other uses pertaining to the welfare of the

---

[10]"Grumet Decl." refers to the Declaration of Lisa Grumet, dated April 11, 2005, in support of Defendants' motion for summary judgment.

21

community." SOP § 5.6.2. The policies of the Board are, by any reading, secular in their purpose.

B.    Primary or Principal Effect

The primary or principal effect of allowing the Church to meet in P.S. 15 is ascertained by asking "whether an objective observer, acquainted with the text, legislative history, and implementation of the [SOP allowing community groups to use the School], would perceive it as a state endorsement of" religion. Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 308 (2000). Similar to the concept of the reasonable person in tort law, the reasonable observer spoken of frequently by Justice O'Connor in this context must be deemed "aware of the history and context of the community and forum" and must "recognize the distinction between speech the government supports and speech that it merely allows in a place that traditionally has been open to a range of private speakers." Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 780, 782 (1995) (O'Connor, J., concurring); see also Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 65 (2004) ("the relevant viewpoint is that of a reasonable observer, fully cognizant of the history, ubiquity, and context of the practice in question") (O'Connor, J., concurring); Elewski v. City of Syracuse, 123 F.3d 51, 54 (2d Cir. 1997). The Supreme Court has recently cautioned that "the world is not made brand new every morning." McCreary County, Ky. v. ACLU of Ky., 125 S. Ct. 2722, 2736 (2005). "[R]easonable observers have reasonable memories, and [the Court's] precedents

22

sensibly forbid an observer 'to turn a blind eye to the context in which [the Church's use of the School] arose.'" Id. at 2737 (quoting Santa Fe, 530 U.S. at 315).

Here, a reasonable observer of Plaintiffs' activities would observe the following undisputed facts:

1.   the School space is offered to all student and community groups only when regular classes are not in session;

2.   after giving preference to "Board of Education programs and activities," the School is available for "community, youth and adult group activities" on a first-come first-served basis, SOP § 5.5; see Def. Reply Mem. at 2 n.2;

3.   the Plaintiffs' activities take place only on Sunday mornings when classes are not in session;

4.   not only does the Board not endorse Plaintiffs' activities, but it has actively opposed them for close to a decade;

5.   employees of the School do not attend Plaintiffs' activities in their official capacities;[11]

6.   like other groups using the School, Plaintiffs engage in ritual, storytelling, teaching of character and morals, eating, socializing, recreation and "other uses

---

[11]Although Defendants note that a parent from P.S. 89 is the main Pastor at Mosaic, a church that meets in P.S. 89, there is no indication that he does so in any capacity other than as a member of the community, viz., not in any official, Board of Education capacity, see Declaration of Thomas Goodkind dated April 15, 2005 ("Goodkind Decl."), and there is no evidence suggesting that any special attention is drawn to the coincidental connection.

23

pertaining to the welfare of the community," SOP § 5.6.2; Bronx II, 226 F. Supp. 2d at 414;

7.     Plaintiffs' meetings are non-exclusive and open to the public; and

8.     Defendants require groups using schools to include on all public notices and other materials that mention the school's name or address a disclaimer noting that the activity is not sponsored by the Board and that the views of the sponsoring organization do not necessarily reflect those of the Board, Farina Decl. ¶ 20 and Ex. A.[12]

See also Bronx II, 226 F. Supp. 2d at 425-26 (similar findings at the preliminary injunction stage). On these undisputed facts, the reasonable observer would conclude that Plaintiffs' meetings constitute speech that the Board merely allows, under protest, in a forum where other groups engage in similar speech and that the principal effect is neutrality toward religion. Allowing Plaintiffs' speech does not advance or inhibit religion but merely allows it on the same neutral basis as similar speech in the same forum.

Defendants have argued that their policies respond to the complaints about Plaintiffs' speech from members of the public. The Supreme Court has ruled, however, that the government may not use the opposition of listeners--the "heckler's veto"--to silence unpopular speakers or to exclude them from a forum. "Listeners'

[12]"Farina Decl." refers to the Declaration of Carmen Farina dated April 7, 2005.

24

reaction to speech is not a content-neutral basis for regulation.
Speech cannot be financially burdened, any more than it can be
punished or banned, simply because it might offend a hostile
mob." Forsyth County, Ga. v. Nationalist Movement, 505 U.S. 123,
134-35 (1992) (citations omitted). Indeed, it is the unpopular
speech that generally needs protection, not popular speech. See,
e.g., Child Evangelism Fellowship of New Jersey, Inc. v. Stafford
Twp. Sch. Dist., 386 F.3d 514, 527 (3d Cir. 2004) ("To exclude a
group simply because it is controversial or divisive is viewpoint
discrimination. A group is controversial or divisive because
some take issue with its viewpoint.") (Alito, J.)).

        The Supreme Court also rejected the "heckler's veto" to
censor private religious speakers from a forum where supposedly
impressionable youth are present, writing:  "We decline to employ
Establishment Clause jurisprudence using a modified heckler's
veto, in which a group's religious activity can be proscribed on
the basis of what the youngest members of the audience might
misperceive." Good News Club, 533 U.S. at 119 (citing Capitol
Square, 515 U.S. at 779-80) (emphasis added). Despite this clear
authority, Defendants contend that the child who happens to be at
or near P.S. 15 on a Sunday when the Church is using space in
that school is the reasonable observer whose assessment is
relevant to the Establishment Clause analysis. See, e.g.,
Goodkind Decl. at 3.[13]  This argument is squarely precluded by

_____

[13]"I know from conversations I have had with my younger
(continued...)

25

the Supreme Court's holding in Good News Club, 533 U.S. at 119, and its prior discussions of the reasonable observer, see, e.g., Capitol Square, 515 U.S. at 765 ("erroneous conclusions do not count").

Defendants also rely on an incident where children on their lunch period entered the public park across the street from M.S. 51 and received hot chocolate from members of the Sovereign Grace City Church who had set up a tent in the park and who handed the children pamphlets and informed them that their church "meets in your school." Tr. 9:11-19; see Declaration of Gail Rosenberg dated April 7, 2005 ("Rosenberg Decl."). This encounter is irrelevant; the speech of adults in a public park directed toward children in a public park has no bearing on the School Board's alleged endorsement of religion. In any event, those expressing their discomfort at that church's meeting in M.S. 51 are not the reasonable observers contemplated by the Supreme Court but rather uninformed observers whose "erroneous conclusions do not count." Capitol Square, 515 U.S. at 765; see, e.g., Rosenberg Decl. & Declaration of Daniel R. Schaffer dated March 25, 2005. In any event, "even if [I] were to inquire into

---

[13](...continued)
daughter that she associates Mosaic [a church that meets in P.S. 89,] with P.S. 89, and is confused by the relationship between the Church and the School. The main Pastor at Mosaic is a parent at P.S. 89, who my daughter has seen in the School and at School events as a parent. For her, it is unclear where her School ends and the Church begins. I also know from my conversations with her that, in addition to being confused, she feels uncomfortable about the relationship between the Church and the School because my family does not share the Church's religious beliefs."

the minds of schoolchildren in this case, [I] cannot say the danger that children would misperceive the endorsement of religion is any greater than the danger that they would perceive a hostility toward the religious viewpoint if the [Church] were excluded from the public forum." Good News Club, 533 U.S. at 118.

Defendants make much of the fact that the schools are otherwise occupied with regular classes and student activities on Fridays and school-related groups on Saturdays, rendering them generally unavailable for religious groups that hold services or religious instruction on Fridays and Saturdays. For example, at oral argument Defendants cited an incident where "a Jewish group that requested to use a Brooklyn high school for services on Saturday was denied permission because of the school's Saturday academic programs," Tr. 8:4; 8:20-22, as evidence that the forum is not equally open for other religious groups. This argument is without merit.

First, the Establishment Clause "mandates governmental neutrality between religion and religion, and between religion and nonreligion." McCreary, 125 S. Ct. at 2733 (quoting Epperson v. Arkansas, 393 U.S. 97, 104 (1968)). Here, the Board's application process is neutral toward religious and secular groups; that the Church takes advantage of the neutral benefit program to use P.S. 15 on Sundays and that P.S. 15 is unavailable for use on most Fridays and Saturdays is incidental. See Zelman v. Simmons-Harris, 536 U.S. 639, 655, 658 (2002) (that 46 of 56

private schools participating in voucher programs were religious
and 96% of voucher students were attending religious schools did
not render neutral program unconstitutional). Second, where a
school is a limited public forum "available for use by groups
presenting any viewpoint," there is no Establishment Clause
violation merely because only groups with religious viewpoints
have sought to use the forum. Good News Club, 533 U.S. at 119
n.9. "[I]t does not follow that a statute violates the
Establishment Clause because it 'happens to coincide or harmonize
with the tenets of some or all religions.'" Harris v. McRae, 448
U.S. 297, 319 (1980) (citing McGowan v. Maryland, 366 U.S. 420,
442 (1961)).

At oral argument, Defendants emphasized the concern
raised by Justice O'Connor in Capitol Square that a forum may
become so dominated by a private religious group "that a formal
policy of equal access is transformed into a demonstration of
approval." Capitol Square, 515 U.S. at 777 (O'Connor, J.,
concurring) (citing Widmar, 454 U.S. at 275). Here, however, as
noted above, Defendants have not identified any evidence of such
domination--either in P.S. 15, in the School District, or in the
City. Indeed, according to the Board, Def. Mem. in Opp. at
16,[14] 9,804 non-government, non-construction contractor permits
were issued for use of school property in the 2003-2004 school

---

[14]"Def. Mem. in Opp." refers to Defendants' Memorandum of Law
in Opposition to Plaintiffs' Motion for Summary Judgment and in
Further Support of their Motion for Summary Judgment dated May
10, 2005.

year. By comparison, in the 2004-2005 school year, approximately "23 congregations held regular worship services in public schools." Def. 56.1 Stmt. ¶ 57.[15] Only 13 congregations have held services in a school for more than one year, and three, including Bronx Household, have held worship services for more than two years on Sundays. Def. 56.1 Stmt. ¶ 58. In comparison, as of February 2005 for the 2004-2005 school year, "school-sponsored" activities occur in approximately 300 school buildings on Sundays, 450 buildings on Friday nights, and 800 school buildings on Saturdays. Def. 56.1 Stmt. ¶ 7. By any measure, the data reflecting the use by religious congregations of schools cannot be deemed dominant in the Capitol Square sense. And even if a religious organization such as Bronx Household were, under some measure, considered the "dominant" user numerically, the later Zelman case suggests that that is "irrelevant" to establishing a First Amendment violation. See Zelman, 536 U.S. at 658 ("we have recently found it irrelevant even to the constitutionality of a direct aid program that a vast majority of program benefits went to religious schools") (citing Agostini v. Felton, 521 U.S. 203, 229 (1997)).

It is of no moment that organizations serving children may meet on school premises at the same time as the Church and that some children might thereby become aware of the religious nature of the Church's activities. See Good News Club, 533 U.S. at 115

---

[15]"Def. 56.1 Stmt." refers to Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts dated April 11, 2005.

29

("[W]e have never extended our Establishment Clause jurisprudence to foreclose private religious conduct during nonschool hours merely because it takes place on school premises where elementary school children may be present."). As noted above, the Supreme Court has proscribed the use of a "modified heckler's veto" to exclude religious speech from a public forum based on the perceptions of the youngest audience members. See Good News Club, 533 U.S. at 119. Thus, the Board may not engage in unconstitutional viewpoint discrimination to avoid the difficulty perceived by the Board that might arise when private speakers in a limited public forum espouse views and engage in religious activities that engender discomfort among other members of the community, either children or adults. "Dealing with misunderstandings--here, educating the students in the meaning of the Constitution and the distinction between private speech and public endorsement--is . . . what schools are for." Hedges v. Wauconda Cmty. Unit Sch. Dist. No. 118, 9 F.3d 1295, 1299 (7th Cir. 1993).

It appeared at oral argument that some of Defendants' Establishment Clause concerns stem not from the fact that churches meet in schools but from the manner in which some churches communicate the fact of their meeting to the community or from modifications made by churches to school buildings. Examples of the problems Defendants identified at oral argument include: at a PTA event in 2003, a church came and distributed church literature and balloons, which had crosses on them, to the

children in attendance; a church advertises its services by distributing postcards, posting signs by the school, and mass mailing. Tr. 10:1-18; compare Declaration of Francis Rabinowitz dated March 29, 2005, Ex. A (postcard advertising Sovereign Grace City Church (without disclaimer)), and Declaration of Veronica Najjar dated April 11, 2005, Ex. B and ¶ 5 (banner in front of P.S. 89 announcing "Mosaic Manhattan [the Church] meets here"), with Declaration of William Fraenkel, Esq., dated April 11, 2005, Ex. A (postcard advertising Community Christian Church (with disclaimer: "This activity is not sponsored nor [sic] endorsed by the New York City Department of Education. The views and opinions expressed by the sponsoring organization do not necessarily state or reflect those of the New York City Department of Education"));[16] see also Declaration of Sandy Brawer dated April 6, 2005, ¶¶ 2, 4 (regarding allegation that Christ Tabernacle Church had installed a satellite dish on the roof of Bushwick High School without obtaining approval and had requested permission to install a T-1 line--a high-speed internet connection--within the school).

In each of these situations, however, any appearance of endorsement can be minimized with neutral time, place, and manner restrictions, for example, regulating use of banners or signs

---

[16]As set out in the Farina Decl. ¶ 20 and Ex. A, the Board "requires that outside organizations include with materials that mention the school's name a disclaimer that states that [the Department of Education] does not sponsor or endorse the organization's activities."

outside of the school, requiring Board permission for permanent installation of equipment or alteration of buildings, or enforcing disclaimer requirements. After all, government "may impose reasonable, content-neutral time, place, or manner restrictions . . ., but it may regulate expressive content only if such a restriction is necessary, and narrowly drawn, to serve a compelling state interest." Capitol Square, 515 U.S. at 761.

In sum, on this record, the undisputed facts demonstrate that permitting the Church to meet in P.S. 89 neither advances nor inhibits religion.

## C. Excessive Entanglement

Finally, because SOP § 5.11 requires the Board to identify "religious services" (Enjoined SOP § 5.11) or "religious worship services" (Present SOP § 5.11), the Board's policy fosters an excessive government entanglement with religion. Just as the dissent did in Widmar, Defendants' policies "seem[] to attempt a distinction between the kinds of religious speech explicitly protected by [the Supreme Court's] cases and a new class of religious 'speech [acts]' constituting 'worship.'" Widmar, 454 U.S. at 270 n.6 (citation omitted). The Widmar Court explicitly rejected that distinction, concluding that there is no "intelligible content" or other basis to determine when "'singing hymns, reading scripture, and teaching biblical principles,' cease to be 'singing, teaching, and reading,'--all apparently forms of 'speech,' despite their religious subject matter--and become unprotected 'worship.'" Id. (citation omitted). "The fact

32

is that the line which separates the secular from the sectarian in American life is elusive." Sch. Dist. of Abington Twp., Pa. v. Schempp, 374 U.S. 203, 231 (1963) (Brennan, J., concurring). No litmus test can be applied to determine when worship ends and when religious teaching or instruction begins. And the Supreme Court expressly has "not excluded from free-speech protections . . . acts of worship." Capitol Square, 515 U.S. at 760. Thus, the distinction Defendants seek to make in both Enjoined and Present SOP § 5.11 between constitutionally protected speech relating to religion and a separate, different-in-kind category of unprotected speech or speech acts called "worship" has been expressly rejected by the Supreme Court.

Even if the Board (and, inevitably, the courts) were competent to parse through hymns, verses, teaching, and ritual to separate "mere worship" from the teaching of character and morals, doing so would require government actors to scrutinize and dissect religious practice and doctrine, leading to a level of government involvement in religious matters that offends the First Amendment principles Defendants supposedly seek to honor. In Widmar, after observing that the distinction between religious worship and protected religious speech lacked "intelligible content," the Court stated that even were such a distinction possible, it would violate the non-entanglement prong of the Establishment Clause:

> Merely to draw the distinction would require the university--and ultimately the courts--to inquire into the significance of words and

practices to different religious faiths, and
in varying circumstances by the same faith.
Such inquiries would tend inevitably to
entangle the State with religion in a manner
forbidden by our cases.

454 U.S. at 270 n.6; see also Good News Club, 533 U.S. at 127

(Scalia, J., concurring) (even if "courts (and other government

officials) were competent, applying the distinction would require

state monitoring of private, religious speech with a degree of

pervasiveness that we have previously found unacceptable")

(citing Rosenberger, 515 U.S. at 844-46).[17] As Justice Souter

explained in his concurring opinion in Lee v. Weisman, "I can

hardly imagine a subject less amenable to the competence of the

federal judiciary, or more deliberately to be avoided where

possible" than "comparative theology." 505 U.S. 577, 616-17

(1992) (Souter, J., concurring).

---

[17]In Rosenberger, the Court concluded that the University's
denial of funding for a student-run Christian public policy
magazine constituted viewpoint discrimination. The Court held
that government actors' parsing religious expression implicated
both the Free Speech Clause and the Establishment Clause:

> [t]he viewpoint discrimination inherent in the
> University's regulation required public
> officials to scan and interpret student
> publications to discern their underlying
> philosophic assumptions respecting religious
> theory and belief. That course of action was
> a denial of the right of free speech and would
> risk fostering a pervasive bias or hostility
> to religion, which could undermine the very
> neutrality the Establishment Clause requires.

515 U.S. at 845-46.

Here, the Board's SOP § 5.11, both Enjoined and Present, requires it to distinguish "religious services" (Enjoined SOP § 5.11) and "religious worship services" (Present SOP § 5.11) from the teaching of character and morals from a religious viewpoint as described in Good News Club. Undertaking that distinction would entangle state actors with religion by requiring them "to dissect and categorize the substance of plaintiffs' speech during their four-hour meeting and determine, inter alia, 'when "singing hymns, reading scripture, and teaching biblical principles" cease to be "singing, teaching, and reading" . . . and become unprotected "worship."'" Bronx II, 226 F. Supp. 2d at 424 (quoting Widmar, 454 U.S. at 270 n.6); see Walz v. Tax Comm'n of the City of New York, 397 U.S. 664, 675 (1970) (excessive entanglement may result when the involvement between government and religion "is a continuing one calling for official and continuing surveillance"). Such excessive entanglement is offensive to the Constitution.

## IV.   The New Policy

As noted above, the Board adopted its Present SOP § 5.11:

> No permit shall be granted for the purpose of holding religious worship services, or otherwise using a school as a house of worship. Permits may be granted to religious clubs for students that are sponsored by outside organizations and otherwise satisfy the requirements of this chapter on the same basis that they are granted to other clubs for students that are sponsored by outside organizations.

Pl. Rule 56.1 Stmt. ¶ 53. The Board is quite candid in acknowledging its intent to "reinstitute a policy that would prevent any congregation from using a public school for its worship services." Def. Mem. in Support at 8. Recognizing the holding of Good News Club, based as it was on a similar policy grounded on the same state statute upon which the Board's SOPs are based, Good News Club, 533 U.S. at 102 (school board policy based on N.Y. Educ. Law § 414 (McKinney 2000) and providing that district residents may use the school for, inter alia, "'social, civic and recreational meetings and entertainment events, and other uses pertaining to the welfare of the community'"), the Board's Present SOP § 5.11 expressly permits religious clubs for students. The Board argues that the distinction the Present SOP § 5.11 seeks to draw between student religious speech and non-student religious speech is permitted based on the identity of the speaker, citing Widmar. Def. Mem. in Support at 9; Def. Mem. in Opp. at 5-10.[18] At oral argument, counsel for the Board acknowledged that the policy was clarified "in order to make clear that we are--we are complying with the Good News Club

---

[18]Defendants imply that groups like Plaintiffs' might crowd out other activities, e.g., "If [P]laintiffs' reasoning should become law, school officials would have no ability to reserve school space for, or give preference to, after school programs for children attending the school." Def. Mem. in Opp. at 5. First, there is no evidence in the record of the activities of groups like Plaintiffs' crowding out other activities. Second, the remedy for such crowding out, were it to occur, is not to ban speech from a religious viewpoint but to amend the SOPs to create a neutral distinction based on the speaker, e.g., Board activities given first preference, student activities next, community activities next, etc.

36

decision." Tr. 66:2-3. When asked whether the policy reflects the facts of Good News Club but not the principles, counsel responded, "We think that this is consistent with the principle of the Good News Club, which is that when you have different student groups, as you have in the Good News Club, that are meeting, that you need to allow religious student groups also. We think that this is something different." Tr. 66:6-10. This approach suffers from several infirmities.

First, the Board has already distinguished between and among speakers. As set out in Bronx II, SOP § 5.3 provides that "[t]he primary use of school premises must be for Board of Education programs and activities." 226 F. Supp. 2d at 409. SOP § 5.5 then provides that "[a]fter Board of Education programs and activities, preference will be given to use of school premises for community, youth and adult group activities." Id. There is no separate category for "student" activities. Thus, the neutral Board policy already provides for preference to Board of Education programs and activities followed by community, youth and adult group activities. The Board's Present SOP § 5.11 permits "religious clubs for students that are sponsored by outside organizations," that is, non-Board of Education programs and activities, but prohibits "holding worship services" or using a school as a "house of worship," presumably events also involving community speakers. Under SOP §§ 5.3 and 5.5, however, these non-Board of Education activities are at the same level of priority, viz., behind Board of Education-sponsored programs and

37

activities. Thus, the Present SOP, as explained by Defendants, is inconsistent with SOP §§ 5.3 and 5.5.

Second, the principles of Good News Club instruct that if community groups teach character and morals or engage in other social, educational, or recreational activities for the benefit of the community, other community groups like Plaintiffs must be permitted to do so from a religious perspective. The new policy, as interpreted by Defendants, would not do so, but instead would treat Plaintiffs' speech differently from similar speech of other community groups based on religious perspective and thus is inconsistent with Good News Club.

Third, just as in McCreary, 125 S. Ct. at 2722, a reasonable observer cognizant of the history of this matter would recognize the Board's new policy as a post hoc attempt to avoid the prior holdings in this case and the holding in Good News Club. Having not "turn[ed] a blind eye to the context in which [the Board's Enjoined SOP § 5.11] arose," McCreary, 125 S. Ct. at 2737, the reasonable observer would recognize that the Board's new policy attempts, yet again, to prohibit the teaching of character and morals from a religious viewpoint, clearly a government attempt to prefer nonreligion over religion, id. at 2733 ("The touchstone for our analysis is the principle that the 'First Amendment mandates governmental neutrality between . . . religion and nonreligion.'").

Finally, even if the Board were permitted to distinguish among speakers in the manner Defendants interpret Present SOP

§ 5.11 to require, the activities at issue here may not be prohibited because they are not "mere religious worship, divorced from any teaching of moral values." See Good News Club, 533 U.S. at 112.

Accordingly, I find unconstitutional the enforcement of Present SOP § 5.11 to bar Plaintiffs from holding Sunday morning meetings that include worship in P.S. 15 or any other New York City public school.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment [dkt. no. 41] is granted, and Defendants' cross-motion [dkt. no. 45] is denied. Defendants are permanently enjoined from enforcing Present SOP § 5.11 so as to exclude Plaintiffs or any other similarly situated individual from otherwise permissible after-school and weekend use of a New York City public school. Counsel shall confer and submit a proposed order.

SO ORDERED:

Dated:   New York, New York
         November 16, 2005

_Loretta A. Preska_
LORETTA A. PRESKA, U.S.D.J.