UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
THE BRONX HOUSEHOLD OF FAITH,    :      01 Civ. 8598 (LAP)
ROBERT HALL, and JACK ROBERTS,   :
                            :
             Plaintiffs,  :      OPINION AND ORDER
                            :
     -against-           :
                            :
BOARD OF EDUCATION OF THE CITY OF :
NEW YORK and COMMUNITY SCHOOL     :
DISTRICT NO. 10,             :
                            :
           Defendants.    :
-----------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/24/12

LORETTA A. PRESKA, Chief United States District Judge:

       The Bronx Household of Faith, Robert Hall, and Jack
Roberts ("Plaintiffs") are once again before this Court seeking
a preliminary injunction against the Board of Education of the
City of New York (the "Board")[1] and Community School District No.
10 (collectively, "Defendants") so that Plaintiffs' Church may
continue to hold Sunday religious worship services in a New York
City public school, as it has done without interruption since
this Court issued an initial preliminary injunction in 2002
barring Defendants from enforcing a regulation that would
prohibit Plaintiffs from conducting their religious worship
services in the Board's schools.  In November 2007, this Court
made the preliminary injunction permanent and granted

---

[1] Not so far into this litigation the Board of Education was
renamed the Department of Education.  While this opinion remains
faithful to the captioned name, references to the Board should
be treated as synonymous with the Department of Education.

Plaintiffs' motion for summary judgment.  On June 2, 2011, the

Court of Appeals reversed summary judgment and vacated the

permanent injunction.  After the Supreme Court denied

Plaintiffs' petition for certiorari, the Court of Appeals issued

its mandate on December 7, 2011.  For the reasons stated below,

Plaintiffs' latest request for a preliminary injunction is

GRANTED.[2]

---

[2] The Court has considered the following submissions in
connection with Plaintiffs' motion: Memorandum of Law in Support
of Motion for Preliminary Injunction; Defendant's Memorandum of
Law in Opposition to Plaintiffs' Motion for Preliminary
Injunction; Reply Brief in Support of Plaintiffs' Motion for
Preliminary Injunction; Defendants' Sur-Reply Memorandum;
Declaration of Robert G. Hall, Co-Pastor of the Bronx Household
of Faith, in Support of Plaintiffs' Motion for Preliminary
Injunction, dated February 2, 2012 ("Hall Decl."); Declaration
of Christopher F. Dito, Pastor of International Christian Center
South, in Support of Plaintiffs' Motion for Preliminary
Injunction, dated February 2, 2012; Declaration of Caleb Clardy,
Pastor of Trinity Grace Church, in Support of Plaintiffs' Motion
for Preliminary Injunction, dated February 3, 2012; Declaration
of Bo Han, Board Member of New Frontier Church, in Support of
Plaintiffs' Motion for Preliminary Injunction, dated February 3,
2012; Declaration of Brad Hertzog, Pastor of Reformation
Presbyterian Church, in Support of Plaintiffs' Motion for
Preliminary Injunction, dated February 15, 2012 ("Hertzog
Decl."); Declaration of Jonathan Pines in Opposition to Motion
for Preliminary Injunction, dated February 10, 2012; and
Declaration of Jonathan Pines in Opposition to Plaintiffs'
Notice of Filing of Supplemental Evidence, dated February 16,
2012.

I.   <u>BACKGROUND</u>[3]

The Bronx Household of Faith (the "Church") is a 37-year-old, "community-based" Christian church with approximately 85-100 congregants.  (Hall Decl. ¶¶ 3, 6.)  The Church has used the school auditorium in P.S. 15 in the Bronx, New York, on a weekly basis since 2002 for purposes of holding its Sunday worship services.  (<u>Id.</u> ¶¶ 3, 5.)  Defendants granted the Church permission to worship in P.S. 15 following this Court's July 3, 2002 order[4] enjoining Defendants from enforcing the Board's Standard Operating Procedure section 5.11 ("SOP § 5.11") so as to deny Plaintiffs' application or the application of any similarly-situated individual or entity to rent space in the Board's public schools for morning meetings that include religious worship.  At the time this Court issued the preliminary injunction in 2002, SOP § 5.11 provided:

> No outside organization or group may be
> allowed to conduct religious services or
> religious instruction on school premises
> after school.  However, the use of school
> premises by outside organizations or groups

---

[3] The history of this litigation, which dates back to 1995, has been recounted multiple times throughout the case's multiple movements between this Court and the Court of Appeals.  Only those facts most pertinent to Plaintiffs' immediate request for relief are recited here.  For a more in-depth recitation of the facts surrounding this litigation, see this Court's earlier opinions.  400 F. Supp. 2d 581, 585-89 (S.D.N.Y. 2005) ("<u>Bronx II</u>"); 226 F. Supp. 2d 401, 403-11 (S.D.N.Y. 2002) ("<u>Bronx I</u>").

[4] The July 3, 2002 order was issued pursuant to this Court's June 26, 2002 opinion in <u>Bronx I</u>.

>           after school for the purpose of discussing
>           religious material or material which
>           contains a religious viewpoint or for
>           distributing such material is permissible.

Bronx II, 400 F. Supp. 2d at 587.

This Court found that, in light of the Supreme Court's

decision in Good News Club v. Milford Central School, 533 U.S.

98 (2001), Plaintiffs demonstrated a substantial likelihood of

success in showing that this particular iteration of SOP § 5.11

violated their First Amendment free speech rights.[5]  Bronx I, 226

F. Supp. 2d at 413-15.  After Good News Club, a school that

opens its doors as a limited public forum may not prevent an

organization from conducting activities in the school that are

consistent with the defined purposes of the forum merely because

those activities may be characterized as "quintessentially

religious," such as Bible study or prayer.  See Good News Club,

533 U.S. at 107-12.  Because the Board opened its schools'

doors, inter alia, for the purposes of "holding social, civic

and recreational meetings and entertainment, and other uses

pertaining to the welfare of the community" so long as "such

uses [are] non-exclusive and open to the general public," Bronx

---

[5] Prior to Good News Club's being on the books, this Court
dismissed Plaintiffs' original complaint in the first phase of
this litigation.  The Court of Appeals affirmed.  See Bronx
Household of Faith v. Cmty. Sch. Dist. No. 10, 127 F.3d 207 (2d
Cir. 1997) ("Bronx Appeal I"), cert. denied, 523 U.S. 1074
(1998).  After Good News Club came down, Plaintiffs re-filed
their complaint, and so began the second phase of the
litigation.

I, 226 F. Supp. 2d at 409, and because the Church's proposed uses on Sunday mornings—which included singing, Bible instruction, and prayer—were consistent with these defined purposes, this Court found the Board's excluding Plaintiffs from its schools likely would violate Plaintiffs' free speech rights. Id. at 413-15; see also id. at 422 ("I find it impossible to distinguish between, on one hand, activities proposed by the plaintiffs that are within the activities expressly permitted in this forum, viz., discussing religious material or material which contains a religious viewpoint and activities contributing to the welfare of the community and, on the other hand, an activity different in kind called worship."). The Court of Appeals affirmed the preliminary injunction but declined to review this Court's determination that Good News Club precludes meaningfully drawing a distinction between worship and other types of religious speech. See 331 F.3d 342, 353-55 (2d Cir. 2003) ("Bronx Appeal II").

In March 2005, the Board announced it planned to modify SOP § 5.11 ("Revised SOP § 5.11") to read as follows:

> No permit shall be granted for the purpose of holding religious worship services, or otherwise using a school as a house of worship. Permits may be granted to religious clubs for students that are sponsored by outside organizations and otherwise satisfy the requirements of this [regulation] on the same basis that they are

granted to other clubs for students that are sponsored by outside organizations.[6]

Bronx II, 400 F. Supp. 2d at 588.  The Board informed Plaintiffs that the Church's use of P.S. 15 for Sunday worship services was prohibited under Revised SOP § 5.11 but did not enforce the new policy because of the preliminary injunction.  Id.  The parties then cross-moved for summary judgment, and Plaintiffs further sought to convert the preliminary injunction into a permanent one on the ground that Revised SOP § 5.11 was unconstitutional in the same manner as its previous incarnation.  This Court granted Plaintiffs' motion for summary judgment, denied Defendant's cross-motion for summary judgment, and permanently enjoined Defendants "from enforcing [Revised] SOP § 5.11 so as to exclude Plaintiffs or any other similarly situated individual from otherwise permissible after-school and weekend use of a New York City public school."  Id. at 601.  This Court's reasons for granting the permanent injunction paralleled those underlying the grant of the preliminary injunction, viz., in the context of a limited public forum Revised SOP § 5.11 constituted impermissible viewpoint discrimination on the basis of religion

---

[6] Revised SOP § 5.11 has since been re-issued as part of Chancellor's Regulation D-180 ("Ch. Reg. D-180").  See Chancellor's Regulation D-180 §§ I.Q, I.S, Extended Use of School Buildings, http://schools.nyc.gov/NR/rdonlyres/023114D9-EA44-4FE0-BCEE-45778134EA14/0/D180.pdf (last visited February 24, 2012).  References in this opinion to Revised SOP § 5.11 should be treated as synonymous with Ch. Reg. D-180.

in violation of Plaintiffs' free speech rights, and such discrimination was not saved by the Board's perceived concern of violating the Establishment Clause.  After the Court of Appeals vacated the permanent injunction on ripeness grounds, see 492 F.3d 89 (2d Cir. 2007) (per curiam), the Board officially instituted Revised SOP § 5.11, the parties again cross-moved for summary judgment, and this Court reissued the permanent injunction for the reasons stated in Bronx I and Bronx II [Dkt. No. 99].

### A.   The Court of Appeals Reverses Summary Judgment and Vacates the Permanent Injunction

In June 2011, the Court of Appeals issued a split decision reversing summary judgment and vacating the preliminary injunction.  See 650 F.3d 30 (2d Cir. 2011) ("Bronx Appeal III").  The majority first concluded that "the challenged rule does not constitute viewpoint discrimination because it does not seek to exclude expressions of religious points of view or of religious devotion, but rather excludes for valid non-discriminatory reasons only a type of activity—the conduct of worship services."  Id. at 33.  Further, "because Defendants reasonably seek by the rule to avoid violating the Establishment Clause," the majority held that "the exclusion of religious worship services is a reasonable content-based restriction, which does not violate the Free Speech Clause."  Id.

7

The majority drew a line between the individual religious activities expressly permitted in Good News Club (e.g., prayer, religious instruction, expression of devotion to God, and the singing of hymns), which amount to "worship," and "worship services"—the former permitted under Revised SOP § 5.11 and the latter excluded.  Id. at 36-37.  The majority then defined worship services as "a collective activity characteristically done according to an order prescribed by and under the auspices of an organized religion, typically but not necessarily conducted by an ordained official of the religion." Id. at 37.  Regarding the Board's concern of violating the Establishment Clause, the majority made clear that it was not deciding "whether use of the school for worship services would in fact violate the Establishment Clause."  Id. at 40; see also id. at 49 ("The Supreme Court has never ruled on whether permitting the regular conduct of religious worship services in public schools constitutes a violation of the Establishment Clause, and we reach no conclusion on that question.").  Rather, it concluded that the Board's concern was reasonably objective, which was sufficient to justify the ban.  Id. at 40-43.

Finally, the majority considered Plaintiffs' Establishment Clause claim but was "not persuaded."  Id. at 45. It did not believe a reasonable observer would perceive Revised SOP § 5.11's ban on religious worship services as being hostile

to religion.  Id. at 45-46.  And it did not believe that
enforcement of the policy causes excessive governmental
entanglement with religion.  Id. at 46-48.

### 1.  Judge Walker's Dissent

In his dissent, Judge Walker disagreed with the
majority on both of its conclusions relating to the free speech
analysis.  First, he concluded that Revised SOP § 5.11's ban on
religious worship services constitutes impermissible viewpoint
discrimination.  Id. at 54-59.  He did not find that the
majority drew a workable distinction between "worship" and
"worship services" and concluded that Good News Club foreclosed
the Board from excluding worship services.  Id. at 55-56.
Moreover, Judge Walker found the majority's definition of
religious worship services "leads to anomalous results: while a
Catholic or Episcopal service would be shut out of the forum, a
Quaker meeting service, Buddhist meditation service, or other
religions worship convocation could be allowed because it would
not follow a 'prescribed order' or because the leader is not
'ordained.'"  Id. at 56.

Second, Judge Walker did not find the Board's
professed Establishment Clause rationale to be reasonable.  Id.
at 59-64.  Instead, he would hold that "the actions of Bronx
Household, a private party, cannot transform the government's
neutral action into an Establishment Clause violation."  Id. at

59.  In Judge Walker's opinion, an objective, fully informed observer would not perceive governmental endorsement of religion because the Board's schools are "open to a wide spectrum of participants," which "bespeaks the state's neutrality, not its favoring of religion or any other group."  Id. at 61.  Finally, Judge Walker indicated that Revised SOP 5.11 raises Free Exercise Clause concerns and would not withstand a free exercise challenge because the Board cannot demonstrate a compelling state interest that would justify the policy's burdening of religious practices.  Because Judge Walker found that the Board's Establishment Clause rationale is not even reasonable, he concluded that it could not be compelling.  Id. at 58 n.4.

> B.  Most Recent Developments

The Court of Appeals denied Plaintiffs' request for an en banc rehearing on July 27, 2011, and the Supreme Court denied Plaintiffs' petition for certiorari on December 5, 2011.  132 S. Ct. 816 (2011).  That cleared the way for the Court of Appeals to issue its mandate on December 7, 2011.  Despite vacatur of the injunction, Defendants agreed to adjourn enforcement of Revised SOP § 5.11 until February 13, 2012.

On December 14, 2011, Plaintiff Hall submitted a new application on behalf of the Church to continue using P.S. 15 on Sunday mornings for the period January 8, 2012 to February 12, 2012.  (Hall Decl. ¶ 15, Ex. A.)  In the space on the

application entitled "Description of activities to be conducted" Hall wrote, "Hymn singing, prayer, communion, preaching, teaching, fellowship." (Id.)  On the permit approving the application, however, the Board listed the activities as "WORHIP [sic] HYMN SINGING, PRAYER, COMMUNION, PREACHING." (Id. ¶ 16, Ex. B.)

On December 16, 2011, this Court ordered the parties to confer and propose how they wished to proceed in light of the mandate.  Plaintiffs' counsel called chambers on January 10, 2012, to inform the Court they had only that day received notice of the December 16 order but would confer with opposing counsel and report back to the Court as soon as practicable.  On January 25, 2012, Plaintiffs' counsel wrote the Court that it intended to seek a new preliminary injunction based on claims that either remained undecided by the Court of Appeals or were revived by the Supreme Court's decision in Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC, 132 S. Ct. 694 (Jan. 11, 2012).[7]  The Court ordered the parties to confer on a proposed briefing schedule, which they worked out on an expedited basis.

_____

[7] Chambers faxed a copy of the December 16 order to the City of New York Law Department—counsel for Defendants—with instructions to distribute it to all parties involved.  The fax apparently was addressed to an attorney who no longer works for the city. While the Court subsequently ordered that the case be designated for electronic filing, at the time the Court issued the December 16 order counsel for the parties could not receive electronic (cont'd on next page)

Oral argument was held on February 14, 2012.  At the conclusion of oral argument the Court asked the parties to confer as to whether they could arrange a temporary resolution for the coming weekend.  That evening Defendants wrote the Court that they would not agree to suspend immediate implementation of Ch. Reg. D-180.  The Court issued a temporary restraining order on February 16, 2012, enjoining Defendants from enforcing that part of Ch. Reg. D-180 that provides: "No permit shall be granted for the purpose of holding religious worship services, or otherwise using a school as a house of worship."[8]  The Court indicated in the temporary restraining order that a written opinion would follow; this is that opinion, applicable both to the temporary restraining order and the preliminary injunction.

II.  STANDARD FOR PRELIMINARY INJUNCTION

Plaintiffs seek a preliminary injunction to preserve the status quo of meeting in P.S. 15 on Sunday mornings, which they have done since this Court issued its initial preliminary

---

(cont'd from previous page)
notification of any case activity.  Given these circumstances and the timing of the Supreme Court's decision in Hosanna-Tabor, the Court does not fault Plaintiffs for not writing the Court sooner.

[8] Defendants immediately moved the Court of Appeals to stay the temporary restraining order.  That motion was denied, although the Court of Appeals clarified that the temporary restraining order should be read as barring the Board from enforcing its policy against Plaintiffs only.

injunction in 2002.  A court generally may grant a preliminary injunction when the moving party can establish both (1) irreparable harm and (2) either (a) a likelihood of success on the merits or (b) sufficient questions on the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in favor of the moving party.  E.g., Cacchillo v. Insmed, Inc., 638 F.3d 401, 405-06 (2d Cir. 2011).  When a party seeks a "mandatory" preliminary injunction that "'alter[s] the status quo by commanding some positive act,' as opposed to a 'prohibitory' injunction seeking only to maintain the status quo," the moving party must make a "'clear showing that [it] is entitled to the relief requested, or [that] extreme or very serious damage will result from a denial of preliminary relief.'"  Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 35 n.4 (2d Cir. 2010) (quoting Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 34-35 (2d Cir. 1995)) (first alteration in original); see also Fifth Ave. Presbyterian Church v. City of N.Y., 293 F.3d 570, 574 n.2 (2d Cir. 2002) (noting the "'clear or substantial likelihood of success' standard applicable to mandatory injunctions").

When this Court issued the initial preliminary injunction in 2002, it applied the higher burden of proof required for mandatory injunctive relief because at the time the

13

Church was not meeting in the Board's schools; thus, Plaintiffs sought to alter the status quo. <u>Bronx I</u>, 226 F. Supp. 2d at 411. This time around, Plaintiffs seek prohibitory injunctive relief because they wish to maintain the current status quo—<u>viz.</u>, meeting in P.S. 15 on Sunday mornings as they have for nearly ten years. As such, although the Court finds that they have done so,[9] Plaintiffs are not now required to meet the higher standard of showing a substantial likelihood of success on the merits.

III. DISCUSSION

The Court finds that Plaintiffs have satisfied their burden of demonstrating irreparable harm and a likelihood of success on the merits of their Free Exercise Clause claim and Establishment Clause claim. Furthermore, the Court finds that these claims are not precluded by the doctrines of the law of the case, claim preclusion, and issue preclusion. Each of these findings is addressed below.

---

[9] Defendants argued before the Court of Appeals when they moved to vacate the temporary restraining order that the status quo is no injunction against enforcement of Revised SOP § 5.11. The Court does not have the benefit of Plaintiffs' response to this argument because Defendants did not argue the merits of Plaintiffs' motion for a preliminary injunction before this Court. Assuming Defendants are correct, Plaintiffs must meet the higher standard of showing a substantial likelihood of success on the merits of their claims. Because the Court finds that Plaintiffs have met that higher standard, this precise issue need not be resolved.

A.   <u>Plaintiffs Will Suffer Irreparable Harm</u>

Plaintiffs claim that because Revised SOP § 5.11 prevents them from holding Sunday worship services in the Board's public schools—the only location in which they can afford to gather as a full congregation without having to curtail other of their religious practices—it prohibits their free exercise of religion in violation of their First Amendment rights.  Plaintiffs assert the prohibitive cost of renting commercial space for the Church's worship services would force them "to reduce and/or eliminate ministries to [the Church's] members and . . . local community."  (Hall Decl. ¶ 9.)  "[The] entire congregation could no longer worship together," which would "undermine the fellowship" that is a "vital aspect of [the Church's] religious ministry and calling."  (<u>Id.</u> ¶ 11.)  Being banned from using the Board's schools would also "undermine [the Church's] ability to engage in the duties of [the Church's] Christian faith—to corporately pray for one another, hear testimony, engage in collective praise, and serve the local community."  (<u>Id.</u> ¶ 12.)  "In addition, [the Church] will lose some [congregants] because they would not be able to participate in [the Church's] vital Sunday ministry.  Many of these individuals are elderly, disabled, or lack transportation, and traveling to another location is not an option."  (<u>Id.</u> ¶ 13.)

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976).  Here, the alleged deprivation of Plaintiffs' free exercise rights results directly from the Board's implementation of Revised SOP § 5.11 so as to ban Plaintiffs from holding worship services in P.S. 15 on Sundays.  "Where a plaintiff alleges injury from a rule or regulation that directly limits [First Amendment rights], the irreparable nature of the harm may be presumed." Bronx Appeal II, 331 F.3d at 349.  Based on these principles and the Court's determination that Plaintiffs likely will prove an actual violation of their First Amendment free exercise rights—"rights that are the bedrock of our liberties," id.—Plaintiffs have demonstrated that they will suffer irreparable harm in the absence of an injunction.

B.   Plaintiffs Are Likely to Succeed on the Merits

Unsurprisingly, the Court of Appeals did not address Plaintiffs' Free Exercise Clause claim when it reversed summary judgment for Plaintiffs and vacated the injunction.  That is so because this Court granted summary judgment and the permanent injunction on free speech grounds only.  Simply put, there was no need for the Court of Appeals to rule on the Free Exercise Clause claim because it was not immediately before the appellate panel.  This Court has now fully considered the claim and finds

16

Plaintiffs have demonstrated a likelihood of success on the merits.  In addition, new facts documenting how the Board's current policy fosters excessive governmental entanglement with religion and the Supreme Court's recent decision in Hosanna-Tabor persuade the Court that Plaintiffs are likely to succeed on the merits of their Establishment Clause claim as well.

1.  Free Exercise Clause Claim

The Free Exercise Clause of the First Amendment, as applied to the states through the Fourteenth Amendment, provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]."  U.S. Const. amend. I.  "At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons."  Church of Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 532 (1993).  While "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice[,] . . . [a] law failing to satisfy these requirements must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest."  Id. at 531-32 (citing Emp't Div. v. Smith, 494 U.S. 872 (1990)); see also Fifth Ave. Presbyterian Church, 293 F.3d at 574 ("Government

enforcement of laws or policies that substantially burden the exercise of sincerely held religious beliefs is subject to strict scrutiny.").

> ### a)  Revised SOP § 5.11 Raises Free Exercise Concerns and Is Not Neutral

There can be no doubt that Revised SOP § 5.11 implicates the protections of the Free Exercise Clause given that it "regulates or prohibits conduct because [the conduct] is undertaken for religious reasons." Lukumi, 508 U.S. at 532. The policy expressly bans "religious worship services"—conduct for which there is no secular analog.  See Bronx Appeal III, 650 F.3d at 37 ("The 'religious worship services' clause does not purport to prohibit use of the facility by a person or group of persons for 'worship.'  What is prohibited by this clause is solely the conduct of a particular type of event: a collective activity characteristically done according to an order prescribed by and under the auspices of an organized religion, typically but not necessarily conducted by an ordained official of the religion." (emphasis added)); Bronx Appeal I, 127 F.3d at 221 (Cabranes, J., concurring in part and dissenting in part) ("Unlike religious 'instruction,' there is no real secular analogue to religious 'services,' such that a ban on religious services might pose a substantial threat of viewpoint discrimination between religion and secularism.").

A law is not neutral if its object is to infringe upon or restrict practices because of their religious motivation. Lukumi, 508 U.S. at 533.  Thus, on its face, Revised SOP § 5.11 is not neutral because it "refers to a religious practice without a secular meaning discernable from the language or context."  Id.; see also Bronx Appeal III, 650 F.3d at 58 n.4 (Walker, J., dissenting) ("Given the plain language of SOP § 5.11, the Board's persistent exclusion of outside organizations seeking to use school facilities for religious purposes, and the Board's repeated statements that SOP § 5.11 is aimed at the practice of religion, it is undisputable that SOP § 5.11 is not neutral.").

In addition, the policy also is not neutral because it discriminates between those religions that fit the "ordained" model of formal religious worship services, see Bronx Appeal III, 650 F.3d at 37 (defining worship services as "a collective activity characteristically done according to an order prescribed by and under the auspices of an organized religion, typically but not necessarily conducted by an ordained official of the religion"), and those religions whose worship practices are far less structured, see id. at 56 (Walker, J., dissenting) (noting that the majority's definition "leads to anomalous results: while a Catholic or Episcopal service would be shut out of the forum, a Quaker meeting service, Buddhist meditation

service, or other religions worship convocation could be allowed because it would not follow a 'prescribed order'" or because the leader is not 'ordained'").

Having concluded that Revised SOP § 5.11 raises Free Exercise Clause concerns[10] and is not neutral, the policy may only be saved if it meets a strict scrutiny analysis. Defendants must show the policy serves a compelling state interest and is narrowly tailored to advance that interest. Throughout this litigation Defendants have maintained that the policy necessarily facilitates their mandate to avoid an unconstitutional establishment of religion.  Defendants argue

---

[10] At oral argument, counsel for Defendants urged that there could be no Free Exercise Clause violation in this case because the cases cited by Plaintiffs in which the Supreme Court found such violations did not involve a defendant who was motivated by a desire to avoid violating the Establishment Clause.  E.g., Lukumi, 508 U.S. 520.  Because Revised SOP § 5.11 results from the Board's balancing of competing constitutional mandates, Defendants argue Plaintiffs' Free Exercise Clause claim is precluded.  The Court disagrees.  That the Board may need to balance competing interests does not foreclose Plaintiffs' claim but rather speaks to whether Revised SOP § 5.11 meets strict scrutiny, i.e., whether the Board's interest in adopting the policy is compelling and whether the policy is narrowly tailored to advance that interest.  Cf. Bronx Appeal III, 650 F.3d at 59 (Walker, J., dissenting) ("[T]he majority argues that my finding of viewpoint discrimination overlooks the Board's Establishment Clause rationale. . . .  [E]ven if the Board were to have legitimate Establishment Clause concerns, those concerns could do nothing to undermine my conclusion that the Board engaged in viewpoint discrimination; at most, they could only serve as a potential justification for such discrimination." (citation omitted)).  The Court discusses the strict scrutiny analysis infra Part III.B.1(b)-(c).

that allowing churches to hold worship services in the Board's public schools sends the message that Defendants are endorsing religion, which runs afoul of the second prong of the Supreme Court's test in Lemon v. Kurtzman for determining compliance with the Establishment Clause.  See 403 U.S. 602, 612 (1971) (requiring that the "principal or primary effect [of the law in question] . . . neither advance[] nor inhibit[] religion").[11] Defendants claim their concern over being perceived as endorsing religion drives the policy's ban on religious worship services.

    The Court does not doubt that a desire to avoid an actual violation of the Establishment Clause can be a compelling state interest.  See Widmar v. Vincent, 454 U.S. 263, 270-71 (1981) ("The University . . . argues that it cannot offer its facilities to religious groups and speakers on the terms available to other groups without violating the Establishment Clause of the Constitution of the United States.  We agree that the interest of the University in complying with its constitutional obligations may be characterized as compelling." (footnote omitted)).  For example, in the context of free speech analysis, the Supreme Court has said that "compliance with the Establishment Clause is a state interest sufficiently compelling

---

[11] As the Court of Appeals noted in Bronx Appeal III, "[a]lthough the Lemon test has been much criticized, the Supreme Court has declined to disavow it and it continues to govern the analysis of Establishment Clause claims in this Circuit."  650 F.3d at 40 n.9.

to justify content-based restrictions on speech." Capitol
Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 761–62
(1995); Good News Club, 533 U.S. at 112-13.

However, the Supreme Court has not decided whether a
state's Establishment Clause rationale might be sufficiently
compelling to justify viewpoint discrimination. See Good News
Club, 533 U.S. at 113 ("[I]t is not clear whether a State's
interest in avoiding an Establishment Clause violation would
justify viewpoint discrimination."). The Court in Good News
Club avoided deciding that question because it concluded that
the defendant-school had no valid Establishment Clause concern.
Id. at 113-19. Because the majority in Bronx Appeal III found
that Revised SOP § 5.11's ban on religious worship services
qualifies as a content-based restriction in light of the defined
purposes of the limited public forum and that it was reasonable
for the Board to believe that permitting worship services in its
schools would, in fact, violate the Establishment Clause, the
Court of Appeals rejected Plaintiffs' free speech challenge.
See Bronx Appeal III, 650 F.3d at 33 ("We also conclude that
because Defendants reasonably seek by rule to avoid violating
the Establishment Clause, the exclusion of religious worship
services is a reasonable content-based restriction, which does
not violate the Free Speech Clause." (emphasis added)).

Importantly, neither the Court of Appeals nor the Supreme Court has ruled whether permitting religious worship services in schools during non-school hours violates the Establishment Clause.  See, e.g., Bronx Appeal III, 650 F.3d at 49 ("The Supreme Court has never ruled on whether permitting the regular conduct of religious worship services in public schools constitutes a violation of the Establishment Clause, and we reach no conclusion on that question."); id. at 43 ("To reiterate, we do not say that a violation has occurred, or would occur but for the policy.").  The Court of Appeals determined that resolving that question was unnecessary in Bronx Appeal III because the Board only had to show its Establishment Clause rationale for banning religious worship services was reasonable.  Because this Court concludes that strict scrutiny now applies to the consideration of Plaintiffs' Free Exercise Clause claim, the question before the Court is whether the Board's Establishment Clause rationale is sufficiently compelling to justify burdening Plaintiffs' free exercise rights.  The Court believes the answer to that question requires a definitive finding as to whether permitting religious worship services in schools during non-school hours violates the Establishment Clause.  For the reasons stated below, the Court answers that question in the negative and concludes that Defendants do not meet their higher burden of demonstrating a compelling interest.

b) <u>Board's Interest Is Not Sufficiently</u>
<u>Compelling Because Allowing Religious</u>
<u>Worship Services During Non-School Hours</u>
<u>Does Not Violate the Establishment Clause</u>

The Court credits the Board's word that in adopting

Revised SOP § 5.11 the Board was motivated by a concern that

allowing schools to be used during non-school hours for

"religious worship services" could be perceived as violating the

Establishment Clause.  But from the perspective of the

objective, fully informed observer, <u>see</u> <u>Bronx Appeal III</u>, 650

F.3d at 60 (Walker, J., dissenting) ("[T]he endorsement test

asks whether 'an objective observer, acquainted with the text,

legislative history, and implementation of the [challenged law

or policy], would perceive it as a <u>state</u> endorsement of

[organized religion] in public schools.'" (quoting <u>Santa Fe</u>

<u>Indep. Sch. Dist. v. Doe</u>, 530 U.S. 290, 308 (2000)) (second and

third alterations in original)), no such violation would result.

This Court considered the Board's Establishment Clause rationale

in <u>Bronx I</u> and concluded the following:

> As in <u>Good News Club</u>, there is a substantial
> likelihood that plaintiffs will be able to
> demonstrate here that defendants do not have
> a compelling state interest in avoiding an
> Establishment Clause violation by denying
> plaintiffs' request to rent space [in the
> Board's schools].  Plaintiffs' proposed
> meetings would occur on Sunday mornings—
> <u>i.e.</u>, during nonschool hours.  The meetings
> are obviously not endorsed by the School
> District.  No [school] employee attends
> plaintiffs' Sunday morning meetings.

> Further, the meetings are "open to all
> members of the public" and "not closed to a
> limited group of people, such as church
> members and their guests."  Nor is there any
> evidence that children are present around
> [the school] on Sunday mornings or that any
> . . . students even attend plaintiffs'
> Sunday school or services.  In short, it can
> hardly be said that plaintiffs' proposed
> meetings would so dominate [the school] that
> children would perceive endorsement by the
> School District of a particular religion.

226 F. Supp. 2d at 426 (internal citations and footnote

omitted); see also Bronx Appeal III, 650 F.3d at 61-62 (Walker,

J., dissenting) ("Bronx Household's use of P.S. 15 takes place

during non-school hours (actually on a day when there is no

school), lacks school sponsorship, occurs in a forum otherwise

available for a wide variety of uses, and is open to the

public.").  The Court readopts all these reasons.

        The Court also notes that the objective observer would

know from the text of the regulation that the schools are open

to all comers whose activities are consistent with the broad

uses of the limited public forum prescribed therein.  That

observer would also know from the legislative history and

implementation of the policy (including the lengthy judicial

history) that the Board's actions betoken great effort to avoid

establishing any religion.  For all these reasons, the

"objective observer, acquainted with the text, legislative

history, and implementation of" Revised SOP § 5.11 would not

perceive the Board's policy as an endorsement of religion in the public schools.  Santa Fe Indep. Sch. Dist., 530 U.S. at 308 (internal quotation marks omitted).

Furthermore, the Board's stated concern that allowing Plaintiffs' Sunday worship services to be held in P.S. 15 would effectively subsidize the Church given New York's otherwise expensive real estate market is contradicted both by precedent and the facts of this case.  As the Supreme Court explained in Rosenberger v. Rector & Visitors of the University of Virginia:

> It does not violate the Establishment Clause for a public university to grant access to its facilities on a religion-neutral basis to a wide spectrum of student groups, including groups that use meeting rooms for sectarian activities, accompanied by some devotional exercises. . . . Even the provision of a meeting room . . . involve[s] governmental expenditure, if only in the form of electricity and heating or cooling costs. . . .  If the expenditure of governmental funds is prohibited whenever those funds pay for a service that is, pursuant to a religion-neutral program, used by a group for sectarian purposes, then [Supreme Court precedent] would have to be overruled.

515 U.S. 819, 842-43 (1995) (citations omitted).  To accept the Board's argument would mean the Supreme Court has impermissibly sanctioned, again and again, state subsidization of religion when public schools open their doors as limited public forums. See, e.g., Good News Club, 533 U.S. 98 (holding that public school could not exclude outside religious organization from meeting for Bible study, prayer, and devotion to God); Widmar,

454 U.S. 263 (holding that public university could not exclude student religious group from meeting for purposes of religious worship and religious discussion).

Here, whether religious student clubs meet in the Board's schools for Bible study (a permissive use under Revised SOP § 5.11) or Plaintiffs meet for Sunday worship services (an impermissible use under the policy), the result is the same: "the use of public funds to finance religious activities." DeStefano v. Emergency Hous. Group, Inc., 247 F.3d 397, 419 (2d Cir. 2001) (internal quotation marks omitted).  But the Supreme Court precedent cited above makes clear that no valid Establishment Clause concern exists in this regard when a school grants access to its facilities "on a religion-neutral basis to a wide spectrum" of outside groups as Defendants do here. Rosenberger, 515 U.S. at 821.  Thus, this misplaced concern does not make the Board's interest a compelling one, and the Court ultimately agrees with Judge Walker that "the actions of Bronx Household, a private party, cannot transform the government's neutral action into an Establishment Clause violation."  Bronx Appeal III, 650 F.3d at 59 (Walker, J., dissenting).[12]

---

[12] The Court acknowledges that the majority in Bronx Appeal III found the Board's stated concern over subsidizing religion to be reasonable.  See 650 F.3d at 41.  To be sure, the majority found that the Board had a "strong basis" for its Establishment Clause concerns.  Id. at 43.  That conclusion, coupled with the
(cont'd on next page)

c) <u>Revised SOP § 5.11 Does Not Advance the
Board's Interest and Is Not Narrowly
Tailored</u>

Even assuming, <u>arguendo</u>, that the Board's
Establishment Clause rationale may be characterized as
compelling, the Board must show that Revised SOP § 5.11 is
narrowly tailored to advance its interest of not appearing to
endorse religion as proscribed by the Establishment Clause.
Although the second prong of the strict scrutiny analysis
generally focuses on the scope of the policy—i.e., whether the
policy is <u>narrowly</u> tailored—it also requires that the policy, in
fact, <u>advance</u> the state's interest.  Because the Court finds
that Revised SOP § 5.11's ban on religious worship services is
ineffective in achieving the Board's stated concern of avoiding
a violation of the Establishment Clause, the challenged policy
does not advance the Board's interest.  The Board also has not
demonstrated that the policy is narrowly tailored.  Revised SOP

---

(cont'd from previous page)
conclusion that the Board's ban on religious worship services is
a content-based restriction, satisfied the Court of Appeals that
Revised SOP § 5.11 does not raise free speech concerns.
     However, the majority did not expressly state that it found
the Board's Establishment Clause rationale to be a <u>compelling</u>
state interest.  Even assuming the Court of Appeals found that
the Board's strong basis for concern of violating the
Establishment Clause amounts to a compelling interest, Revised
SOP § 5.11 survives Plaintiffs' free exercise challenge only if
it is narrowly tailored to achieve that interest.  For the
reasons stated <u>infra</u> Part III.B.1(c), the Court finds that
Revised SOP § 5.11 fails this second prong of <u>Lukumi</u>'s strict
scrutiny analysis.

§ 5.11 thus fails the second prong of Lukumi's strict scrutiny analysis.

### i) Ban on Religious Worship Services Is Ineffective

Despite Defendants' claim that Revised SOP § 5.11's ban on religious worship services is necessary to avoid the perception of endorsement of religion, the policy does not serve that purpose.  Because it singles out only those religions that conduct "ordained" worship services, the ban works against the informed observer's perception of neutrality that would otherwise result if all religions were treated on the same terms.  See Good News Club, 533 U.S. at 114 ("Because allowing the Club to speak on school grounds would ensure neutrality, not threaten it, [the school district] faces an uphill battle in arguing that the Establishment Clause compels it to exclude the Good News Club."); Bd. of Educ. v. Mergens, 496 U.S. 226, 248 (1990) ("[I]f a State refused to let religious groups use facilities open to others, then it would demonstrate not neutrality but hostility toward religion.").

Indeed, "the fact that the [Board's schools are] open to a wide spectrum of participants bespeaks the state's neutrality, not its favoring of religion or any other group." Bronx Appeal III, 650 F.3d at 61 (Walker, J., dissenting). While Christian churches use the schools to worship on Sundays,

29

Jewish and Muslim groups use the schools on Fridays and
Saturdays.  Bronx Appeal III, 650 F.3d at 62-63 (Walker, J.,
dissenting).  The objective, fully informed observer who passes
by the Board's schools and witnesses a wide variety of community
groups meeting on weeknights, followed by a Jewish Friday night
service, a Ramadan Saturday evening service, and finally a
Sunday morning Christian worship service, could not reasonably
infer that the Board was endorsing religion in its public
schools.  Rather, the informed observer would conclude that the
Board opens its schools during non-school hours to a diverse
group of organizations pursuant to a neutral policy generally
aimed at improving "the welfare of the community."  Revised SOP
§ 5.22's ban on religious worship services—which would exclude
certain religions from worshiping in the schools but permit
others—only weakens the perception of neutrality as between
religion and non-religion.

        Beyond this, Revised SOP § 5.11 expressly provides
that "[p]ermits may be granted to religious clubs for students
that are sponsored by outside organizations."[13]  As the Court of
Appeals noted, following Good News Club, the Board may not
exclude groups from using its schools for "[p]rayer, religious
instruction, expression of devotion to God, and the singing of
hymns."  Bronx Appeal III, 650 F.3d at 36-37.  Given the variety

---

[13] See Chancellor's Regulation D-180 § I.S, supra note 6.

of religious practices that are permitted under Revised SOP §
5.11—as to which the Board makes clear there is no endorsement
of religion—the Board fails to explain how the informed observer
would view any differently the Board's permitting Plaintiffs'
use of its schools for Sunday worship services.  Because the
individual elements of those services are expressly permitted,
the policy's ban on "religious worship services" is entirely
ineffective in dispelling any confusion in the mind of the
objective observer over State endorsement of religion.  The
Board is just as likely to be perceived as endorsing religion
with the ban in place as with it enjoined.  In both instances,
the observer would see "[p]rayer, religious instruction,
expression of devotion to God, and the singing of hymns."  Id.
Whether the applicant or a Board bureaucrat deems those
activities to constitute "worship services" or not does not
change the objective observer's perception of whether or not the
Board is endorsing religion.  Accordingly, Revised SOP § 5.11
does not advance the Board's interest of avoiding an
Establishment Clause violation.

> ii)  Revised SOP § 5.11 Is Not
>       Narrowly Tailored

Because the Board has not shown that other, less
restrictive measures would fail to advance the Board's stated
interest, the Court finds that the regulation is not narrowly

tailored.   In <u>Bronx Appeal III</u>, Judge Walker explained why this
is so:

> While Bronx Household's four-hour use of
> P.S. 15 on Sundays hardly dominates the
> limited public forum the Board has created
> under [Revised SOP § 5.11], any concern over
> a given group's prolonged or dominant use of
> the forum can be addressed through
> reasonable time, place, and manner
> restrictions.  For example, in order to
> ensure greater weekend availability of a
> particular school's facilities to more
> outside organizations, the Board could limit
> the number of times per year that any one
> outside organization may use school
> facilities.  Likewise, the Board may revoke
> any organization's permit if it fails to
> adhere to neutral rules imposed by the
> Board, i.e., by failing to include the
> Board's sponsorship disclaimer in written
> materials or by actively creating an
> impression of school sponsorship.

650 F.3d at 64 n.11 (Walker, J., dissenting).  Additionally, in
order to dispel any implication of endorsement, the Board could,
for example, require groups to install signs outside the schools
disclaiming endorsement.  That Defendants have not even
addressed the potential effectiveness of options such as these
signals that Revised SOP § 5.11's ban on religious worship
services is not narrowly tailored to advance the Board's
interest in avoiding a violation of the Establishment Clause.
Thus, the lack of narrow tailoring is another reason why Revised
SOP § 5.11 does not withstand Plaintiffs' free exercise
challenge.

The interplay of Plaintiffs' free exercise rights and the Board's stated Establishment Clause concern warrants one final comment.  The Court of Appeals acknowledged the difficult line the Board must toe in protecting Plaintiffs' First Amendment free speech rights so as not to cause a separate First Amendment violation by endorsing religion.  See Bronx Appeal III, 650 F.3d at 46 (characterizing the Board's motivation in adopting Revised SOP § 5.11 as "a good faith desire to navigate successfully through the poorly marked, and rapidly changing, channel between the Scylla of viewpoint discrimination and the Charybdis of violation of the Establishment Clause").  While the Board may have struck the appropriate balance for free speech and Establishment Clause purposes, Revised SOP § 5.11 does not provide due consideration to Plaintiffs' First Amendment free exercise rights.  Perhaps nothing short of a Herculean effort would permit the Board to sail unscathed through the constitutional strait that pits the Religion Clauses against one another, but Revised SOP § 5.11 operates to deprive the Board's constituents of their free exercise rights.  In this Court's view, losing one's right to exercise freely and fully his or her religious beliefs is a greater threat to our democratic society than a misperceived violation of the Establishment Clause.

33

2.   Establishment Clause Claim

Although the majority decided Bronx Appeal III on free speech grounds, it also addressed Plaintiffs' Establishment Clause claim.   The majority indicated that Revised SOP § 5.11 likely satisfies the Lemon test for determining compliance with the Establishment Clause.   See Bronx Appeal III, 650 F.3d at 45-48.   Regarding the third prong of the Lemon test, which requires that the challenged regulation not foster an excessive entanglement with religion, see 403 U.S. at 613, Plaintiffs claimed that the Board cannot apply Revised SOP § 5.11 without excessively entangling itself in matters of religious doctrine because the policy requires the Board to determine which religious practices amount to "worship services."   The majority found this argument to be a non-starter due to Plaintiffs' own admission to the Board:

> To begin with, whatever merit this argument
> may have in other types of cases, we do not
> see what application it has here.   Bronx
> Household does not contest that it conducts
> religious worship services.   To the
> contrary, it applied for a permit to conduct
> "Christian worship services," and the
> evidence suggests no reason to question its
> own characterization of its activities.

Bronx Appeal III, 650 F.3d at 47; see also id. at 52 n.1 (Calabresi, J., concurring) ("Once an applicant says that what it wishes to do is 'worship,' no inquiry into whether the underlying or accompanying activities actually constitute

34

worship is required."). At oral argument on February 14, 2012, counsel for Defendants reiterated that Revised SOP § 5.11 does not raise excessive entanglement concerns because it asks the applicants themselves to certify whether their proposed permit use complies with the policy's ban on religious worship services and represented that the Board will not second-guess an applicant's own characterization of its proposed activities. Specifically, defense counsel maintained:

> I can represent to the Court, under the new policy, fellowship, singing hymns and other similar type[s] of activities will not be equal to worship . . . . We are certainly not going to purport to look under the tent and make those evaluations and say X, Y and Z equals worship. . . . [W]e are not going to do the X, Y, Z equals worship, even if [applicants] say it doesn't, so long as they certify that they are complying with the policy.

(Prelim. Inj. Hr'g Tr. at 22, 25-26, Feb. 14, 2012.) Factual and legal developments since the Court of Appeals decided Bronx Appeal III contradict these assertions and merit reconsideration of Plaintiffs' Establishment Clause claim.

First, the Board's handling of Plaintiffs' latest permit application belies the notion that the Board will take applicants' descriptions of their proposed activities at face value. Upon vetting Plaintiff Hall's December 2011 application to use P.S. 15 during the "adjournment" period before the Board began enforcing Revised SOP § 5.11, the Board sua sponte wrote

in "WORHIP [sic]" as one of the Church's activities when Hall
had only listed "Hymn singing, prayer, communion, preaching,
teaching, fellowship" on the application.  (Hall Decl. ¶¶ 15-16,
Exs. A-B.)  Though the permit was granted for the adjournment
period, the Board's conduct suggests that an identical
application would be rejected should the Board begin enforcing
Revised SOP § 5.11.  The Board essentially tallied the
individual activities listed by Plaintiffs and concluded that
"X, Y and Z equals worship."  Thus, despite Defendants'
suggestion that any concern about excessive entanglement may
only properly be considered in the "next case," Plaintiffs now
raise a colorable inference of excessive entanglement in this
case.

        Second, the Declaration of Brad Hertzog, Pastor of
Reformation Presbyterian Church, in Support of Plaintiffs'
Motion for Preliminary Injunction ("Hertzog Decl.") [Dkt. No.
126], illustrates how Revised SOP § 5.11 compels the Board
unconstitutionally to inject itself into matters of religious
province.  Reformation Presbyterian Church ("Reformation") had
been holding weekly meetings in P.S. 173 in Queens since 2009.
(Hertzog Decl. ¶ 4.)  Hertzog describes those meetings as
follows:

                Our weekly meetings in the auditorium of
                P.S. 173 include singing, prayer, reading
                and studying the Bible, and fellowship.  The

36

> focus of the meeting is Bible study with
> some prayer and some singing.  When we
> finish, we have some light snacks and
> socialize.  Sometimes we break off for
> further Bible Study with kids and adults in
> different groups—though not at every
> meeting.  Our time is probably split 50/50
> between informal social time and the more
> structured singing, praying, and study.

(Id. ¶ 6.)  In December 2011, after the Board informed Hertzog

that Reformation's permit would expire on January 1, 2012,

Hertzog applied for a new permit through June 2012.  (Id. ¶ 7.)

On December 20, 2011, the Board's Yelena Kramer asked

Hertzog to describe Reformation's proposed use of the new permit

and asked, "Are you conducting religious worship services?"

(Id. ¶ 8.)  Hertzog answered that Reformation's meetings involve

reading and studying the Bible, prayer, singing, and fellowship.

(Id. ¶ 9.)  Ms. Kramer responded that Hertzog did not answer her

question directly and that she needed a "Yes or No" whether

Reformation would be conducting religious worship services.

(Id. ¶ 10.)  Hertzog replied that he could not answer that

question since he did not know how the Board defined "religious

worship services."  (Id. ¶ 11.)  Soon thereafter, the Board's

Lorenzo Arnoldo asked Hertzog for a detailed description of

Reformation's meetings, and Hertzog responded in sum and

substance with the description quoted above.  (Id. ¶¶ 12-13.)

Mr. Arnoldo wrote Hertzog on January 6, 2012, that Reformation's

permit had been denied and provided the following explanation:

"Chancellor's Regulation D -180, which governs the extended use of school buildings, prohibits a permit from being granted for the purpose of holding religious worship services or otherwise using a school as a house of worship." (Id. ¶ 14.)

The email string attached to Hertzog's declaration reveals the improper manner in which the Board inquires into religious matters and ultimately determines whether particular sectarian practices amount to "worship services," a determination that only subscribers to the religions themselves may make. (See id. Ex. B.) In Bronx Appeal I, Judge Cabranes presciently voiced concern over this form of excessive governmental entanglement with religion that Revised SOP § 5.11 encourages. See 127 F.3d 207, 221 (Cabranes, J., concurring in part and dissenting in part) ("There may be cases in which the parties dispute whether or not a proposed activity for which permission to use school premises is denied actually constitutes religious . . . worship, and the very act of making such classifications may deeply-and unconstitutionally-entangle public officials in essentially theological determinations."). The recent declarations submitted in this case illustrate that Plaintiffs' excessive entanglement concerns are real and ripe for reconsideration.

While Defendants submitted no declaration on behalf of a litigant with personal knowledge of the facts of this case,

38

counsel for defendants submitted a counter declaration to that
of Mr. Herzog.  (<u>See</u> Declaration of Jonathan Pines, dated
February 16, 2012 [Dkt. No. 127].)  Counsel asserts in his
declaration, <u>inter alia</u>:

> [D]efendants' requirement that Mr. Hertzog's
> organization certify that it will not engage
> is [sic] religious worship services hardly
> 'targets' his, or any other organization's,
> religious viewpoint.  Rather, as the [Court
> of Appeals] has permitted the [Board] to do,
> the permit process only seeks to ascertain,
> by the applicant's own representation,
> whether it will be engaging in proscribed
> religious worship services.

(<u>Id.</u> ¶ 9 (internal citation omitted).)  As evidenced in the
email string between Mr. Hertzog and the Board, this
characterization of the certification process differs from
counsel's hearsay description at oral argument.  The Court
understood the Board's new policy to require every applicant to
certify that it would comply with the Board's entire policy
governing the use of school buildings during non-school hours.
For example, the certification requirement would be no different
for the Boy Scouts than for a synagogue seeking to hold Torah
study classes: each organization would have to certify that its
activities comply with the Board's policy.  But apparently the
Board only asks those organizations that plan to use the schools
for religious purposes to certify compliance with the ban
against religious worship services.  The Board may then conduct

an independent evaluation of the religious applicant's activities to ensure compliance.  These revelations certainly suggest that religious organizations are targeted throughout the application process.

Defendants argue that any perceived targeting of religious organizations' permit applications is expressly allowed under the majority's opinion in <u>Bronx Appeal III</u>:

> Without doubt there are circumstances where a government official's involvement in matters of religious doctrine constitutes excessive government entanglement.  But it does not follow, as Bronx Household seems to argue, that the mere act of inspection of <u>religious</u> conduct is an excessive entanglement.  The Constitution, far from forbidding government examination of assertedly religious conduct, at times <u>compels</u> government officials to undertake such inquiry in order to draw necessary distinctions.

650 F.3d at 47 (footnote and citations omitted) (first emphasis added).  The Court does not dispute this proposition or the general characterization that "government officials cannot discharge their constitutional obligations without close examination of the particular conduct to determine if it is properly deemed to be <u>religious</u> and if so whether allowing it would constitute a prohibited establishment of religion." <u>Id.</u> (emphasis added).  Essentially, the government may entangle itself with religion so long as that entanglement is not <u>excessive</u>.

40

The declarations recently filed in this case, however, demonstrate that the Board does not engage in a "mere act of inspection of religious conduct" when enforcing Revised SOP § 5.11.  Rather, the Board has evidenced a willingness to decide for itself which religious practices rise to the level of worship services and which do not, thereby causing the government's entanglement with religion to become excessive. The Supreme Court in <u>Widmar</u> explained that such conduct is impermissible:

> [E]ven if the distinction [between religious speech and religious worship] drew an arguably principled line, it is highly doubtful that it would lie within the judicial competence to administer.  Merely to draw the distinction would require the university-and ultimately the courts-to inquire into the significance of words and practices to different religious faiths, and in varying circumstances by the same faith. Such inquiries would tend inevitably to entangle the State with religion in a manner forbidden by our cases.

454 U.S. at 269 n.6 (citations omitted).  If such line-drawing is not within the judicial competence, so also it is not within the Board's.

Furthermore, the excessive entanglement is not diminished by what Defendants' counsel represented to be the Board's plan regarding certification, <u>viz.</u>, to require all applicants to certify that their activities conform to the Board's policy.  As set out above, Pastor Hertzog listed the

41

activities Reformation planned to engage in and was then asked
whether those activities constituted religious worship services.
Even assuming the Board asked him whether Reformation's proposed
activities conformed to the policy, he could not respond because
he did not know how the Board defined "religious worship
services."  These unchallenged facts demonstrate that
implementation of Revised SOP § 5.11 as represented by counsel
would require the Board to define worship—a task beyond its (and
the Court's) competence.

        Finally, that the entanglement required by the current
policy, however implemented, is excessive is confirmed by the
Supreme Court's recent decision in Hosanna-Tabor Evangelical
Lutheran Church & School v. EEOC, 132 S. Ct. 694 (2012).  There,
in deciding that the Free Exercise Clause and Establishment
Clause provide for a "ministerial exception" that bars a
minister from bringing an employment discrimination suit against
her church, the Court emphasized the wide berth religious
institutions are to be given with respect to their core
activities, including worship.  See id. at 706 ("By imposing an
unwanted minister, the state infringes the Free Exercise Clause,
which protects a religious group's right to shape its own faith
and mission through its appointments.  According the state the
power to determine which individuals will minister to the
faithful also violates the Establishment Clause, which prohibits

42

government involvement in such ecclesiastical decisions."). Indeed, that the Court of Appeals itself undertook to attempt to define worship in Bronx Appeal III merely illustrates the problem of excessive governmental entanglement with religion that led the Supreme Court to recognize the ministerial exception in Hosanna-Tabor.  In light of the new facts documenting how the Board's current policy fosters excessive governmental entanglement and the Supreme Court's decision in Hosanna-Tabor, the Court finds that Plaintiffs are likely to succeed on the merits of their Establishment Clause claim.

C.   Plaintiffs' Claims Are Not Barred by the Doctrines of the Law of the Case, Claim Preclusion, and Issue Preclusion

In response to Plaintiffs' motion, Defendants do not argue the merits of Plaintiffs' claims but instead raise three procedural arguments.  First, Defendants argue that the doctrine of the law of the case bars consideration of Plaintiffs' Free Exercise Clause claim and Establishment Clause claim.  In support of this argument, Defendants point to the Court of Appeals' decision in Bronx Appeal III and the briefs Plaintiffs submitted on appeal in which they asserted both Free Exercise Clause and Establishment Clause claims.  Defendants' second and third arguments rely upon the closely related doctrines of claim preclusion and issue preclusion; Defendants contend these doctrines bar relitigation of Plaintiffs' Free Exercise Clause

claim because the Court of Appeals reached the merits of that claim in Bronx Appeal I.  The Court disagrees.

### 1.  Law of the Case

The law of the case doctrine incorporates two subsidiary rules, United States v. Ben Zvi, 242 F.3d 89, 95 (2d Cir. 2001), only one of which pertains to this Court's obligations.  The "mandate rule" describes the duty of the district court on remand.  "When an appellate court has once decided an issue, the trial court, at a later stage of the litigation, is under a duty to follow the appellate court's ruling on that issue."  United States v. Tenzer, 213 F.3d 34, 40 (2d Cir. 2000) (internal quotation marks omitted) (emphasis added).  "The mandate rule prevents re-litigation in the district court not only of matters expressly decided by the appellate court, but also precludes re-litigation of issues impliedly resolved by the appellate court's mandate."  Yick Man Mui v. United States, 614 F.3d 50, 53 (2d Cir. 2010).  However, in certain circumstances such as "a dramatic change in controlling legal authority" or "significant new evidence that was not earlier obtainable through due diligence but has since come to light," a district court may depart from the dictates of the mandate.  United States v. Webb, 98 F.3d 585, 587 (10th Cir. 1996); see also Ben Zvi, 242 F.3d at 95 (citing Webb with

44

approval for its discussion of "circumstances when departure from [the] mandate rule may be warranted").[14]

The mandate rule does not bar this Court from considering Plaintiffs' Free Exercise Clause and Establishment Clause claims.  As an initial matter, the mandate reversed summary judgment and vacated the permanent injunction, both of which had been granted on free speech grounds only.  With respect to the Free Exercise Clause claim, there can be no doubt that the Court of Appeals failed to rule on it.  See, e.g., Bronx Appeal III, 650 F.3d at 58 n.4 (Walker, J., dissenting) ("[T]his case was argued under the First Amendment's Free Speech and Establishment Clauses . . . .").  In fact, the majority mentions the Free Exercise Claim only twice in its twenty-page opinion–once in a parenthetical and once in the accompanying footnote.  Id. at 47 & n.15.  Given the cursory treatment that the majority gives to the Free Exercise Clause it cannot be argued that the Court expressly rejected Plaintiffs' claim. Furthermore, the Court of Appeals did not state that it had

_____

[14] The second subsidiary rule of the law of the case doctrine holds that "a court of appeals must usually adhere to its own decision at an earlier stage of the litigation" absent cogent or compelling reasons such as "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."  Tenzer, 213 F.3d at 39 (internal quotation marks omitted).  This part of the law of the case doctrine implicates the Court of Appeals' discretion only, not that of the district court.

considered Plaintiffs' other claims and found them to be without merit.  Thus, there is no ruling on the free exercise issue that this Court is mandated to follow.[15]

As for Plaintiffs' Establishment Clause claim, the recent declarations submitted by Pastors Hall and Hertzog reflect "significant new evidence that was not earlier obtainable through due diligence but has since come to light." Webb, 98 F.3d at 587.  This evidence was not obtainable when the Court of Appeals decided Bronx Appeal III because the facts alleged in the declarations occurred after the Court of Appeals issued its mandate.  Because the Court finds that the facts alleged therein significantly alter the majority's excessive entanglement analysis, reconsideration of Plaintiffs' Establishment Clause claim is proper.  This is especially so in

---

[15] This Court's reading of the Court of Appeals' mandate would be different had this Court granted summary judgment and the permanent injunction on multiple grounds, including Plaintiffs' Free Exercise Clause and Establishment Clause claims, but the Court of Appeals had still issued the same opinion as in Bronx Appeal III reversing judgment and vacating the injunction.  In that scenario, the Court of Appeals' failure to address any other issue besides the free speech analysis would signal an implied rejection of the other claims.  But those are not the facts.  Additionally, neither the Court of Appeals' refusal to rehear Bronx Appeal III en banc nor the Supreme Court's denial of certiorari indicates an implied rejection of Plaintiffs' Free Exercise Clause and Establishment Clause claims.  Defense counsel at oral argument acknowledged that one "cannot read too much into" any such denial, (see Prelim. Inj. Hr'g Tr. at 16-17), and the Court itself is in no better position to do so.

light of the Court's preference for deciding cases on their
merits.[16]

### 2.  Claim Preclusion and Issue Preclusion

The doctrine of claim preclusion, or res judicata,
precludes parties to a litigation or their privies from
relitigating issues that were or could have been raised prior to
a final judgment on the merits.  See Allen v. McCurry, 449 U.S.
90, 94 (1980); Monahan v. N.Y. City Dep't of Corr., 214 F.3d
275, 284-85 (2d Cir. 2000).  The factors a court may consider
when deciding whether a final judgment on one claim has
preclusive effect on a subsequent claim include whether the same
series of transactions is at issue, whether the claims rely on
common evidence, and whether facts essential to the subsequent
claim were in play when the first claim was considered.  See
Monahan, 214 F.3d at 285.  A party raising the affirmative
defense of claim preclusion must show "(1) the previous action
involved an adjudication on the merits; (2) the previous action
involved the plaintiffs or those in privity with them; [and] (3)
the claims asserted in the subsequent action were, or could have
been, raised in the prior action."  Id.

---

[16] While the Supreme Court's decision in Hosanna-Tabor might not
amount to "a dramatic change in controlling legal authority," it
certainly strengthens Plaintiffs' excessive entanglement claim
and speaks to the significance of the new evidence highlighted
in the declarations.  Therefore, Hosanna-Tabor also factors into
this Court's determination that the mandate rule does not bar
Plaintiffs' Establishment Clause claim.

Distinct from but related to the doctrine of claim
preclusion is the doctrine of issue preclusion, or collateral
estoppel.  Issue preclusion holds that "once a court has decided
an issue of fact or law necessary to its judgment, that decision
may preclude relitigation of the issue in a suit on a different
cause of action involving a party to the first case."  Allen,
449 U.S. at 94.  A party raising the affirmative defense of
issue preclusion must show "(1) the issues in both proceedings
are identical, (2) the issue in the prior proceeding was
actually litigated and actually decided, (3) there was full and
fair opportunity to litigate in the prior proceeding, and (4)
the issue previously litigated was necessary to support a valid
and final judgment on the merits."  Transaero, Inc. v. La Fuerza
Aerea Boliviana, 162 F.3d 724, 731 (2d Cir. 1998) (quoting In re
PCH Assocs., 949 F.2d 585, 593 (2d Cir. 1991)).

Defendants argue that both these doctrines bar
relitigation of Plaintiffs' Free Exercise Clause claim in this
case because the Court of Appeals rejected Plaintiffs' Free
Exercise Clause claim in the first litigation.  In Bronx Appeal
I, the Court of Appeals considered a free exercise challenge to
Revised SOP § 5.11's predecessor—which prohibited outside
organizations from using the Board's schools for "religious
services or religious instruction"—and found it lacking in
merit:

> [Plaintiffs] contend that "[t]he School
> District flagrantly violates the Free
> Exercise Clause by singling out religious
> services and instruction for exclusion from
> its forum."  To support this contention,
> [Plaintiffs] cite Employment Division,
> Department of Human Resources v. Smith and
> Church of the Lukumi Babalu Aye, Inc. v.
> City of Hialeah.  Each of these cases
> involved specific religious practices-the
> ingestion of peyote in Smith and animal
> sacrifice in Church of the Lukumi. . . .
>
>     . . . .
>
>     The state statute and SOP under
> consideration in this case do not bar any
> particular religious practice.  They do not
> interfere in any way with the free exercise
> of religion by singling out a particular
> religion or imposing any disabilities on the
> basis of religion.  The members of the
> Church here are free to practice their
> religion, albeit in a location separate from
> [the Board's public schools].  "The free
> exercise of religion means, first and
> foremost, the right to believe and profess
> whatever religious doctrine one desires."
> Smith, 494 U.S. at 877.  That right has not
> been taken from the members of the Church.

127 F.3d at 216 (citations omitted).  Defendants argue that even

though a different policy was at issue in Bronx Appeal I, since

that policy prohibited more religious activity than the current

policy, the Court of Appeals' free exercise analysis remains

undisturbed and therefore precludes Plaintiffs from raising a

free exercise challenge in this case.

    Defendants' claim preclusion and issue preclusion

arguments suffer from the same fatal flaw.  Despite accurately

stating the respective tests for each doctrine Defendants fail to show how each element is satisfied on the facts of this case, and they cannot do so.  As to claim preclusion, Defendants cannot demonstrate that Plaintiffs raised or could have raised their current Free Exercise Clause claim, based on Revised SOP § 5.11, in the first litigation.  With respect to issue preclusion, Defendants cannot demonstrate that the issues in both proceedings are identical.  This is so because Defendants overlook a key aspect of Plaintiffs' free exercise challenge to the Board's current policy.  Even though the former version of the policy arguably excluded more religious activities because it prohibited religious instruction, Revised SOP § 5.11's ban on "religious worship services" discriminates among religions. Because only "ordained" religions are excluded under the "religious worship services" prong whereas religions with less formal worship practices are not, Plaintiffs argue that the current policy singles out certain religions in violation of the Free Exercise Clause.  At the very least, Plaintiffs' modified free exercise challenge—the exact contours of which could not have taken shape under the old policy at issue in Bronx Appeal I—warrants analysis under the test outlined in Lukumi.  Because the Court of Appeals has yet to weigh in on that analysis in light of the current policy's scope, Plaintiffs' Free Exercise Clause claim is not procedurally barred.

IV.   CONCLUSION

　　　　For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction [Dkt. No. 114] is GRANTED.  Defendants are enjoined from enforcing Ch. Reg. D-180 § I.Q so as to deny Plaintiffs' application or the application of any similarly-situated individual or entity to rent space in the Board's public schools for morning meetings that include religious worship.[17]


SO ORDERED.

Dated:    New York, New York
          February 24, 2012

                              _Loretta A. Preska_
                              UNITED STATES DISTRICT JUDGE

---

[17] The Court is, of course, aware of the Court of Appeals' order applying the temporary restraining order only to named Plaintiff Bronx Household of Faith.  With respect, however, if a rule is unconstitutional, it is unconstitutional as to all similarly-situated parties.  Defendants obviously recognized this in permitting many non-party congregations to meet during non-school hours during the pendency of the prior injunctions. Also, the Court of Appeals made no suggestion in any of the three full opinions it issued heretofore that the prior injunctions extended only to the named Plaintiffs.  Thus, with respect, this order extends to the Bronx Household of Faith and, in addition, to any similarly-situated party.