UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
THE BRONX HOUSEHOLD OF FAITH,          :        01 Civ. 8598 (LAP)
ROBERT HALL, and JACK ROBERTS,         :
                                       :
                        Plaintiffs,    :        OPINION AND ORDER
                                       :
          -against-                    :
                                       :    ┌─────────────────────────────┐
BOARD OF EDUCATION OF THE CITY OF      :    │ USDC SDNY                   │
NEW YORK and COMMUNITY SCHOOL          :    │ DOCUMENT                    │
DISTRICT NO. 10,                       :    │ ELECTRONICALLY FILED        │
                                       :    │ DOC #:                      │
                        Defendants.    :    │ DATE FILED: 6/29/12         │
------------------------------------x       └─────────────────────────────┘

LORETTA A. PRESKA, Chief United States District Judge:

        The Bronx Household of Faith, Robert Hall, and Jack

Roberts ("Plaintiffs") seek a permanent injunction against the

Board of Education of the City of New York (the "Board")[1] and

Community School District No. 10 (collectively, "Defendants") so

that Plaintiffs' Church may continue to hold Sunday religious

worship services in a New York City public school, as it has

done without interruption since this Court issued an initial

preliminary injunction in 2002 barring Defendants from enforcing

a regulation that would prohibit Plaintiffs from conducting

their religious worship services in the Board's schools.

        On February 24, 2012, the Court issued an order [Dkt.

No. 131] granting Plaintiffs' most recent motion for a

---

[1] Not so far into this litigation the Board of Education was
renamed the Department of Education.  While this opinion remains
faithful to the captioned name, references to the Board should
be treated as synonymous with the Department of Education.

preliminary injunction and enjoining Defendants from enforcing Chancellor's Regulation D-180 so as to deny Plaintiffs' application or the application of any similarly-situated individual or entity to rent space in Defendants' public schools for morning meetings that include religious worship.  See -- F. Supp. 2d --, 2012 WL 603993 (S.D.N.Y. Feb. 24, 2012) ("Bronx III").[2]  Defendants immediately appealed, but the Court of Appeals declined to hear the appeal and instead directed this Court to render a final judgment.  See Bronx Household of Faith v. Bd. of Educ. of the City of N.Y., No. 12-0751, slip op. at 2 (2d Cir. Feb. 29, 2012).  Consequently, the parties agreed to expedite limited discovery and set a briefing schedule for submitting their cross-motions for summary judgment.  The Court heard oral argument on the motions on June 1, 2012.  For the reasons stated below, Plaintiffs' motion for summary judgment is GRANTED, and Defendants' cross-motion for summary judgment is DENIED.[3]

---

[2] For consistency's sake, the case abbreviations used in this opinion to refer to the multiple pronouncements in this litigation in both this Court and the Court of Appeals follow those this Court used in its February 2012 opinion.

[3] The Court has considered the following submissions in connection with the parties' motions: Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment; Plaintiffs' Opposition to Defendants' Cross-Motion for Summary Judgment and Reply in Further Support of Plaintiffs' Motion for Summary Judgment; Memorandum of Law of Amicus Curiae the Becket Fund for (cont'd on next page)

2

(cont'd from previous page)
Religious Liberty in Support of Plaintiffs' Motion for Summary
Judgment ("Becket Mem."); Memorandum of Law of Amici Curiae
Council of Churches of the City of New York et al. in Support of
Plaintiffs' Motion for Summary Judgment; Plaintiffs' Response to
Defendants' Re-Filed 2005 Statement of Material Facts Pursuant
to Rule 56.1 ("Pl. 56.1"); Plaintiffs' Response to Defendants'
Supplemental Statement of Material Facts ("Pl. Suppl. 56.1");
Declaration of Jordan W. Lorence in Support of Plaintiffs'
Motion for Summary Judgment, dated April 20, 2012 ("Lorence
Decl."); Second Declaration of Katie Lynn Geleris in Support of
Plaintiffs' Motion for Summary Judgment, dated May 11, 2012
("Geleris Decl."); Second Declaration of Travis C. Barham in
Support of Plaintiffs' Motion for Summary Judgment, dated May
14, 2012 ("Barham Decl."); Declaration of Brad Hertzog, Pastor
of Reformation Presbyterian Church, in Support of Plaintiffs'
Motion for Summary Judgment, dated April 19, 2012 ("Hertzog
Decl."); Declaration of Ryan Holladay, Pastor of Lower Manhattan
Community Church, in Support of Plaintiffs' Motion for Summary
Judgment, dated May 2, 2012 ("Holladay Decl."); Declaration of
Marilynn N. Cole in Support of Plaintiffs' Motion for Summary
Judgment, dated May 10, 2012 ("Cole Decl."); Declaration of
Jeremy Del Rio in Support of Plaintiffs' Motion for Summary
Judgment, dated May 11, 2012 ("Del Rio Decl."); Declaration of
Robert Hall in Support of Plaintiffs' Motion for Summary
Judgment, dated May 14, 2012 ("Hall Decl."); Memorandum of Law
in Support of Defendants' Cross-Motion for Summary Judgment and
in Opposition to Plaintiffs' Motion for Permanent Injunction
("Def. Mem."); Defendants' Reply Memorandum ("Def. Reply Mem.");
Defendants' Response to Plaintiffs' Rule 56.1 Statement of
Undisputed Material Facts in Support of Their Motion for Summary
Judgment ("Def. 56.1"); Declaration of Jonathan Pines in Support
of Defendants' Cross-Motion for Summary Judgment, dated April
20, 2012; Declaration of Sandy Brawer in Support of Defendants'
Cross-Motion for Summary Judgment, dated April 20, 2012 ("Brawer
Decl."); Declaration of Lois Herrera in Support of Defendants'
Cross-Motion for Summary Judgment, dated May 12, 2012 ("Herrera
Decl."); Declaration of Tom W. Smith in Support of Defendants'
Cross-Motion for Summary Judgment, dated May 15, 2012;
Supplemental Declaration of Jonathan Pines in Support of
Defendants' Cross-Motion for Summary Judgment, dated May 15,
2012; and Supplemental Declaration of Charles Carey in Support
of Defendants' Cross-Motion for Summary Judgment, dated May 15,
2012 ("Carey Decl.").

I.   BACKGROUND

  A.   Relevant Facts

       The history of this litigation, which dates back to
1995, has been recounted multiple times throughout its multiple
movements between this Court and the Court of Appeals, including
most recently in this Court's February 2012 opinion granting
Plaintiff's motion for a preliminary injunction.  See Bronx III,
2012 WL 603993, at *1-4.  The Court thus presumes the readers'
familiarity with the facts of the case and recites here only
those facts most pertinent to the parties' cross-motions for
summary judgment, especially those which have come to light
during recent discovery.[4]

       The Bronx Household of Faith (the "Church") is a 37-
year-old, "community-based" Christian church.  Id. at *1.
Approximately ninety people currently attend the Church,
including thirty children.  (Hall Decl. ¶ 5.)  Pursuant to an
initial preliminary injunction granted in an earlier phase of
this litigation, the Church has used the school auditorium in
P.S. 15 in the Bronx, New York, on a weekly basis since 2002 for
purposes of holding its Sunday worship services.  Bronx III,

_____

[4] For a recitation of the facts involving earlier phases of this
litigation, see this Court's prior opinions, 400 F. Supp. 2d
581, 585-89 (S.D.N.Y. 2005) ("Bronx II"); 226 F. Supp. 2d 401,
403-11 (S.D.N.Y. 2002) ("Bronx I").  For a discussion of the
procedural history that led to Plaintiffs' recent request for a
preliminary injunction, see Bronx III, 2012 WL 603993, at *4.

2012 WL 603993, at *1.  The Church has moved five times since its inception, each move necessitated by the need for a larger space to accommodate all those who attend the Church's services and meetings.  (Hall Decl. ¶ 4.)  P.S. 15 currently serves the Church's need to "meet collectively in one location so that [all its members] can fellowship together during . . . service[s]," which is "vitally important to the Church's theological beliefs."  (Id. ¶ 6.)  None of the Church's previous meeting locations can accommodate all the Church's current attendees.  (Id.)

        The Board owns and controls 1,197 school facilities in New York City.  (Def. 56.1 ¶ 8.)  Defendants seek to enforce in full Chancellor's Regulation D-180 ("Ch. Reg. D-180"), which constitutes the Board's policy on granting "extended use" permits to use the Board's schools for activities occurring outside normal school hours and on days when schools are not in session.  Ch. Reg. D-180 generally authorizes the use of school facilities for "holding social, civic, and recreational meetings and entertainment, and other uses pertaining to the welfare of the community," provided that "such uses shall be non-exclusive and open to the general public."  (Id. ¶¶ 11-13.)  Section I.Q of Ch. Reg. D-180 provides that "[n]o permit shall be granted for the purpose of holding religious worship services, or

otherwise using a school as a house of worship."[5]  (Id. ¶¶ 11,

18.)  However, the regulation also provides that "[p]ermits may

be granted to religious clubs for students that are sponsored by

outside organizations and otherwise satisfy the requirements of

this regulation on the same basis that they are granted to other

clubs for students that are sponsored by outside organizations."

(Id. ¶¶ 11, 17.)  Pursuant to Ch. Reg. D-180, Defendants allow

community-based organizations to use the Board's public school

facilities after school hours, including week nights, weekends,

holidays, and over the summer.  (Id. ¶ 12.)  Defendants require

all permit holders to post a disclaimer on any public notice or

other material, including media and the Internet, that states:

"This activity is not sponsored or endorsed by the New York City

Department of Education or the City of New York."  (Id. ¶ 25.)

   B.   The Preliminary Injunction

        On February 24, 2012, this Court granted Plaintiffs'

motion for a preliminary injunction.  The Court found the

deprivation of Plaintiffs' First Amendment free exercise rights

to constitute irreparable harm.  Bronx III, 2012 WL 603993, at

---

[5] For simplicity's sake, as well as to be consistent with the
parties' apparent preference, going forward this opinion uses
the abbreviation "Ch. Reg. D-180" to refer specifically to
section I.Q of the regulation.  Only section I.Q of Chancellor's
Regulation D-180 is being challenged in this litigation.  To be
clear, this opinion should not be read as invalidating the
entire regulation but rather only section I.Q.  The Board
currently implements the remaining provisions of the regulation
without issue and remains free to do so.

*5.  Regarding Plaintiffs' likelihood of success on the merits, the Court first found that under the Supreme Court's Free Exercise Clause analysis in <u>Church of Lukumi Babalu Aye, Inc. v. City of Hialeah</u>, 508 U.S. 520, 532-33 (1993), Ch. Reg. D-180 is not neutral both on its face—because it "refers to a religious practice without a secular meaning discernable from the language or context"—and because it "discriminates between those religions that fit the 'ordained' model of formal religious worship services and those religions whose worship practices are far less structured."  2012 WL 603993, at *6-7 (internal quotation marks and citations omitted).

Having found the regulation not to be neutral, the Court noted that Ch. Reg. D-180 only passes constitutional muster if it meets a strict scrutiny analysis, meaning Defendants must show the policy serves a compelling state interest and is narrowly tailored to advance that interest.  <u>Id.</u> at *7.  The Court then found that Defendants could not satisfy either prong of the strict scrutiny analysis.  First, the Court found that the Board's stated interest in avoiding the perception that it was endorsing religion is not sufficiently compelling because allowing religious worship services in the Board's schools during non-school hours does not violate the Establishment Clause.  <u>Id.</u> at *8-10.  This is particularly true given that the objective observer would "know from the

7

legislative history and implementation of the policy (including the lengthy judicial history) that the Board's actions betoken great effort to <u>avoid</u> establishing any religion." <u>Id.</u> at *9.

Second, the Court found that Ch. Reg. D-180 does not even advance the Board's stated interest because, in light of the types of religious activities that are expressly permitted in the Board's schools under <u>Good News Club v. Milford Central School</u>, 533 U.S. 98 (2001), <u>e.g.</u>, prayer, religious instruction, expression of devotion to God, and the singing of hymns, the policy's ban on religious worship services is ineffective.  2012 WL 603993, at *10-11 ("Because the individual elements of [worship] services are expressly permitted, the policy's ban on 'religious worship services' is entirely ineffective in dispelling any confusion in the mind of the objective observer over State endorsement of religion.  The Board is just as likely to be perceived as endorsing religion with the ban in place as with it enjoined.").  The Court further found that Ch. Reg. D-180 is not narrowly tailored "[b]ecause the Board has not shown that other, less restrictive measures would fail to advance the Board's stated interest." <u>Id.</u> at *11-12.

In addition, based on new evidence regarding how the Board was implementing Ch. Reg. D-180 and the Supreme Court's recent decision in <u>Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC</u>, 132 S. Ct. 694 (2012), the Court found that the

policy violates the Establishment Clause by fostering excessive
government entanglement with religion.  2012 WL 603993, at *12-
16.  Finally, the Court found that Plaintiffs' Free Exercise
Clause and Establishment Clause claims were not procedurally
barred.  Id. at *17-19.

> Plaintiffs now seek to convert the February 2012
preliminary injunction into a permanent injunction by way of
their motion for summary judgment and reassert that Ch. Reg. D-
180 violates their free exercise rights and fosters excessive
government entanglement with religion in violation of the
Establishment Clause.

> Defendants, for their part, reargue that enforcing Ch.
Reg. D-180's ban on religious worship services does not violate
Plaintiffs' free exercise rights and that enforcing the ban is
in fact necessary to avoid violating the Establishment Clause.
Defendants also restate that implementation of Ch. Reg. D-180
does not require Defendants to entangle themselves excessively
with religion, and therefore the policy does not run afoul of
the Establishment Clause.

> Having considered the latest evidence and the parties'
respective arguments, the Court determines that its reasons for
granting Plaintiffs' motion for a preliminary injunction were
sound and that implementation of Ch. Reg. D-180 violates both
the Free Exercise Clause and the Establishment Clause.  Rather

than merely repeat here the reasoning set forth in <u>Bronx III</u>—
which, to be sure, the Court readopts—this opinion primarily
addresses why Defendants' latest arguments fail.[6]


II.  LEGAL STANDARD FOR SUMMARY JUDGMENT

        Summary judgment is appropriate when no genuine
dispute as to any material fact exists and the moving party is
entitled to judgment as a matter of law.  <u>See</u> Fed. R. Civ. P.
56(a); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23
(1986).  The substantive law governing the suit identifies the
essential elements of the claims asserted and therefore
indicates whether a fact is material; a fact is material if it
"might affect the outcome of the suit under the governing law."
<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).
"[T]he dispute about a material fact is 'genuine' . . . if the

---

[6] The Court here briefly disposes of Defendants' procedural
arguments.  In support of their cross-motion for summary
judgment, Defendants "reassert, and incorporate by reference"
their arguments presented in opposition to Plaintiffs' motion
for a preliminary injunction that Plaintiffs' Free Exercise
Clause and Establishment Clause claims are procedurally barred.
(Def. Mem. at 33-34.)  The Court similarly incorporates by
reference the reasons stated in <u>Bronx III</u> why the Court
disagrees.  2012 WL 603993, at *17-19.  The Court notes that the
Court of Appeals apparently disagrees with Defendants'
procedural arguments, too.  <u>See</u> <u>Bronx Household of Faith v. Bd.
of Educ. of the City of N.Y.</u>, No. 12-0751, slip op. at 2 (2d
Cir. Feb. 29, 2012) ("In the twelfth year of this litigation,
the district court has granted a new preliminary injunction
adjudicating grounds <u>previously not addressed</u>." (emphasis
added)).

evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

To determine whether a genuine dispute of material fact exists, a court must review the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986); Lucente v. IBM Corp., 310 F.3d 243, 253 (2d Cir. 2002). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ." Fed. R. Civ. P. 56(c)(1)(A). Where, as here, an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); see Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d Cir. 2008). Ultimately, the court must grant summary judgment "if, under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson, 477 U.S. at 250.


III. DISCUSSION

The Court finds Plaintiffs have satisfied their burden of demonstrating that no genuine dispute as to any material fact

exists and that they are entitled to judgment as a matter of law on their Free Exercise Clause and Establishment Clause claims. Each claim is addressed below.

A.   Ch. Reg. D-180 Violates the Free Exercise Clause

The Free Exercise Clause of the First Amendment, as applied to the states through the Fourteenth Amendment, provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]." U.S. Const. amend. I. "At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." Lukumi, 508 U.S. at 532. In Bronx III, 2012 WL 603993, at *6-12, the Court found that Ch. Reg. D-180 unconstitutionally burdens Plaintiffs' free exercise rights under the test laid out in Lukumi because it is not neutral and does not satisfy strict scrutiny. See Lukumi, 508 U.S. at 546 ("A law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny. To satisfy the commands of the First Amendment, a law restrictive of religious practice must advance interests of the highest order and must be narrowly tailored in pursuit of those interests." (internal quotation marks omitted)); see also Fifth Ave. Presbyterian Church v. City of N.Y., 293 F.3d 570, 574 (2d Cir. 2002) ("Government enforcement of laws or policies that

substantially burden the exercise of sincerely held religious beliefs is subject to strict scrutiny.").

Plaintiffs and amici curiae agree with the Court's prior conclusion that Ch. Reg. D-180 is unconstitutional under Lukumi.  Defendants, on the other hand, raise three primary objections to that conclusion.  First, Defendants argue that Ch. Reg. D-180 does not burden, let alone substantially burden, Plaintiffs' free exercise rights.  Second, they argue that Lukumi and strict scrutiny do not apply to the facts of this case.  Instead, they urge the Court to adopt the reasoning of Locke v. Davey, 540 U.S. 712 (2004), under which Defendants say Ch. Reg. D-180 passes constitutional muster.  Finally, Defendants argue that even if Lukumi applies, Ch. Reg. D-180 withstands strict scrutiny.  The Court finds all three objections to be without merit.

1.   Ch. Reg. D-180 Burdens Plaintiffs' Free Exercise Rights

In Bronx III, the Court highlighted the burdens on Plaintiffs' free exercise rights that would result from Defendants' implementation of Ch. Reg. D-180.  The Court noted:

> Plaintiffs claim that because [Ch. Reg. D-180] prevents them from holding Sunday worship services in the Board's public schools—the only location in which they can afford to gather as a full congregation without having to curtail other of their religious practices—it prohibits their free exercise of religion in violation of their

13

First Amendment rights.  Plaintiffs assert
the prohibitive cost of renting commercial
space for the Church's worship services
would force them "to reduce and/or eliminate
ministries to [the Church's] members and
. . . local community."  "[The] entire
congregation could no longer worship
together," which would "undermine the
fellowship" that is a "vital aspect of [the
Church's] religious ministry and calling."
Being banned from using the Board's schools
would also "undermine [the Church's] ability
to engage in the duties of [the Church's]
Christian faith—to corporately pray for one
another, hear testimony, engage in
collective praise, and serve the local
community."  "In addition, [the Church] will
lose some [congregants] because they would
not be able to participate in [the Church's]
vital Sunday ministry.  Many of these
individuals are elderly, disabled, or lack
transportation, and traveling to another
location is not an option."

2012 WL 603993, at *5 (citations omitted) (all but the first

alteration in original).  Defendants raise two grounds—one legal

and the other factual—for why the foregoing does not constitute

any burden on Plaintiffs' free exercise rights.

First, Defendants cite the Court of Appeals'

determination that the predecessor to Ch. Reg. D-180 did not

raise any free exercise concerns to suggest that the current

regulation is similarly immune from any free exercise challenge:

"[P]laintiffs' rights under the Free Exercise Clause are not

burdened because [Ch. Reg. D-180] does 'not interfere in any way

with the free exercise of religion by singling out a particular

religion or imposing any disabilities on the basis of religion'

. . . ."  (Def. Mem. at 5 (quoting 127 F.3d 207, 216 (2d Cir. 1997) ("Bronx Appeal I")).)  But this, of course, is no longer true with respect to Ch. Reg. D-180 because the new regulation both discriminates against religion on its face and discriminates among religions.  See Bronx III, 2012 WL 603993, at *6-7.

Moreover, Plaintiffs' Church has grown considerably since the Court of Appeals decided Bronx Appeal I.  In this regard, the remainder of the quote that Defendants cite, with all due respect, is stale:

> The members of the Church here are free to practice their religion, albeit in a location separate from [the Board's public schools].  "The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires."  That right has not been taken from the members of the Church.

Bronx Appeal I, 127 F.3d at 216 (quoting Emp't Div. v. Smith, 494 U.S. 872, 877 (1990)).  This characterization of Ch. Reg. D-180's effect on Plaintiffs' free exercise rights ignores the thrust of Lukumi that besides protecting "the right to believe and profess whatever religious doctrine one desires," the Free Exercise Clause also bans government interference with religious "outward physical acts," Hosanna-Tabor, 132 S. Ct. at 707, such as the conduct of worship services at issue in this case, see 650 F.3d 30, 37 (2d Cir. 2011) ("Bronx Appeal III") (defining

15

"worship services" as "a collective <u>activity</u> characteristically done according to an order prescribed by and under the auspices of an organized religion, typically but not necessarily <u>conducted</u> by an ordained official of the religion" (emphasis added)).  Because the unopposed testimony is that P.S. 15 is the "<u>only</u> location in which [Plaintiffs] can afford to gather as a <u>full</u> congregation without having to curtail other of their religious practices," <u>Bronx III</u>, 2012 WL 603993, at *5 (emphasis added), it cannot be gainsaid that Ch. Reg. D-180 burdens Plaintiffs' free exercise rights.[7]

        Second, Defendants argue that because Plaintiffs' Church has moved five times since its inception and "has not only survived such relocations, but has grown after each one" and because certain members of the Church own five houses within one block of P.S. 15—"sites that are not only potentially available for the Church's use, but are, in fact, currently being used by [Plaintiffs] for Church-related activities"—

_____

[7] Even the Court in <u>Locke</u>—which Defendants urge is the more appropriate case to <u>apply</u> on the facts of this litigation, <u>see</u> <u>infra</u> Part III.A.2—acknowledged that the challenged law there placed <u>some</u> burden on the plaintiff's free exercise rights. <u>See, e.g.</u>, <u>Locke</u>, 540 U.S. at 725 ("[T]he exclusion of . . . funding [the pursuit of devotional degrees] places a relatively minor burden on [plaintiff].").  If the challenged law in <u>Locke</u>, which excluded students who were pursuing a degree in devotional theology from participating in a state scholarship program, at least placed some form of burden—if only a "relatively minor" one—on the free exercise of religion, surely so does Ch. Reg. D-180's ban on religious worship services.

enforcing Ch. Reg. D-180 so as to ban the Church from holding its Sunday worship services in the Board's schools will not cause any harm to Plaintiffs.  (Def. Mem. at 4.)  But this argument ignores the undisputed testimony of Plaintiff Hall that no other location besides P.S. 15 currently facilitates the Church's religious mandate to worship as an <u>entire</u> congregation. Furthermore, if forced to worship elsewhere, the Church would have no choice but "to reduce and/or eliminate ministries to [the Church's] members and . . . local community."  <u>Bronx III</u>, 2012 WL 603993, at *5 (alterations in original).  And even though the Church is in the process of constructing its own building as a permanent place to hold its worship services, that building is not yet complete.  (Pl. Suppl. 56.1 ¶ 6.)  As such, and given the uniquely expensive and crowded real estate market in which the Church resides, eviction from the Board's schools would amount to a concrete loss of religious freedom.[8]

　　　　Ultimately, given the plain text of Ch. Reg. D-180,

---

[8] Defendants' attempt to marshal the Church's resources and dictate how those resources should be deployed gives the Court great concern because it suggests that Defendants believe they know best how the Church should conduct its religious affairs. But only Plaintiffs may "decide for themselves, free from state interference, [such] matters of church government as well as those of faith and doctrine."  <u>Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.</u>, 344 U.S. 94, 116 (1952). Certainly Plaintiffs' assessment of what qualifies as sufficient space to conduct the Church's worship services is an "internal church decision," which is outside Defendants' regulatory authority.  <u>Hosanna-Tabor</u>, 132 S. Ct. at 706-07.

the additional fact that the regulation discriminates <u>among</u>
religions, controlling caselaw regarding what constitutes a
burden on the free exercise of religion, and Plaintiff Hall's
unopposed testimony that the Church would be forced to curtail
its religious practices were it no longer allowed to hold its
worship services in P.S. 15, the Court rejects Defendants'
argument that Ch. Reg. D-180 places no burden on Plaintiffs'
free exercise rights.

> 2.  <u>Lukumi and Strict Scrutiny Apply to Plaintiffs'
> Free Exercise Clause Claim</u>

In <u>Bronx III</u>, the Court touched upon Defendants'
argument that the test in <u>Lukumi</u> should not apply on the facts
of this case due to the existence here of a competing
Establishment Clause concern.  The Court noted:

> At oral argument, counsel for Defendants
> urged that there could be no Free Exercise
> Clause violation in this case because the
> cases cited by Plaintiffs in which the
> Supreme Court found such violations did not
> involve a defendant who was motivated by a
> desire to avoid violating the Establishment
> Clause.  <u>E.g.</u>, <u>Lukumi</u>, 508 U.S. 520.
> Because [Ch. Reg. D-180] results from the
> Board's balancing of competing
> constitutional mandates, Defendants argue
> Plaintiffs' Free Exercise Clause claim is
> precluded.  The Court disagrees.  That the
> Board may need to balance competing
> interests does not foreclose Plaintiffs'
> claim but rather speaks to whether [Ch. Reg.
> D-180] meets strict scrutiny, <u>i.e.</u>, whether
> the Board's interest in adopting the policy
> is compelling and whether the policy is
> narrowly tailored to advance that interest.

2012 WL 603993, at *7 n.10; cf. Bronx Appeal III, 650 F.3d at 59
(Walker, J., dissenting) ("[T]he majority argues that my finding
of viewpoint discrimination overlooks the Board's Establishment
Clause rationale. . . . [E]ven if the Board were to have
legitimate Establishment Clause concerns, those concerns could
do nothing to undermine my conclusion that the Board engaged in
viewpoint discrimination; at most, they could only serve as a
potential justification for such discrimination." (citation
omitted)).  Defendants have elaborated on their argument that
Lukumi is inapplicable for purposes of the pending cross-motions
for summary judgment, but the Court remains unpersuaded.

First, Defendants argue that applying Lukumi's strict
scrutiny analysis in the presence of Defendants' competing
Establishment Clause concern would essentially render the
Establishment Clause meaningless.  Defendants say:

> If plaintiffs' expansive reading of
> Lukumi were to prevail, most government
> restrictions on religious activity that have
> been upheld based upon Establishment Clause
> concerns-for example, the prohibition on
> prayer in public schools, see Engel v.
> Vitale, 370 U.S. 421 (1962)-would instead
> have been struck down on free exercise
> grounds as "non-neutral" to religious
> expression and exercise.  The flaw in this
> analysis is that, extended to its logical
> conclusion, the reasoning would find every
> Establishment Clause concern advanced by the
> government, necessarily singling out as its
> concern religious speech and conduct, to be
> unconstitutionally "non-neutral" and

19

therefore presumptively unconstitutional.
(Def. Mem. at 10.)  As an initial matter, the Court notes that
Defendants mischaracterize the posture of <u>Engel</u>.  In that case,
the state defendants had adopted a policy "direct[ing] the
School District's principal to cause . . . [a] prayer to be said
aloud by each class in the presence of a teacher at the
beginning of each school day."  <u>Engel</u>, 370 U.S. at 422-23.  The
parents of ten students affected by the policy subsequently
brought suit alleging that a mandate of prayer in public schools
violated the Establishment Clause, <u>id.</u> at 423, and the Supreme
Court agreed, <u>see id.</u> at 424 ("We think that by using its public
school system to encourage recitation of . . . prayer, the State
of New York has adopted a practice wholly inconsistent with the
Establishment Clause.").  Thus, it was the Supreme Court—not a
state actor—that announced the prohibition on prayer in public
school.  Because no state law involving a "government
restriction[] on religious activity" was at issue in <u>Engel</u>,
(Def. Mem. at 10), Defendants' citation thereto does not support
their argument.  <u>See also generally</u> <u>Lee v. Weisman</u>, 505 U.S. 577
(1992) (finding similar Establishment Clause violation in public
school district's inclusion of prayer in its graduation
ceremonies).

        But even putting aside Defendants' mischaracterization
of the posture of the "school prayer" cases, it is important to

note that those cases did not involve competing Free Exercise
Clause claims.  That is, the proponents of the policies that
introduced prayer in the public schools did not assert a free
exercise justification to counter the Establishment Clause
concerns raised by the plaintiffs.  Nor could they, as no burden
was placed on the free exercise of religion in the absence of
the policies that mandated school prayer.  The school prayer
cases, therefore, stand for the unremarkable proposition that
"[t]he principle that government may <u>accommodate</u> the free
exercise of religion does not supersede the fundamental
limitations imposed by the Establishment Clause."  <u>Lee</u>, 505 U.S.
at 587 (emphasis added).

        In the absence of a burden on the free exercise of
religion[9] and the presence of a concrete Establishment Clause
violation, the school prayer cases were relatively simple cases.
An entirely different situation is presented here, however,

---

[9] Because freedom of religion also means freedom from religion,
one of the concurrences in <u>Lee</u> viewed as coercion the mandatory
nature of the graduation ceremonies that included prayer, in
violation of the Free Exercise Clause.  <u>See</u> 505 U.S. at 621
(Souter, J., concurring) ("[L]aws that coerce nonadherents to
support or participate in any religion or its exercise would
virtually by definition violate their right to religious free
exercise." (internal quotation marks and citation omitted)).
Thus, the school prayer cases may be characterized as presenting
both Establishment Clause and Free Exercise Clause violations on
the same side of the coin.  This case, in contrast, does not
implicate the issue of coercion because Plaintiffs' meetings
occur on Sundays (<u>i.e.</u>, during non-school hours) and no student
is forced to attend them.

where at issue is not the accommodation of religion but rather the <u>burdening</u> of religion, <u>see</u> <u>supra</u> Part III.A.1, and where no <u>actual</u> Establishment Clause violation is of concern, <u>see</u> <u>infra</u> Part III.A.3.  In other words, Defendants' argument that applying <u>Lukumi</u> to the facts of this case reads the Establishment Clause out of the Constitution is simply not true: a concern over an actual violation of the Establishment Clause could certainly justify a burden on the free exercise of religion under <u>Lukumi</u>.[10]

---

[10] Justice Scalia's dissent in <u>Locke</u> addressed a similar argument to the one Defendants put forth here and explained why it is really just form over substance:

> Equally unpersuasive is the [majority's] argument that the State may discriminate against theology majors in distributing public benefits because the Establishment Clause and its state counterparts are themselves discriminatory. The [majority's] premise is true at some level of abstraction-the Establishment Clause discriminates against religion by singling it out as the one thing a State may not establish.  All this proves is that a State has a compelling interest in not committing <u>actual</u> Establishment Clause violations.  We have never inferred from this principle that a State has a constitutionally sufficient interest in discriminating against religion in whatever other context it pleases, so long as it claims some connection, however attenuated, to establishment concerns.

540 U.S. at 730 n.2 (Scalia, J., dissenting) (citations omitted).  Furthermore—and somewhat ironically—Defendants'
(cont'd on next page)

Defendants next argue that given the competing interests of Plaintiffs' free exercise rights and Defendants' purported Establishment Clause concern, the Court should decline to apply strict scrutiny based on the reasoning set forth in Locke.  The plaintiff in that case was a resident of the State of Washington who was awarded a state-funded college scholarship.  See 540 U.S. at 715-17.  Pursuant to the Washington State Constitution, however, no student who was pursuing a degree in devotional theology could participate in the scholarship program.  Id. at 716.  The plaintiff, who sought to use his scholarship to pursue a degree in pastoral ministries, brought suit against certain state officials alleging the State's refusal to apply the scholarship towards a degree in devotional theology violated, inter alia, his free exercise rights.  Id. at 718.  The Court of Appeals declared the scholarship program unconstitutional under Lukumi because it found that the State had singled out religion for unfavorable treatment, thereby triggering strict scrutiny, and that the State's Establishment Clause concerns were not sufficiently

---

(cont'd from previous page)
position that a state actor requires only a rational basis regarding an antiestablishment concern in order to justify religious discrimination threatens to nullify the Free Exercise Clause.  See id. ("If religious discrimination required only a rational basis, the Free Exercise Clause would impose no constraints other than those the Constitution already imposes on all government action.").

compelling.  Id.

The Supreme Court reversed, finding that the "'room for play in the joints'" between the Religion Clauses permitted the scholarship program's challenged exclusion.  Id. at 718 (quoting Walz v. Tax Comm'n of City of N.Y., 397 U.S. 664, 669 (1970)).  "In other words, there are some state actions permitted by the Establishment Clause but not required by the Free Exercise Clause."  Id. at 718-19.  The Court held that the Establishment Clause did not require Washington to ban the funding of religious instruction that prepares students for the ministry, even if the Washington State Constitution did.  Id. at 719.

Additionally, given Washington's only "mild[]" disfavor of religion, id. at 720-21 ("The State has merely chosen not to fund a distinct category of instruction."), and the unique historical concern that most States had "around the time of the founding . . . against using tax funds to support the ministry," id. at 723, the Court decided that Lukumi's "presumption of unconstitutionality"—i.e., strict scrutiny—did not apply, id. at 725 ("Given the historic and substantial interest at issue, we therefore cannot conclude that the denial of funding for vocational religious instruction alone is inherently constitutionally suspect.").  Having decided not to apply strict scrutiny, the Court upheld the challenged law.  Id.

But the Court also did not articulate the exact test it was applying other than to say the scholarship program's carve-out was permitted by the "play in the joints" between the Religion Clauses.  See id. at 730 (Scalia, J., dissenting) ("[T]he [majority's] opinion is devoid of any mention of standard of review . . . .").

In light of the facts of this case, the Court rejects Defendants' argument that Locke is the more appropriate case to apply.  For starters, the Court in Locke made clear that the scholarship program at issue was "not a forum for speech" and that consequently the Court's cases dealing with speech forums were "simply inapplicable."  Id. at 720 n.3.  Defendants acknowledge as much.  (Def. Mem. at 8 n.4.)  In fact, the Court did not reference a specific category of cases within which Locke comfortably fit.  Instead, the Court merely characterized the competing claims at issue there as being compatible with the "play in the joints" between the Religion Clauses and, in doing so, did not seem concerned with establishing much precedential value.  See id. at 725 ("If any room exists between the two Religion Clauses, it must be here.  We need not venture further into this difficult area . . . .").  Thus, even the Locke Court itself intimated that Locke is sui generis.

In addition, "Locke involved neither discrimination among religions nor intrusive determinations regarding contested

25

religious questions." Colo. Christian Univ. v. Weaver, 534 F.3d 1245, 1256 (10th Cir. 2008).  The same cannot be said here. First, Ch. Reg. D-180's ban on religious worship services "discriminates between those religions that fit the 'ordained' model of formal religious worship services and those religions whose worship practices are far less structured." Bronx III, 2012 WL 603993, at *7 (citation omitted).  "[L]aws discriminating among religions are subject to strict scrutiny." Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos, 483 U.S. 327, 339 (1987).  Second, the Board's policy of verifying whether applicants are in fact worshiping in the Board's schools "entail[s] intrusive governmental judgments regarding matters of religious belief and practice," Colo. Christian Univ., 534 F.3d at 1256, in violation of the Establishment Clause, see infra Part III.B.

Finally, the counter-interests at play in this case are altogether differently balanced from those at issue in Locke.  While the Locke Court confronted a minimal burden on the free exercise of religion and a substantial and historic antiestablishment interest, here the Court faces a substantial burden on Plaintiffs' free exercise rights[11] and a misperceived

---

[11] The Court finds that the free exercise burdens Plaintiffs say they would face were Defendants permitted to enforce Ch. Reg. D-180, see supra Part III.A.1, are undoubtedly substantial.  But (cont'd on next page)

Establishment Clause concern raised by Defendants.[12]  Because of

this additional fact that the constitutional scales tilt in the

opposite direction here than in <u>Locke</u>, the Court determines that

<u>Locke</u> is inapposite.[13]  See <u>Colo. Christian Univ.</u>, 534 F.3d at

1255-56 ("The Court's . . . holding [in <u>Locke</u>] that 'minor

---

(cont'd from previous page)
even putting aside the qualitative nature of the burdens alleged
in this case, the Court agrees with the general proposition that
"[t]he indignity of being singled out for special burdens on the
basis of one's religious calling [on the face of a statute] is
so profound that the concrete harm produced can never be
dismissed as insubstantial." <u>Locke</u>, 540 U.S. at 731 (Scalia,
J., dissenting).  Indeed, as much is implied by <u>Lukumi</u>'s
directive to apply strict scrutiny when presented with a law
that is not neutral.

[12] Furthermore, whereas history was on the state defendant's side
in <u>Locke</u>, it appears Plaintiffs can lay claim to it here.  <u>See
infra</u> Part III.A.3.

[13] At oral argument, Defendants took issue with Plaintiffs'
suggestion that only an actual Establishment Clause violation
could justify <u>any</u> burden on the free exercise of religion and
cited <u>Locke</u> as an example where the Supreme Court tolerated such
a burden even in the absence of such a violation.  The Court
does not dispute Defendants' reading of <u>Locke</u> yet fails to see
the relevance of Defendants' point.  Because the Court did not
apply strict scrutiny in <u>Locke</u>, the bar was lowered such that
the state-defendant was not required to show an actual violation
of the Establishment Clause in order to prove the
constitutionality of the challenged law.  But where there is a
greater burden placed on the free exercise of religion such that
strict scrutiny does apply, as in this case, the Supreme Court's
jurisprudence suggests only an <u>actual</u> violation of the
Establishment Clause amounts to a compelling interest that could
justify so considerable a burden on religion.  <u>Cf., e.g.</u>,
<u>Capitol Square Review & Advisory Bd. v. Pinette</u>, 515 U.S. 753,
761-62 (1995) (noting that, in the context of free speech
analysis, "compliance with the Establishment Clause is a state
interest sufficiently compelling to justify content-based
restrictions on speech").

burden[s]' and 'milder' forms of 'disfavor' are tolerable in service of 'historic and substantial state interest[s]' implies that major burdens and categorical exclusions from public benefits might not be permitted in service of lesser or less long-established governmental ends." (quoting <u>Locke</u>, 540 U.S. at 720, 725) (all but the first two alterations in original)).

      3.  <u>Ch. Reg. D-180 Does Not Withstand Strict Scrutiny</u>

Defendants argue that Ch. Reg. D-180 survives even a strict scrutiny analysis.  They say the Board's interest in avoiding an Establishment Clause violation has already been deemed compelling by the Court of Appeals and is further supported by the latest evidence adduced in this case. Defendants also say Ch. Reg. D-180 is narrowly tailored to advance the Board's compelling interest.  Here, too, the Court disagrees.

      a)  <u>Defendants Do Not Have a Compelling Interest</u>

First, contrary to Defendants' reading of <u>Bronx Appeal III</u>, the Court of Appeals did not hold that Defendants' stated interest in "seek[ing] to steer clear of violating the Establishment Clause" was compelling for purposes of a strict scrutiny analysis.  650 F.3d at 40.  Because the Court of Appeals was conducting a limited public forum free speech analysis, its task was only to determine whether Ch. Reg. D-180's ban on religious worship services was reasonable in light

of the purposes served by the forum.  While the Court of Appeals cited the undisputed proposition that "an interest in avoiding a <u>violation</u> of the Establishment Clause 'may be characterized as compelling,'" the reasonableness inquiry at issue did not require it to "decide whether use of the school for worship services would in fact violate the Establishment Clause." <u>Id.</u> (emphasis added) (quoting <u>Widmar v. Vincent</u>, 454 U.S. 263, 271 (1981)).  And the Court of Appeals did not voluntarily confront that question.  <u>Id.</u> at 43 ("To reiterate, we do not say that [an Establishment Clause] violation has occurred, or would occur but for the policy.").  Instead, it only went so far as to say the Board had a "strong basis to believe that allowing the conduct of religious worship services in schools would give rise to a sufficient appearance of endorsement to constitute a violation of the Establishment Clause." <u>Id.</u> at 40.  But strict scrutiny requires more than a "strong basis;" it requires a <u>compelling</u> interest.

In <u>Bronx III</u>, the Court determined that the inquiry into whether Defendants' antiestablishment interest is compelling for purposes of a strict scrutiny analysis required the Court to answer the question that the Court of Appeals declined to entertain—<u>i.e.</u>, whether use of the Board's schools for worship services during non-school hours violates the Establishment Clause.  2012 WL 603993, at *8.  In answering that

29

question in the negative, the Court readopted its findings from
2002 when it granted Plaintiffs' earlier motion for a
preliminary injunction.  Those findings included the following:
Plaintiffs' Sunday meetings "are obviously not endorsed by the
School District;" no school employee attends Plaintiffs'
meetings; the meetings are open to all members of the public;
children are not present around the school on Sunday mornings;
and no student attends the meetings.  Bronx I, 226 F. Supp. 2d
at 426.  In light of the recent evidentiary record, Defendants
say the Court's reliance on its 2002 findings is misplaced.
While the Court acknowledges that changed circumstances warrant
reconsideration of the Court's prior findings, the latest
evidence does not alter the Court's conclusion that Defendants
misperceive an Establishment Clause violation.

       Turning first to the number of extended use permits,
Defendants received 122,874 permit applications for the fiscal
year 2011.  (Barham Decl. ¶ 25.)  The parties have applied
different methodologies to discern how many of these permits
were granted for the purposes of holding religious worship
services; as a result, they have reached different conclusions
about the total number of permit applications granted for such
purposes.  Defendants say the most important figure is that 81
religious organizations obtained permits to hold worship
services in the Board's schools for at least three weeks in the

fiscal year 2011, up from the 23 that did so when the record previously closed in 2005. (Def. Mem. at 17.) Assuming all these organizations used different school buildings, this would equal 6.77 percent of all the Board's schools. (Barham Decl. ¶ 16.) Plaintiffs, for their part, focus on the percentage of all permits involving religious activity issued to unions and community-based organizations, which they say fluctuates near five percent. (Id. ¶ 40.) At the end of the day, however, the parties concur that the gaps in their statistics are not "material enough to really belabor".[14] (Summ. J. Hr'g Tr. at 24.)

Based on these figures, the Court finds that even though more religious organizations are using the Board's schools to hold worship services now than in 2005, the increase

---

[14] Were the statistical differences material the Court would rely on Plaintiffs' methodology because it provides a more accurate presentation of the data than that of Defendants. Plaintiffs contend that for purposes of classifying the permit applications it is more accurate to use the codes assigned by the Board than the varying descriptions provided by the organizations themselves. (Barham Decl. ¶ 9.) The Court agrees. While Defendants contend that the Board's codes do not accurately reflect all the permits they believe are for religious services, (Carey Decl. ¶ 20), the Board's codes provide a more objective and uniform system of classification. Moreover, Defendants make a number of errors in applying their own methodology, which affects 508 of Defendants' entries. (Barham Decl. ¶¶ 7-13.) For example, Defendants include a number of entries that they claimed to exclude. (See Carey Decl. Ex. M-2.) In addition, Defendants include in their analysis 100 permits that have not been granted final approval. (See id.) By contrast, Plaintiffs exclude any permits without final approval. (Barham Decl. ¶ 32.)

is statistically insignificant.  Today, close to 95 percent of
all permits issued to community-based organizations do not
involve religious activity, and the same can be said for the
percentage of the Board's public school buildings that are not
being used for religious purposes.  Furthermore, of the 23
religious organizations that were meeting in the Board's schools
in 2005, only seven continued to meet there in 2011.  (Geleris
Decl. ¶ 8.)  At least one of those seven, Lower Manhattan
Community Church, has since left the Board's schools.  (Holladay
Decl. ¶ 7.)  Thus, the Court's conclusion in Bronx II that "[b]y
any measure, the data reflecting the use by religious
congregations of schools cannot be deemed dominant"—"either in
P.S. 15, in the School District, or in the City"—remains sound.
400 F. Supp. 2d at 596.

Defendants next point to the fact that in at least
three schools, children and staff from the schools have attended
worship services.  (Pl. 56.1 ¶¶ 70-71.)[15]  But because the Board

---

[15] In connection with their cross-motion for summary judgment,
Defendants re-filed their Rule 56.1 statement from 2005, along
with Plaintiffs' responses thereto.  Plaintiffs, in turn, filed
updated responses to Defendants' 2005 Rule 56.1 statement;
Defendants object to their having done so.  Putting aside the
substantial authority that suggests Plaintiffs' 2005 responses
were binding only for purposes of the prior motion for summary
judgment they were filed in connection with, the reality is that
some of the 2005 responses are no longer true.  Defendants
cannot dispute this, as even they have responded to Plaintiffs'
new Rule 56.1 statement at times in a manner inconsistent with
(cont'd on next page)

has opened its limited public forum "for holding social, civic, and recreational meetings and entertainment, and other uses pertaining to the welfare of the community," provided that "such uses shall be non-exclusive and open to the general public," (Def. 56.1 ¶¶ 11-13), this merely reflects the permit holders' efforts to comply with the Board's open use requirement.   The Church's Sunday meetings comply with that requirement.[16]   And if parents of students choose to exercise their (and their children's) First Amendment rights by attending the Church's services, and school staff do the same, the Court fails to see any impact this would have on the endorsement test analysis under Lemon v. Kurtzman.   See 403 U.S. 602, 612 (1971) (requiring that the "principal or primary effect [of the law in question] . . . neither advance[] nor inhibit[] religion").   Certainly there is no evidence that the school staff who attend the meetings are proselytizing to the school's students during the school day.   Given the disclaimer all permit holders are

(cont'd from previous page)
their 2005 responses.   In any event, Defendants cannot show that they have been prejudiced by Plaintiffs' updated responses because none of the facts relied upon in this opinion are the product of a "more favorable" updated response.

[16] Indeed, the Court of Appeals in Bronx Appeal III believed that any form of exclusion would only "aggravate[] the potential Establishment Clause problems the Board seeks to avoid."   650 F.3d at 43.   Were Plaintiffs to exclude anyone from its Sunday meetings, no doubt Defendants would point to that in support of their antiestablishment interest.   Defendants cannot have it both ways.

required to post on any public notice or other material, stating
that "[t]his activity is not sponsored or endorsed by the New
York City Department of Education or the City of New York,"
(Def. 56.1 ¶ 25), not to mention the long history of this
litigation, the limited attendance of students and staff cited
by Defendants would not alter the objective, fully informed
observer's conclusion that "the Board's actions betoken great
effort to <u>avoid</u> establishing any religion." <u>Bronx III</u>, 2012 WL
603993, at *9.

        Finally, Defendants point out that, contrary to the
Court's finding in 2002 that there was no evidence children are
in the school on Sunday mornings while the Church conducts its
services, "sports programs, literacy enrichment programs, test
preparation programs, and other activities for children and
families have taken place in schools at the same time as
religious organizations have held their worship services in the
schools." (Def. Mem. at 18.)  But this evidence cuts both ways.
Defendants cannot argue domination on the one hand—<u>i.e.</u>, that
the worship services so dominate the schools on Sunday mornings
that Defendants' Establishment Clause concern is heightened—and
then also point to simultaneous non-worship Sunday activities
that involve students to prove the same.  The fact that a youth
basketball program holds tournaments in a school at the same
time that a church holds Sunday services there, both pursuant to

34

a neutral policy that promotes the general welfare of the
community, does not suggest to the informed objective observer
that the school is endorsing religion just as it does not
suggest the school is endorsing basketball.[17]  See Bronx III,
2012 WL 603993, at *11 ("The objective, fully informed observer
who passes by the Board's schools and witnesses a wide variety
of community groups meeting on weeknights, followed by a Jewish
Friday night service, a Ramadan Saturday evening service, and
finally a Sunday morning Christian worship service, could not
reasonably infer that the Board was endorsing religion in its
public schools.  Rather, the informed observer would conclude
that the Board opens its schools during non-school hours to a

---

[17] To the extent Defendants point to the fact that some of the
schools where services take place are elementary schools
attended by young and impressionable students, such as P.S. 15,
to show their Establishment Clause concern is particularly
acute, the Supreme Court has already rejected this argument.
See Good News Club v. Milford Cent. Sch., 533 U.S. 98, 113-19
(2001) ("[W]hatever significance we may have assigned in the
Establishment Clause context to the suggestion that elementary
school children are more impressionable than adults, we have
never extended our Establishment Clause jurisprudence to
foreclose private religious conduct during nonschool hours
merely because it takes place on school premises where
elementary school children may be present." (citation omitted));
cf. Gregoire v. Centennial Sch. Dist., 907 F.2d 1366, 1381-82
(3d Cir. 1990) ("So long as [the school district] maintains a
limited student open forum to which outsiders may be invited, it
expresses a judgment concerning its students' ability to
distinguish neutral access from state sponsorship of the view
expressed.  [The school district] cannot, therefore, rely on the
impressionability of these same students as the basis for
content-based exclusions from its facilities in the evening
hours or as the basis for an establishment clause defense.").

diverse group of organizations pursuant to a neutral policy generally aimed at improving the welfare of the community." (internal quotation marks omitted)).

In short, none of the scant evidence that Defendants point to proves that an Establishment Clause violation would result but for Ch. Reg. D-180's religious use prohibitions. Instead, the opposite is true.  "[V]iewed in its totality by an ordinary, reasonable observer," Galloway v. Town of Greece, 681 F.3d 20, 2012 WL 1732787, at *8 (2d Cir. 2012), a policy that treats neutrally all applicants—religious and secular alike— would not "convey[] the view that the [Board] favored or disfavored certain religious beliefs," id.[18]

---

[18] In Bronx Appeal III, the Court of Appeals found that "the fact that school facilities are principally available for public use on Sundays results in an unintended bias in favor of Christian religions."  650 F.3d at 43.  This factored into the Court of Appeals' conclusion that the Board's Establishment Clause concern was reasonable.  Now that the Court is tackling the question of whether the Board's antiestablishment interest is compelling, on this point the Court notes the Supreme Court's conclusion in Marsh v. Chambers, 463 U.S. 783 (1983), that the mere fact "a clergyman of only one denomination-Presbyterian-has been selected for 16 years" as a state legislative chaplain does not "in itself" violate the Establishment Clause.  Id. at 793-94.  The Court rejected the argument that such a long tenure had "the effect of giving preference to his religious views," absent proof that the chaplain's reappointment "stemmed from an impermissible motive."  Id. at 793.  Thus, even if the Board's schools lend themselves to being available more frequently for religions that hold worship services over the weekend, based on Marsh, this fact alone does not violate the Establishment Clause.

One last consideration deserves mentioning.  When considering a law challenged under the First Amendment or assessing a defendant's purported justification for enacting such a law, the Supreme Court has often conducted a historical analysis to gauge how the Framers would have viewed the law or justification at issue.  Compare, e.g., Locke, 540 U.S. at 725 (justifying minimal burden on religion in light of state-defendant's historic antiestablishment interest in not funding the religious training of clergy), with Marsh, 463 U.S. at 788 (finding state-funded legislative prayer not per se invalid under the Establishment Clause because "[c]learly the men who wrote the First Amendment Religion Clause did not view paid legislative chaplains and opening prayers as a violation of that Amendment").  Here, history suggests that the Framers would not have given much credence to Defendants' purported Establishment Clause concern.  As amicus curiae point out:

> President Washington permitted religious groups to conduct worship services in the U.S. Capitol building as early as 1795. President Jefferson, whose devotion to church-state separation cannot be questioned, regularly attended services in the Capitol throughout his presidency, and allowed worship services in the Treasury and War Office buildings as well.  Even the Supreme Court chamber was occasionally used for worship services.  Mr. Jefferson later invited religious societies, under "impartial regulations," to conduct "religious exercises" in rooms at his beloved University of Virginia, for the

> benefit of students who wished to attend.
> He specifically observed that these
> arrangements would "leave inviolate the
> constitutional freedom of religion."

(Becket Mem. at 10-11 (citations omitted) (quoting 19 The
Writings of Thomas Jefferson at 414-17 (Memorial ed. 1904)).)
Thus, contrary to the situation in Locke, Defendants' stated
Establishment Clause concern is in fact contradicted by history.

Given all the above considerations, it is unsurprising
that Defendants cite no case—and the Court is aware of none—in
which a court has struck down a public school board's policy of
permitting religious worship during non-school hours as
violative of the Establishment Clause.  At the same, there is
authority to the contrary.  See Fairfax Covenant Church v.
Fairfax Cnty. Sch. Bd., 17 F.3d 703, 706-08 (4th Cir. 1994);
Gregoire, 907 F.2d at 1379-81.  The Court agrees with those
other courts that have directly confronted the merits of
Defendants' constitutional concern and concluded that a school
board does not violate the Establishment Clause by permitting
religious organizations to hold worship services during non-
school hours.  Accordingly, for the reasons stated above, as
well as those stated in Bronx II, 400 F. Supp. 2d at 592-98, and
Bronx III, 2012 WL 603993, at *8-10, the Court concludes that
Defendants' purported antiestablishment interest is not
compelling and that, as a result, Ch. Reg. D-180 fails to

satisfy the first prong of <u>Lukumi</u>'s strict scrutiny analysis.
Ch. Reg. D-180 thus violates the Free Exercise Clause, and the
Court grants Plaintiffs' motion for summary judgment on this
ground.

b)   <u>Ch. Reg. D-180 Does Not Advance Board's</u>
<u>Antiestablishment Interest</u>

The Court concluded in <u>Bronx III</u> that Ch. Reg. D-180
also fails the second prong of <u>Lukumi</u>'s strict scrutiny analysis
in that it does not advance the Board's stated antiestablishment
interest and is not narrowly tailored to advance that interest.
2012 WL 603993, at *10-12.   The Court briefly elaborates here on
the first part of that conclusion.

To begin, the Court previously found that "[b]ecause
[Ch. Reg. D-180] singles out only those religions that conduct
'ordained' worship services, the ban works against the informed
observer's perception of neutrality that would otherwise result
if all religions were treated on the same terms." <u>Id.</u> at *10.
Defendants now assert that "[t]aken together, . . . the two
provisions of Ch. Reg. D-180, § I.Q—the 'religious worship
services' provision and the 'house of worship' provision—reach
all forms of worship, whether practiced by ordained religions or
those with less formal worship practices." (Def. Reply Mem. at
3.)   The Court finds two fundamental flaws with Defendants'
assertion.

39

First, the Court does not see how Defendants can possibly prove their assertion that "the two provisions of Ch. Reg. D-180 . . . reach all forms of worship" in light of their refusal to define either provision.  The Court of Appeals has undertaken to define "religious worship services" as "a collective activity characteristically done according to an order prescribed by and under the auspices of an organized religion, typically but not necessarily conducted by an ordained official of the religion."  Bronx Appeal III, 650 F.3d at 37. In the absence of any guidance or objection from Defendants, this Court has proceeded to analyze Plaintiffs' pending claims with that definition in mind.  However, because the Court of Appeals declined to consider the reach of the "house of worship" prong, it did not attempt to define that term.  Id. at 36 & n.6. Because Defendants continue to refuse to define it as well, this Court cannot competently assess the merits of their argument that both worship-related prongs of Ch. Reg. D-180 work together to treat all religions equally.  As such, the Court is left to analyze the "religious worship services" prong alone.  Based on the Court of Appeals' definition of that term, this Court reaffirms its conclusion in Bronx III that Ch. Reg. D-180 is ineffective in advancing the Board's antiestablishment interest

because the regulation discriminates among religions.[19]

Second, the report submitted by Plaintiffs' expert, Gerard R. McDermott, demonstrates the practical impossibility that Ch. Reg. D-180 treats all religions equally.  Many non-theistic religions exist that do not "worship." (Lorence Decl. Ex. 32, at 16-20.)  For example, Theravada Buddhists do not worship or participate in worship services but they do hold "meetings in which believers teach and learn and meditate and chant." (Id. Ex. 32, at 18.)  These religious adherents therefore would not be excluded from the Board's schools under Ch. Reg. D-180, whereas followers of an "ordained" religion would be excluded.  Thus, the dual worship-related provisions are not comprehensive and neutral; rather, they treat certain religions differently from others.  Furthermore, because the

---

[19] Defendants' failure to define the term "house of worship" presents an additional problem.  Under Good News Club, the Board may not exclude from its schools organizations who wish to conduct activities such as prayer, religious instruction, expression of devotion to God, and the singing of hymns; to do so would encroach impermissibly on their free speech rights. See Bronx Appeal III, 650 F.3d at 36-37.  Yet the vagueness of Ch. Reg. D-180's religious use ban coupled with the regulation's certification requirement, see infra Part III.B, threatens to keep certain organizations out of the Board's schools for exactly these types of activities.  Defendants admit that if a religious organization considered, for example, the singing of hymns to be barred under the Board's ban on using its schools as a "house of worship," that organization could be precluded from fully exercising its free speech rights. (See Summ. J. Hr'g Tr. at 52-53.)  The Court finds this risk to be all too real and unacceptable.

Board relies in the first instance on the religious applicants themselves to determine whether their proposed uses are prohibited under the regulation, Ch. Reg. D-180 would allow the very same activities on behalf of one church that does not consider them to be worship that it would prohibit on behalf of another church that does view them as worship.  The end result, as Defendants admit, is that some religious applicants "will fall through th[e] net."  (Summ. J. Hr'g Tr. at 48.)  For these additional reasons, the Court remains convinced that Ch. Reg. D-180 is ineffective in advancing Defendants' antiestablishment interest.

In <u>Bronx III</u>, the Court noted that Ch. Reg. D-180's ineffectiveness is also evidenced by the fact that student religious clubs conduct the constituent activities of a worship service that would otherwise be banned under the regulation:

> Given the variety of religious practices
> that are permitted under [Ch. Reg. D-180]—as
> to which the Board makes clear there is no
> endorsement of religion—the Board fails to
> explain how the informed observer would view
> any differently the Board's permitting
> Plaintiffs' use of its schools for Sunday
> worship services.  Because the individual
> elements of those services are expressly
> permitted, the policy's ban on "religious
> worship services" is entirely ineffective in
> dispelling any confusion in the mind of the
> objective observer over State endorsement of
> religion.  The Board is just as likely to be
> perceived as endorsing religion with the ban
> in place as with it enjoined.  In both
> instances, the observer would see "[p]rayer,

> religious instruction, expression of
> devotion to God, and the singing of hymns."
> Whether the applicant or a Board bureaucrat
> deems those activities to constitute
> "worship services" or not does not change
> the objective observer's perception of
> whether or not the Board is endorsing
> religion.

2012 WL 603993, at *11 (quoting Bronx Appeal III, 650 F.3d at 36-37).  New insight into how religious student clubs operate in the Board's schools buttresses the Court's prior discussion on this issue.

The typical meeting of one such student-led religious club—Seeker Christian Fellowship—occurs either right before or after the school day.  (Del Rio Decl. ¶ 2.)[20]  Anywhere from a few students to over one hundred students attend meetings.  (Id. ¶ 9.)  The meetings occur weekly, usually last thirty minutes or less, and "consist of prayer, singing, study of the Bilbe and students discussing with each other their Christian beliefs." (Id.)  A faculty advisor is present during the meetings but does not participate in them.  (Id. ¶ 8.)  All students are invited to attend the meetings, which occur in "rooms where students are walking by and can note the fact that the Christian meetings are

---

[20] Defendants object to the Del Rio declaration as based purely on inadmissible hearsay.  But the declaration makes clear that it is based upon the declarant's personal knowledge.  (Del Rio Decl. ¶ 1.)  Furthermore, Defendants themselves have filed declarations in support of their cross-motion for summary judgment that are littered with objectionable hearsay.  The Court therefore rejects Defendants' objection.

taking place." (Id. ¶ 10.) "[S]tudents from other religious faiths conduct[] meetings in the New York City public schools right before, after, or during the school day, including Muslim, Jewish, and other religious student groups." (Id. ¶ 12.)

Defendants argue that the student-led religious clubs do not raise the same Establishment Clause concerns as do Plaintiffs' meetings. In fact, Defendants go so far as to say "the requirements under which student groups operate insure that there is virtually no likelihood that students, or members of the public, will discern a message of endorsement on the part of [the Board]." (Def. Reply Mem. at 13.) Given the functionally similar restrictions under which both types of meetings operate, the Court rejects Defendants' position that students and members of the public would interpret so differently the Board's message of endorsement with respect to the activities of Plaintiffs' meetings versus those of student-led religious clubs.

For example, Defendants point to the fact that student clubs only advertise their meetings within the school whereas Plaintiffs are free to advertise their meetings outside the school community. But given the size of the respective environments, the Court fails to see the significance of this distinction. In fact, a student-led religious club's advertisement on a bulletin board or over the school's public address announcement system, (see Herrera Decl. ¶ 12), is more

likely to be noticed by a greater percentage of people within the school than is Plaintiff's announcement of its meetings by the eight million plus inhabitants of New York City or the seemingly infinite number of users surfing the Web.  Defendants also say "[s]ome congregations have more than 100 people in attendance at their services," (Def. Reply Mem. at 13), but the same can be said for certain student club meetings, (Del Rio Decl. ¶ 9).

But perhaps most telling is the fact that student-led religious clubs, even though they meet during non-instructional time, hold their meetings on school days when significantly more students are present than on Sundays (when Plaintiffs' meetings take place).  This suggests the likelihood that a student or parent would misperceive that the Board was endorsing the club's religious activities is greater than the likelihood either would have the same misperception regarding Plaintiffs' Sunday meetings.  In this regard, the Court agrees with Plaintiffs' counsel's comment at oral argument that "high school students may not have the benefit of reading the Second Circuit's decision [in Bronx Appeal III] and [may] not be able to parse between a worship service and [the activities of a student-led religious club].  They're going to see a lot of worship-like activity going on by their peers, permitted by the public school officials." (Summ. J. Hr'g Tr. at 25.)  Of course, the

45

endorsement test looks to the objective, fully informed observer's perception as determinative of whether there is an actual Establishment Clause violation.  But the fact that the risk of confusion by the uninformed regarding endorsement is greater with respect to the activities of student-led religious clubs than it is with respect to Plaintiff's Sunday meetings highlights the ineffectiveness of Ch. Reg. D-180 in advancing the Board's stated antiestablishment interest.[21]

Accordingly, the Court rejects Defendants' argument that Ch. Reg. D-180 is effective in advancing their antiestablishment interest.[22]  Because the Court finds to the

---

[21] Putting the activities of student-led religious clubs aside, Ch. Reg. D-180—which relies on the subjective labels applicants use to describe their religious practices—is ineffective in countering the perception of establishment because observers still see outside groups conducting the constituent parts of a worship service in the Board's schools.  See Bronx III, 2012 WL 603993, at *11.

[22] Defendants argued for the first time at oral argument that the effectiveness of Ch. Reg. D-180's ban on "religious worship services" and otherwise using the Board's schools as a "house of worship" is evidenced by the fact that, prior to this Court's issuing its preliminary injunction, some organizations that had previously been meeting in the schools either vacated them or were planning to leave upon learning that the Board would begin enforcing the regulation in February 2012.  While Defendants did not elaborate on this argument, the gist appears to be that because religious organizations were leaving the schools entirely and not remaining to conduct the individual elements of worship permitted under Good News Club, the schools were trending towards being entirely "religious free," thus demonstrating the effectiveness of Board's policy.  Because Defendants did not raise this argument until the eleventh hour (cont'd on next page)

contrary—i.e., that the regulation does not advance the Board's interest—Ch. Reg. D-180 also fails the second prong of Lukumi's strict scrutiny analysis.  Ch. Reg. D-180 thus violates the Free Exercise Clause for this additional reason.

B.  Ch. Reg. D-180 Also Violates the Establishment Clause

The Court additionally based its February 2012 preliminary injunction on post-Bronx Appeal III factual and legal developments, which the Court found warranted reconsideration of Plaintiffs' Establishment Clause claim.  See Bronx III, 2012 WL 603993, at *12-16.  Specifically, the Court found that Ch. Reg. D-180 violates the Establishment Clause under Lemon because it causes the Board's officials to become excessively entangled with religion by requiring them to make their own bureaucratic determinations as to what constitutes "worship."  The Court also found that the Supreme Court's recent decision in Hosanna-Tabor confirms that the Establishment Clause "prohibits government involvement in such ecclesiastical decisions."  132 S. Ct. at 706.  At oral argument on Plaintiffs'

---

(cont'd from previous page)
and failed to submit a declaration detailing the number of religious organizations that previously obtained permits to conduct the types of activities expressly permitted under Good News Club but which decided to leave the schools after being informed that worship services would no longer be allowed, the Court cannot address the merits of Defendants' argument. Furthermore, the Cole declaration contradicts Defendants' assertion.  See infra Part III.B.  Therefore, Defendants' unsupported argument does not factor into the Court's analysis.

motion for a preliminary injunction, Defendants provided a rough
sketch of the verification procedure for determining applicants'
compliance with Ch. Reg. D-180's worship-related provisions;
Defendants were unsuccessful in convincing the Court of the
constitutionality of that procedure.  Defendants have now sought
to explain in greater detail their current verification method
and why it does not cause excessive government entanglement with
religion, but the Court remains unconvinced.

In Bronx III, the Court cited the testimony of a
permit applicant who sought the Board's guidance whether his
church's proposed activities would be permitted under Ch. Reg.
D-180.  The applicant provided the Board with descriptions of
his church's meetings, and the Board ultimately determined that
the meetings constituted impermissible "religious worship
services" under the regulation.  The Court concluded the
following:

> The declarations recently filed in this
> case . . . demonstrate that the Board does
> not engage in a mere act of inspection of
> religious conduct when enforcing [Ch. Reg.
> D-180].  Rather, the Board has evidenced a
> willingness to decide for itself which
> religious practices rise to the level of
> worship services and which do not, thereby
> causing the government's entanglement with
> religion to become excessive.

Bronx III, 2012 WL 603993, at *16 (internal quotation marks
omitted).  The Board's excessive entanglement with religion is

48

further evidenced by the declaration of Marilynn N. Cole

("Cole"), submitted in support of Plaintiffs' motion for summary

judgment.

Cole serves as an elder for Unbroken Chain Church, a

Christian church that currently meets on Sunday mornings for its

"main worship service" in one of the Board's schools.  (Cole

Decl. ¶ 3.)  When Cole learned of the Board's intention to begin

enforcing Ch. Reg. D-180's ban on religious worship services

after February 12, 2012, she called a Board official to see

whether her church's weekly Wednesday night prayer meeting and

weekly Friday night Bible study would also be prohibited.  (Id.

¶¶ 7-8.)  The Board official told Cole to "write him an email

describing what [the church does] at those meetings."  (Id.

¶ 8.)  Cole explained in a subsequent email that "Wednesday

night is Prayer . . . and congregation members come to the front

to share their requests.  And then they pray.  Our Bible Study

is teaching from our Pastor or from one of our elders or

ministers."  (Id. (alteration in original).)  The Board official

eventually answered Cole's inquiry by stating that "Bible study

would be ok, but not prayer meetings."  (Id. ¶ 10.)  Cole's

unopposed declaration reaffirms the Court's conclusion that "the

Board has evidenced a willingness to decide for itself which

religious practices rise to the level of worship services and

which do not, thereby causing the government's entanglement with

religion to become excessive."   <u>Bronx III</u>, 2012 WL 603993, at
*16.

Defendants, for their part, admit that some Board
officials made mistakes in following the Board's protocol for
verifying compliance with Ch. Reg. D-180.   (<u>See, e.g.</u>, Brawer
Decl. ¶ 32.)   But Defendants insist the Board's method of
implementing Ch. Reg. D-180 is constitutionally sound because it
first looks to the religious applicants themselves to certify
whether they intend to use the schools for "religious worship
services" or as a "house of worship."   Defendants summarize the
Board's verification procedure as follows:

> Staff will rely, in the first instance, upon
> the representations of religious
> organization applicants regarding their
> compliance with the worship-related
> provisions of [Ch. Reg. D-180], but reserve
> the right to look to other sources of
> publicly available information to verify
> applicants' representations made on permit
> forms, just as staff do with non-religious
> applicants.

(Def. Reply Mem. at 8; <u>see also</u> Brawer Decl. ¶¶ 20-21, 47.)
While this approach of "look[ing] beyond the four corners of the
Extended Use Application," (Brawer Decl. ¶ 20), may be proper
for purposes of verifying a political or commercial applicant's
compliance with Ch. Reg. D-180, the same cannot be said of
verifying whether a religious applicant is complying with the
worship-related provisions of the regulation.   This is because

it is the religious adherents alone who can determine for themselves how to "shape [their] own faith," Hosanna-Tabor, 132 S. Ct. at 706, and no amount of bureaucratic second-guessing—even if based solely on the adherents' own words—may invade their province.[23]

The following colloquy at oral argument highlights the problem of excessive entanglement that results from Defendants' verification process:

> COURT: If there is no definition in [Ch. Reg. D-180] of [religious] worship service or . . . house of worship, how can the regulation be enforced and how will folks know whether they are in or out?

> DEFENDANTS: Well, your Honor, the plaintiffs themselves in their 56.1 statement make that argument for us, because they say it is only the religious worshiper who knows what worship is. . . . The definition [of "religious worship services" or "house of worship"] is what the religious organization believes it to be.

(Summ. J. Hr'g Tr. at 44-45, 60 (emphasis added).)  If it is true that only a religious organization can define for itself what it means to conduct "religious worship services" or to use a building as a "house of worship," it is equally true that an

---

[23] The fact that Defendants may investigate a political or commercial applicant's public statements to confirm compliance with Ch. Reg. D-180 is irrelevant.  Whereas specific First Amendment prohibitions on state action are implicated when a religious adherent applies for an extended use permit under Ch. Reg. D-180, no such constitutional limitations are triggered when Board officials review a politician's or a merchant's application.

outsider has no insight into whether that organization is acting consistently with its own religious beliefs.  Defendants' attempts to do so in this case only serve to illustrate the constitutional impropriety of such a task.

For example, Defendants point to a religious applicant's use of the word "worship" in public documents and statements as a red flag that the applicant may have deceitfully certified compliance with Ch. Reg. D-180.  (See, e.g., Def. Mem. at 27 ("[N]otwithstanding plaintiffs' varying approaches to Ch. Reg. D-180 and purported difficulty with the regulation's use of the word 'worship,' their use of the word when facing the larger community is remarkably clear and straightforward.  Hall testified that the Church has consistently distributed flyers to the public over ten years, inviting the community 'to worship with them Sunday at 11:00 AM' at P.S.15.").)  Defendants seem to be conflating "worship" with "religious worship services," see Bronx Appeal III, 650 F.3d at 37 ("The 'religious worship services' clause does not purport to prohibit use of the facility by a person or group of persons for 'worship.'), but in any event they are excessively entangling themselves in religious matters.  Because Defendants do not define either term, a religious organization may, according to its religious beliefs, honestly certify on a permit application that it will not use the Board's schools for "religious worship services" or

as a "house of worship" yet nevertheless conduct some other form
of "worship" not proscribed by Ch. Reg. D-180.  As Brad Hertzog,
Pastor of Reformation Presbyterian Church, points out:

> From my theological perspective, the Bible
> gives us a taxonomy of worship that includes
> different angles on this word.  For example,
> there is a sense (from the Bible) that
> everything the Christian does is worship—
> including eating and drinking . . . .  There
> is another aspect of worship which includes
> certain things that are more particularly
> set apart for God.  For example, prayer can
> rightly be called worship, because it is an
> act of worship.

(Hertzog Decl. ¶ 11.)

Assuming Pastor Hertzog applied for an extended use
permit for his congregation to hold Bible study meetings,
certified that he was in compliance with Ch. Reg. D-180, and
then distributed a leaflet that said, "Come worship the Bible
with us Sunday mornings in P.S. 173," Defendants say they would
be justified in revoking his permit for certifying his
application falsely.  (See Summ. J. Hr'g Tr. at 40 ("Well, you
look at [the applicant's] leaflet.  It says come worship with
us.  It sounds like worship to me.  You don't have to go much
further than that.").)  But that would only mean the Board is
substituting its own understanding of the congregation's faith
for that of the congregation itself—even if the Board's
officials only look to the congregants' own words—in clear
violation of both the Establishment Clause (excessive

entanglement) and the Free Exercise Clause (government interference with an internal church decision).[24]  Indeed, the Board's inquiry into the applicant's religious views alone suffices to violate Plaintiffs' First Amendment rights.  See NLRB v. Catholic Bishop of Chicago, 440 U.S. 490, 502 (1979) ("It is not only the conclusions that may be reached by the Board which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions."); Bronx Appeal I, 127 F.3d at 221-22 (Cabranes, J., dissenting in part) ("There may be cases in which the parties dispute whether or not a proposed activity for which permission to use school premises is denied actually constitutes religious instruction or worship, and the very act of making such classifications may deeply-and unconstitutionally-entangle public officials in essentially theological determinations."); Colo. Christian Univ., 534 F.3d at 1261 ("Properly understood, the [excessive entanglement] doctrine protects religious

---

[24] Quaker "meeting for worship," in which attendees sit in communal silence and speak only when (and if) the "Holy Spirit" so moves them, presents a similar problem.  A Quaker organization that applies for an extended use permit may certify compliance with Ch. Reg. D-180 because it does not consider its meetings to qualify under either of the regulation's worship-related provisions.  Nevertheless, were the Board's officials to visit the organization's website and see the advertisement, "Come join our meeting for worship at P.S. 90 on Saturdays," Defendants say they would be justified in deeming the organization to have falsely certified its permit application. The Religion Clauses say otherwise.

institutions from governmental monitoring or second-guessing of
their religious beliefs and practices . . . .").

      The Court further finds the excessive government
entanglement with religion that Ch. Reg. D-180 fosters to be
congruent with that found by the court in <u>Faith Center Church
Evangelistic Ministries v. Glover</u>, 2009 WL 1765974 (N.D. Cal.
June 19, 2009).  In that case, the plaintiff was a non-profit
religious organization that challenged a county library policy
that generally opened the library's meeting room "for
educational, cultural, and community related meetings, programs,
and activities" but prohibited the use of the room for
"religious services."  <u>Id.</u> at *1.  The plaintiff had initially
won a preliminary injunction against enforcement of the policy
on free speech grounds.  After the Court of Appeals for the
Ninth Circuit reversed that ruling in part, <u>see</u> 480 F.3d 891,
918 (9th Cir. 2007) ("[P]rohibiting Faith Center's religious
worship services from the [library] meeting room is a
permissible exclusion of a category of speech that is meant to
preserve the purpose behind the limited public forum.  Religious
worship services can be distinguished from other forms of
religious speech by the adherents themselves."), the plaintiff
submitted a new application to use the library meeting room for
"Prayer, Praise Wordshop [sic] Purpose to Teach Scripture and
Encourage Salvation thru Jesus to Build-Up this Community

Overall."  2009 WL 1765974, at *3.  A county official approved the application but clarified that the plaintiff could use the library's meeting room "for any activity that does not violate the meeting room use policy including activities that express a religious viewpoint.  In accordance with the Ninth Circuit's holding, <u>you</u> are responsible for distinguishing religious worship services from other forms of religious speech."  <u>Id.</u> (emphasis added).  In response, the plaintiff's "leader" argued:

> "[I]t is impossible for [her] to distinguish between worship and any other aspect of Faith Center's meetings," because she understands "worship to be an outward expression of a relationship with God," and "any time [she is] doing something that is in accordance with what God would like [her] to do, that is an act of worship."

<u>Id.</u> at *4 (all but the first alteration in original).

The parties cross-moved for summary judgment, and the court first concluded that the religious use restriction did not violate the Free Speech Clause.  <u>See id.</u> at *4-7.  However, it found that the religious use restriction did violate the Establishment Clause based on the policy's fostering of excessive government entanglement.[25]  The court noted:

---

[25] The Court notes that the procedural posture of <u>Faith Center Church</u> is also on par with this litigation's procedural history.  That the Court of Appeals in that case reversed the district court's ruling on the plaintiff's Free Speech Clause claim did not prevent the district court from finding in the plaintiff's favor on its Establishment Clause claim.  The same can be said (cont'd on next page)

> [T]he County has not defined what it means
> by "religious services."  The County
> contends that the Library relies only on the
> applications to determine whether an event
> would fall within the scope of the Religious
> Use restriction.  However, the record
> demonstrates that if there are questions
> about whether activities are religious
> services, rather than other religious
> activities permitted in the Meeting Room,
> someone from the County reviews the
> application to make that determination.
>      Indeed [there is] the likelihood that
> the County would be called upon to inquire
> into religious doctrine in order to
> determine whether a particular activity
> qualified as a religious service.

Id. at *9 (citations omitted).  The same is true here.

First, the Board has refused to define the terms
"religious worship services" and "house of worship."  Second,
the declarations filed in this case demonstrate that Board
officials have reviewed permit applications to make the
determination whether the applicant's proposed activities
constitute these types of prohibited religious use.  Third, even
though Board officials look to the applicants in the first
instance to decide whether their proposed activities fall within
the proscribed worship-related provisions, the Board's
verification method requires state officials to "inquire into
religious doctrine"—as discussed above, because only the

---

(cont'd from previous page)
here: the Court of Appeals' rejection of Plaintiffs' Free Speech
Clause claim does not preclude this Court from granting
Plaintiffs' requested relief on its Establishment Clause and
Free Exercise Clause claims.

religious adherents themselves may shape their own faith, an outsider's interpretation of the adherents' own statements regarding their religious practices "does not lie within the [government's regulatory] competence to administer."  Widmar v. Vincent, 454 U.S. 263, 269 n.6 (1981).

Accordingly, for all these reasons, the Court concludes that Ch. Reg. D-180 "call[s] for official and continuing surveillance leading to an impermissible degree of [government] entanglement" with religion, in violation of the Establishment Clause.  Walz, 397 U.S. at 675.  Defendants are not immune from excessive entanglement once they begin to verify the qualitative nature of specific religious practices.[26]  The Court thus grants Plaintiffs' motion for summary judgment on this additional ground.

---

[26] Defendants even seemed to recognize as much at oral argument. (See Summ. J. Hr'g Tr. at 39 ("I think we sketched out—I mean, look, the plaintiffs have cited some e-mails or other communication[s] that said, you know, tell me in detail everything you're doing.  I'm not going to say that was what we intended that they do.  Rolling out a policy of this difficulty to 1500 schools, you may find somebody asking questions that might not be the way you would want to frame them." (emphasis added)).)

IV.   CONCLUSION

        For the foregoing reasons, Plaintiffs' motion for
summary judgment [Dkt. No. 148] is GRANTED, and Defendants'
cross-motion for summary judgment [Dkt. No. 158] is DENIED.
Defendants are permanently enjoined from enforcing Ch. Reg. D-
180 so as to deny Plaintiffs' application or the application of
any similarly-situated individual or entity to rent space in the
Board's public schools for meetings that include religious
worship.[27]


SO ORDERED.

Dated:   New York, New York
         June 29, 2012

                              _____
                              UNITED STATES DISTRICT JUDGE

---

[27] The Court incorporates by reference the reasons why the
preliminary injunction extended to any similarly-situated party
as Plaintiffs.  See Bronx III, 2012 WL 603993, at *20 n.17.  The
same reasons apply for purposes of this permanent injunction.