12-2730
**Bronx Household v. Board of Education**

1    **UNITED STATES COURT OF APPEALS**
2    **FOR THE SECOND CIRCUIT**
3

4    August Term, 2012
5
6    (Argued: November 19, 2012          Decided: April 3, 2014)

> USDC SDNY
> **DOCUMENT**
> **ELECTRONICALLY FILED**
> DOC #: _____
> DATE FILED: April 03, 2014 _____

7    Docket No. 12-2730-cv
8

9    - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

10   THE BRONX HOUSEHOLD OF FAITH, ROBERT HALL, and JACK ROBERTS,
11
12          *Plaintiff-Appellees,*

13   v.

14   BOARD OF EDUCATION OF THE CITY OF NEW YORK and COMMUNITY SCHOOL
15   DISTRICT NO. 10,
16
17          *Defendant-Appellants*
18
19   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

20   Before:   WALKER, LEVAL, and CALABRESI, *Circuit Judges.*

21          Defendants, the Board of Education of the City of New York and Community School
22   District No. 10 appeal from the grant of summary by the United States District Court for the
23   Southern District of New York (Preska, *C.J.*), permanently enjoining Defendants from enforcing
24   a policy which permits the use of school facilities outside of school hours by outside
25   organizations and individuals but provides that no permit shall be granted for the purpose of
26   holding religious worship services. The Court of Appeals (Leval, *J.*) rejects the District Court's
27   conclusion that the policy violates the Free Exercise and Establishment Religion Clauses of the
28   First Amendment. REVERSED.

29          Judge Walker dissents by separate opinion.
30

1

CERTIFIED COPY ISSUED ON 04/03/2014

12-2730
Bronx Household v. Board of Education

1
2     JANE L. GORDON (Edward F.X. Hart, Jon Pines, Lisa Grumet, Janice Casey
3     Silverberg, Charles Carey, *on the brief*), of counsel, for Michael A. Cardozo,
4     Corporation Counsel of the City of New York, New York, NY, *for Appellants.*
5
6     JORDAN W. LORENCE, (Joseph P. Infranco, Alliance Defending Freedom,
7     Washington, DC; David A. Cortman, Alliance Defending Freedom,
8     Lawrenceville, GA; David J. Hacker, Heather Gebelin Hacker, Alliance
9     Defending Freedom, Folsom, CA, *on the brief*), Alliance Defending Freedom,
10    Washington D.C*., for Appellees.*

11    Jay Worona, Pilar Sokol, New York State School Boards Association, Inc.,
12    Latham, NY, *for Amicus Curiae* New York State School Boards Association, Inc.

13    Ayesha N. Khan, Alex J. Luchenitser, Americans United for Separation of Church
14    and State, Washington, D.C., *for Amicus Curiae* Americans United for Separation
15    of Church and State.

16    Beth Haroules, Arthur Eisenberg, Donna Lieberman, New York Civil Liberties
17    Union Foundation, New York, NY; Daniel Mach, American Civil Liberties Union
18    Foundation, Washington, D.C., *for Amici Curiae* New York Civil Liberties Union
19    and American Civil Liberties Union.

20    Jillian Rennie Stillman, Jonathan R. Bell, Rosemary Halligan, The Association of
21    the Bar of the City of New York, New York, NY, *for Amicus Curiae* The
22    Association of the Bar of the City of New York.

23    Bruce H. Schneider, Christopher P. Hemphill, Strook & Stroock & Lavan LLP,
24    New York, NY; Steven M. Freeman, David L. Barkey, Seth M. Marnin, Anti-
25    Defamation League, New York, NY, *for Amicus Curiae* Anti-Defamation League.

26    Allison B. Jones, Williams & Connolly LLP, Washington, D.C., *for Amicus
27    Curiae* The New York City Council Black, Latino, and Asian Caucus.

28    Deborah J. Dewart, Swansboro, NC; Michael W. McConnell, Stanford, CA; Eric
29    C. Rassbach, Luke W. Goodrich, The Becket Fund for Religious Liberty,
30    Washington, D.C., *for Amicus Curiae* The Becket Fund for Religious Liberty.

31    Thomas P. Gies, Frederick W. Claybrook, Jr., Crowell & Moring, LLP, New
32    York, NY; Kimberlee Wood Colby, Center for Law & Religious Freedom of the

2

12-2730
Bronx Household v. Board of Education

1   Christian Legal Society, Springfield, VA, *for Amici Curiae* Council of Churches
2   of the City of New York, Union of Orthodox Jewish Congregations of America,
3   Brooklyn Council of Churches, Queens Federation of Churches, American Baptist
4   Churches of Metropolitan New York, Synod of New York, Reformed Church in
5   America, Interfaith Assembly on Homelessness and Housing, Anglican Church in
6   North America, National Council of the Churches of Christ in the USA, General
7   Conference of Seventh-Day Adventists, National Association of Evangelicals,
8   Ethics & Religious Liberty Commission of the Southern Baptist Convention,
9   American Bible Society, The Rev. Charles H. Straut, Jr. and Christian Legal
10  Society.

11  LEVAL, *Circuit Judge*:

12      This appeal raises the question whether the Board of Education of The City of New York

13  (the "Board"),[1] in making the City's school facilities available outside of school hours for use by

14  outside users and subsidizing such use, may, in furtherance of interests favored by the

15  Establishment Clause of the First Amendment, refuse to permit the holding of religious worship

16  services. The United States District Court for the Southern District of New York (Preska, *C.J.*)

17  concluded that the Free Exercise and Establishment Clauses of the First Amendment compel the

18  Board to allow outside users to conduct religious worship services in the school facilities and

19  enjoined the Board from enforcing its prohibition. We conclude that the Board's prohibition was

20  consistent with its constitutional duties. We therefore vacate the injunction imposed by the

21  District Court and reverse its judgment.

---

[1] During this litigation, the Board was renamed the New York City Department of
Education. *See, e.g.*, *A.R. ex rel. R.V. v. New York City Dep't of Educ.*, 407 F.3d 65, 67 n.2 (2d
Cir. 2005).

3

12-2730
**Bronx Household v. Board of Education**

1    The Board and co-defendant Community School District No. 10 appeal from the District

2    Court's grant of summary judgment permanently enjoining Defendants from enforcing

3    Chancellor's Regulation D-180 § I.Q. ("Reg. I.Q.") against Plaintiffs, The Bronx Household of

4    Faith ("Bronx Household") and its pastors Robert Hall and Jack Roberts. Regulation D-180

5    governs the "extended use" of school facilities (the term refers to the use of school facilities

6    outside of school hours by outside organizations and individuals).[2] Extended use, which requires

7    a permit issued by the Board, is subsidized in that no rent is charged for use of the school

8    facilities.[3] Reg. I.Q. provides: "No permit shall be granted for the purpose of holding religious

9    worship services, or otherwise using a school as a house of worship."[4]

---

[2] Reg. D-180 § I.S. provides that "[p]ermits may be granted to religious clubs for students that are sponsored by outside organizations and otherwise satisfy the requirements of this regulation on the same basis that they are granted to other clubs for students that are sponsored by outside organizations."

[3] "While the [Board] imposes no excess charge (profit or overhead) on extended use of its schools, there are pass-along contractual costs . . . i.e., costs incurred in schools for custodial services when the use is outside of normal school hours." Reg. D-180 § IV.A. Users may also incur charges for use of additional services or specialized equipment or facilities. *See* Reg. D-180 § V.

[4] Reg. I.Q. authorizes denial of a permit sought either for (1) "the purpose of holding religious worship services" or (2) "otherwise using a school as a house of worship." In this opinion we limit our consideration to the first clause. Because we conclude that the denial of Bronx Household's application for a permit under this clause is constitutional, we have no need to consider whether the Board might also lawfully deny an application for a permit based solely on the second clause. Judge Calabresi notes that if worship that is not religious does exist, so that, as the dissent may be taken to suggest, Dissenting Op. at 5, the first clause discriminates against *religious* worship, the second clause, which does not distinguish between religious and any such putative nonreligious worship, would be sufficient to pass constitutional muster since it does not treat nonreligious worship more favorably than religious worship. *See Bronx Household III*, 492 F.3d at 92-106 (Calabresi, J., concurring); *Bronx Household IV*, 650 F.3d at 51-52 (Calabresi, J., concurring).

4

12-2730
**Bronx Household v. Board of Education**

1    The District Court found that enforcement of Reg. I.Q. to exclude religious worship

2    services would violate the Free Exercise and Establishment Clauses. We disagree. We conclude

3    Reg. I.Q. is constitutional in light of the Board's reasonable concern to observe interests favored

4    by the Establishment Clause and avoid the risk of liability under that clause. Accordingly, we

5    vacate the injunction and reverse the District Court's judgment.

6                                              **BACKGROUND**

7    We assume familiarity with the facts and procedural history of this long-running

8    litigation, as set forth in our prior opinions, and we recount them here only as necessary to

9    explain our disposition of this appeal. *See Bronx Household of Faith v. Bd. of Educ. of City of*

10   *New York*, 650 F.3d 30 (2d Cir. 2011) ("*Bronx Household IV*"); *Bronx Household of Faith v. Bd.*

11   *of Educ. of City of New York*, 492 F.3d 89 (2d Cir. 2007) ("*Bronx Household III*"); *Bronx*

12   *Household of Faith v. Bd. of Educ. of City of New York*, 331 F.3d 342 (2d Cir. 2003); *Bronx*

13   *Household of Faith v. Cmty. Sch. Dist. No. 10*, 127 F.3d 207 (2d Cir. 1997).

14   In July 2007, the Board adopted Reg. I.Q. (then designated Standard Operating Procedure

15   § 5.11). On November 2, 2007, in litigation resulting from the Board's denial of Bronx

16   Household's application for a permit to use school facilities for "Christian worship services," the

17   district court permanently enjoined the Board from enforcing the rule. *Bronx Household IV*, 650

18   F.3d at 35; *Bronx Household of Faith v. Bd. of Educ. of City of New York*, No. 01 Civ. 8598,

19   2007 WL 7946842, at *1 (S.D.N.Y. Nov. 2, 2007). The District Court's ruling was predicated on

20   its conclusion that the rule constituted an unconstitutional viewpoint discrimination against

5

12-2730
**Bronx Household v. Board of Education**

1    religion and as such was forbidden by *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 111-

2    12 (2001), in which the Supreme Court found that a school's refusal to permit a Christian

3    children's club to meet at the school outside of school hours because of the club's religious

4    nature constituted viewpoint discrimination and violated the club's free speech rights. *See Bronx*

5    *Household of Faith v. Bd. of Educ. of City of New York*, 400 F. Supp. 2d 581 (S.D.N.Y. 2005).

6            On appeal, we reversed the District Court's judgment and vacated the injunction. *Bronx*

7    *Household IV*, 650 F.3d at 51. (We incorporate that opinion into this one by reference as several

8    of the issues we there discussed are pertinent to the present appeal.) Noting the "important

9    difference between excluding the *conduct of an event or activity* that includes expression of a

10   point of view, and excluding the *expression* of that point of view," we observed that, unlike the

11   rule imposed by the school in *Good News Club*, the Board's rule barring the conduct of religious

12   worship services placed no restriction on the use of school facilities by religious groups to teach

13   religion, sing hymns, recite prayers, and express or advocate their religious point of view. *Id.* at

14   37-38. The rule prohibiting religious worship services therefore did not exclude expression of a

15   religious viewpoint. It was a content-based exclusion of a particular category of activity, which

16   exclusion was constitutionally permissible in light of the Board's reasonable and good faith

17   belief that permitting religious worship services in its schools might give rise to an appearance of

18   endorsement in violation of the Establishment Clause, thus exposing the Board to a substantial

19   risk of liability.[5] *Id.* at 43.

---

            [5] We did not find that a violation of the Establishment Clause had occurred or would have
occurred but for the prohibition on religious worship services but rather that "it was objectively

12-2730
**Bronx Household v. Board of Education**

1    We also rejected Bronx Household's claim that the rule violated the Establishment

2    Clause. *Id.* at 45-48. We found no basis for Bronx Household's contention that the rule was

3    motivated by hostility to religion. *Id.* at 46. Nor would a reasonable observer perceive the rule as

4    an expression of such hostility in light of the range of religious activity the rule permitted and in

5    light of the reasonableness of the imposition of the rule to guard against being found in violation

6    of the Establishment Clause. *Id.* at 45-46. Finally, we rejected Bronx Household's claim that the

7    Board would become excessively entangled in religious matters in undertaking to determine

8    whether an applicant's proposed activities constituted a religious worship service. *Id.* at 46-48. In

9    the first place, Bronx Household had expressly applied to conduct "Christian worship services."

10   Moreover, in view of the fact that both the Free Exercise and Establishment Clauses impose

11   restrictions on the conduct of government relating exclusively to religious activities, in many

12   instances "government officials cannot discharge their constitutional obligations without close

13   examination of . . . particular conduct to determine if it is properly deemed to be religious and if

14   so whether allowing it would constitute a prohibited establishment of religion." *Id.* at 47.

15   On remand to the District Court after we vacated the injunction, Bronx Household again

16   moved for a preliminary injunction against enforcement of Reg. I.Q., this time on different

17   grounds. Bronx Household asserted that our prior ruling, which was based on its Free Speech

18   Clause claim, should not close the matter as neither we nor the District Court had passed on its

19   claims that Reg. I.Q. violated the Free Exercise Clause. The District Court again granted a

---

reasonable for the Board to worry that use of the City's schools for religious worship services . . .
expose[d] the City to a substantial risk of being found to have violated the Establishment
Clause." *Bronx Household IV*, 650 F.3d. at 43.

7

12-2730
**Bronx Household v. Board of Education**

1   preliminary injunction, *Bronx Household of Faith v. Bd. of Educ. of City of New York*, 855 F.

2   Supp. 2d 44 (S.D.N.Y. 2012), and went on to grant summary judgment in favor of Bronx

3   Household, permanently enjoining the enforcement of Reg. I.Q. *Bronx Household of Faith v. Bd.*

4   *of Educ. of City of New York*, 876 F. Supp. 2d 419 (S.D.N.Y. 2012).

5          Defendants appealed, and this case is now before us for the sixth time.

6                                        **DISCUSSION**

7          The District Court concluded for a number of reasons that the enforcement of Reg. I.Q. to

8   exclude religious worship services would violate the Free Exercise Clause and the Establishment

9   Clause. We respectfully disagree.

10  *A. The Free Exercise Clause*

11         1) *The Free Exercise Clause does not entitle Bronx Household to a grant from the Board*

12            *of a subsidized place to hold religious worship services.*

13         The District Court found that the enforcement of Reg. I.Q. to exclude religious worship

14  services would violate Bronx Household's rights under the Free Exercise Clause because the

15  City's schools are "the only location in which [Bronx Household's congregation] can afford to

16  gather as a full congregation [for Sunday worship services] without having to curtail other of

17  their religious practices." *Bronx Household*, 876 F. Supp. 2d at 426. The District Court cited no

18  authority for this proposition, and we know none.

19         The Free Exercise Clause bars government from "prohibiting the free exercise" of

20  religion. U.S. Const. amend. I ("Congress shall make no law . . . prohibiting the free exercise [of

8

12-2730
**Bronx Household v. Board of Education**

1   religion].”). In the District Court's view, because Bronx Household and its congregants have a

2   constitutional right to worship as they choose without interference from government, and cannot

3   afford to pay for a large enough site to accommodate the entire congregation, the Free Exercise

4   Clause obligates the Board to provide them with a subsidized facility in which to exercise the

5   right. The Free Exercise Clause, however, has never been understood to require government to

6   finance a subject's exercise of religion. And to the extent any such suggestion has been raised in

7   litigation, it has been rejected. *See, e.g., Locke v Davey*, 540 U.S. 712 (2004) (finding that the

8   exclusion of devotional theology degree programs from eligibility for state scholarships does not

9   violate Free Exercise Clause); *Skoros v. City of New York*, 437 F.3d 1, 39 (2d Cir. 2006) ("Just as

10  government may not compel any person to adopt a prescribed religious belief or form of worship,

11  no person may require the government itself to behave in ways that the individual believes will

12  further his or her spiritual development." (internal quotation marks and emphasis omitted));

13  *Eulitt ex. rel. Eulitt v. Maine Dep't of Educ.*, 386 F.3d 344, 354 (1st Cir. 2004) ("The fact that the

14  state cannot interfere with a parent's fundamental right to choose religious education for his or

15  her child does not mean that the state must fund that choice . . . ."); *see also Regan v. Taxation*

16  *With Representation of Washington*, 461 U.S. 540, 549-50 (1983) ("We have held in several

17  contexts that a legislature's decision not to subsidize the exercise of a fundamental right does not

18  infringe the right . . . . The reasoning of these decisions is simple: although government may not

19  place obstacles in the path of a person's exercise of . . . freedom of speech, it need not remove

20  those not of its own creation." (internal quotation marks and brackets omitted)).

12-2730
**Bronx Household v. Board of Education**

1        *2) The Supreme Court's ruling in* <u>Lukumi</u> *that invidiously discriminatory ordinances*

2        *targeting a religious practice of a particular religion are subject to strict scrutiny has no*

3        *application to Reg. I.Q.*

4        The District Court believed that under authority of the Supreme Court's ruling in *Church*

5   *of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520 (1993) ("*Lukumi*"), the validity

6   of Reg. I.Q. must be assessed under strict scrutiny because it prohibits the provision of a

7   subsidized premises for the conduct of religious worship services, constitutes a discrimination

8   against religion generally, and constitutes a discrimination against those religions that conduct

9   worship services. *Bronx Household*, 876 F. Supp. 2d at 428-32. We respectfully disagree. In our

10  view the District Court's reasoning is incorrect for several reasons. In the first place, we think the

11  District Court's view that Reg. I.Q. is subject to strict scrutiny is based on a misunderstanding of

12  *Lukumi*. Secondly, on facts very similar to these, the Supreme Court has rejected applicability of

13  strict scrutiny. Furthermore, a reasonable governmental decision not to subsidize a category of

14  activity is not a suspect discrimination among religions merely because some religions do and

15  others do not engage in that activity.

16        *a) Suspect discrimination against religion.*

17        The District Court believed that, under the *Lukumi* precedent, because the conduct of

18  religious worship services is an activity that has no secular analog, a decision by the Board not to

19  subsidize it is necessarily a suspect discrimination against religion to be assessed under strict

20  scrutiny. *But see* note 4; *Bronx Household III*, 492 F.3d at 92-106 (Calabresi, J. concurring);

10

12-2730
**Bronx Household v. Board of Education**

1     *Bronx Household IV*, 650 F.3d at 51-52 (Calabresi, J., concurring). It is correct without question

2     that in declining to furnish school facilities for the conduct of religious worship services, Reg.

3     I.Q. focuses on a religious activity that has no secular analog. There is no such thing as a

4     nonreligious "religious worship service." In our view, the District Court's conclusion is based on

5     a misunderstanding of the Supreme Court's opinion. While there are indeed words in the *Lukumi*

6     opinion, which, if taken out of context, could be read as expressing such a message, it becomes

7     clear when the words are considered in context that they mean no such thing.

8         In *Lukumi*, worshipers in the Santeria religion, in which animal sacrifice plays an

9     important part of worship services, were planning to build a house of worship in the city of

10     Hialeah, Florida. 508 U.S. at 525-26. Members of Hialeah's city council disapproved of

11     Santeria's practice of animal sacrifice and, with a goal of banning the practice, the council passed

12     a set of ordinances prohibiting the unnecessary killing of animals in a ritual or ceremony not

13     primarily for the purpose of food consumption. *Id.* at 526-28. Hialeah claimed that the

14     prohibition was motivated by secular objectives including public health and prevention of cruelty

15     to animals. *Id.* at 527-28. Although the set of ordinances was designed to appear to apply even-

16     handedly to religious and secular conduct alike, a plethora of exceptions and exclusions

17     (exempting, for example, fishing and Kosher slaughter) made the prohibition apply almost

18     exclusively to the Santeria ritual of animal sacrifice. *Id.* at 535 ("[A]lmost the only conduct

19     subject to [the prohibition] is the religious exercise of Santeria church members."). In addition,

20     the legislative history revealed that disapproval of animal sacrifice *as a Santeria religious ritual*

21     had in fact motivated the legislators. *Id.* at 534 ("[S]uppression of the central element of the

11

12-2730
Bronx Household v. Board of Education

1    Santeria worship service was the object of the ordinances."). Furthermore, although the

2    legislation claimed a variety of secular goals, those objectives were belied by exclusions that

3    were incompatible with those goals because they widely permitted animal sacrifice outside the

4    context of Santeria religious ceremonies. *Id.* at 536. Because the prohibition was found to be

5    motivated by disapproval of a religious practice and represented an attempt suppress it, and

6    because, notwithstanding its disguise, it in fact applied almost exclusively to the Santeria ritual of

7    animal sacrifice, the Supreme Court found that the ordinances were subject to strict scrutiny, and

8    that they violated the plaintiffs' free exercise rights. *Id.* at 547.

9        The *Lukumi* opinion, indeed, declared the "principle" that "government, in pursuit of

10   legitimate interests, cannot in a selective manner impose *burdens* only on conduct motivated by

11   religious belief," *id.* at 543 (emphasis added), thus justifying strict scrutiny. It characterized this

12   principle as "essential to the protection of the rights guaranteed by the Free Exercise Clause." *Id*.

13   Yet, there are crucial differences between the facts in *Lukumi* and those in the present case. First,

14   the ordinances in *Lukumi* were intended to, and did, *suppress* a religious ritual of a particular

15   faith, by prohibiting its performance in the city. Reg. I.Q. does no such thing. It leaves all

16   religions free without interference to engage in whatever religious practices they choose

17   (including, of course, religious worship services) throughout the City. It represents only a

18   decision by the Board not to subsidize religious worship services by providing rent-free school

19   facilities in which to conduct them.

20       Second, the Hialeah ordinances were motivated by the city council's disapproval of the

21   targeted religious practice. The Board has no such motivation. There is not a scintilla of evidence

12

12-2730
**Bronx Household v. Board of Education**

1    that the Board disapproves of religion or any religion or religious practice, including religious

2    worship services. Its sole reason for excluding religious worship services from its facilities is the

3    concern that by hosting and subsidizing religious worship services, the Board would run a

4    meaningful risk of violating the Establishment Clause by appearing to endorse religion. This

5    difference is of crucial importance in determining the reach of *Lukumi*'s reasoning that a

6    burdensome regulation focused on a religious practice is constitutionally suspect and therefore

7    subject to strict scrutiny. This reasoning makes perfect sense when the regulation's focus on

8    religion is gratuitous, and all the more so when it is motivated by disapproval of religion (or of a

9    particular religion or religious practice). On the other hand, it makes no sense when the

10   regulation's focus on religion is motivated by the governmental entity's reasonable interest in

11   complying with the Establishment Clause. The Free Exercise and Establishment Clauses place

12   limits on the conduct of all governmental entities. The Free Exercise Clause prohibits

13   government from interfering with free exercise of religion. The Establishment Clause prohibits

14   government from engaging in conduct that would constitute an establishment of religion, such as

15   endorsing, or seeming to endorse, a religion. It is only to the extent that governmental conduct

16   *affects religion* that the restrictive force of the Religion Clauses is operative. Accordingly, rules

17   and policies designed to keep a governmental entity in conformity with its obligations under the

18   Religion Clauses must of necessity focus on religious subject matter. If the focus is not religious,

19   the Religion Clauses have no application. Such focus on religion is neither an invidious

20   discrimination nor constitutionally suspect. To the contrary, it is inevitable.

13

12-2730
**Bronx Household v. Board of Education**

1        To illustrate, we consider a number of rules that might be adopted with the purpose of

2        complying with the Religion Clauses. One such rule might state, "This city shall not adopt any

3        rule or practice that constitutes an improper burden on the free exercise of religion, or that

4        constitutes an establishment of religion." Or a school board might adopt a rule stating, "No

5        school or teacher shall compel any student to participate in religious exercises, or seek to

6        persuade any student to alter his or her religious beliefs." Such rules can hardly be

7        constitutionally suspect in view of the fact that they are constitutionally mandated. Going further,

8        a reformed Hialeah, chastened by the Supreme Court's ruling in *Lukumi,* might adopt a new

9        ordinance that summarizes the Supreme Court's ruling. The ordinance might provide something

10       like, "Under no circumstances will this city pass any ordinance prohibiting any practice

11       undertaken as a religious exercise, unless it similarly prohibits the practice when done in a

12       secular context, and in no circumstances will a practice be prohibited because of disapproval of

13       the practice as a religious ceremony." Or, in recognition of the Supreme Court's recent ruling in

14       *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 132 S. Ct. 694 (2012), that

15       there is a constitutionally compelled "ministerial exception" to the laws forbidding

16       discrimination in employment, the Congress might pass a statute amending the federal laws that

17       forbid discrimination in employment, stating something like, "No minister of a religious faith

18       shall have a claim against the church or religious organization that employs the minister for the

19       performance of ministerial duties." These hypothetical rules – the very rules declared by the

20       Supreme Court to be constitutionally mandated – do not represent invidious discrimination

21       against religion and are not constitutionally suspect simply because the limitations they impose

12-2730
Bronx Household v. Board of Education

1    target religion. They target religion in order to give effect to the Constitution's Religion Clauses,

2    which themselves apply only to religion. Yet under the District Court's analysis, a statute stating

3    the rule of *Lukumi* would fail to pass the test of *Lukumi,* and a statute stating the rule of

4    *Hosanna-Tabor* would fail to pass the test of *Hosanna-Tabor*. We believe the District Court has

5    misunderstood *Lukumi* in construing it to mean that a rule declining to subsidize religious

6    worship services so as not to risk violating the Establishment Clause is automatically

7    constitutionally suspect and subject to strict scrutiny.

8             *b) Locke v. Davey.*

9             More importantly, upon facts very similar to ours, the Supreme Court has expressly ruled

10   that where motivated by Establishment Clause concerns, a governmental decision to exclude

11   specified religious causes from eligibility to receive state educational subsidies is neither a

12   violation of free exercise, nor even subject to strict scrutiny under *Lukumi*.[6] In *Locke v. Davey*,

13   540 U.S. 712 (2004), the State of Washington had established a scholarship program to assist

14   academically gifted students in post-secondary education. 540 U.S. at 715. The state, however,

15   provided by statute and by provision of its constitution that students pursuing a degree in

16   theology were not eligible to receive the scholarship grants. *Id.* at 716. This restriction was

17   challenged by Davey, a gifted student, who was awarded a grant but was informed that it could

18   not be used to pursue the degree in pastoral ministries he sought. *Id.* at 717. Davey brought suit

---

[6]Judge Walker argues in his dissent that "*Locke* is not applicable here . . . because it dealt only with a government subsidy." Dissenting Op. 7. However, Reg. I.Q. also concerns a government subsidy. As discussed above, the regulation represents a governmental decision not to subsidize religious worship services by providing rent-free facilities to house such services. *See supra* pp. 10, 12. Therefore, *Locke* is not distinguishable on this ground.

15

**12-2730**
**Bronx Household v. Board of Education**

1  alleging, among other claims, that the state's refusal to allow use of its scholarship funds for the

2  study of theology was, under the rule of *Lukumi*, presumptively unconstitutional and subject to

3  strict scrutiny. *Id.* at 720. Recognizing the state's Establishment Clause interest underlying the

4  restriction, the Court observed that "[t]he[] two [Religion] Clauses . . . are frequently in tension.

5  Yet we have long said that there is room for play in the joints between them. In other words,

6  there are some state actions permitted by the Establishment Clause but not required by the Free

7  Exercise Clause." *Id.* at 718-19 (citations and internal quotation marks omitted). Specifically

8  addressing Davey's claim that the prohibition was presumptively unconstitutional and subject to

9  strict scrutiny pursuant to *Lukumi,* the Court concluded:

10        We reject his claim of presumptive unconstitutionality,
11        however; to do otherwise would extend the *Lukumi* line of cases well
12        beyond not only their facts but their reasoning. In *Lukumi*, the city of
13        Hialeah made it a crime to engage in certain kinds of animal
14        slaughter. We found that the law sought to suppress ritualistic animal
15        sacrifices of the Santeria religion. In the present case, the State's
16        disfavor of religion (if it can be called that) is of a far milder kind. It
17        imposes neither criminal nor civil sanctions on any type of religious
18        service or rite. It does not deny to ministers the right to participate in
19        the political affairs of the community. And it does not require
20        students to choose between their religious beliefs and receiving a
21        government benefit.  The State has merely chosen not to fund a
22        distinct category of instruction.

23  *Id.* at 720-21 (citations and footnote omitted).

16

12-2730
**Bronx Household v. Board of Education**

1      Finding no animus toward religion in the legislative history or text of the prohibition, nor

2    in the operation of the scholarship program, and finding substantial evidence indicating a

3    historical aversion to using tax funds to support the ministry, "which was one of the hallmarks of

4    an 'established' religion," *id*. at 722-25, the Court concluded that, "[g]iven the historic and

5    substantial state [anti-establishment] interest at issue, we therefore cannot conclude that the

6    denial of funding for vocational religious instruction alone is inherently constitutionally suspect."

7    *Id*. at 725. Accordingly, Davey's Free Exercise Clause claim failed because "[t]he State's [anti-

8    establishment] interest in not funding the pursuit of devotional degrees is substantial and the

9    exclusion of such funding places a relatively minor burden on [students eligible for scholarship

10   funds]." *Id*.

11     As Washington's exclusion of students of theology from eligibility for the state's

12   subsidies was not subject to strict scrutiny under *Lukumi* because the exclusion was enacted in

13   the interest of establishment concerns, we can see no reason why the rule should be any different

14   in this case. We see no meaningful distinctions between the cases. Our record reveals no animus

15   toward religion generally or toward a particular religion or religious practice in either the text of

16   Reg. I.Q. or the operation of Board's policy. Underlying the Board's prohibition is a slightly

17   different manifestation of the same historical and constitutional aversion to the use of public

18   funds to support the practice of religion cited by the Court in *Locke*. As in *Locke,* the Board's

19   interest in respecting the principle of the Establishment Clause that disfavors public funding of

20   religion is substantial, and the burden, if it can properly be called a burden, that falls on Bronx

21   Household in needing to find a location that is not subsidized by the City for the conduct of its

22   religious worship services, is minor from a constitutional point of view.

17

12-2730
**Bronx Household v. Board of Education**

1    We do not mean to imply that merely by claiming the motivation of observing interests

2    favored by the Establishment Clause a governmental entity gets a free pass, avoiding *all* scrutiny.

3    We recognize that a school authority's prohibition of a religious practice, even if explained as an

4    attempt to comply with constitutional responsibilities, can in some circumstances represent a

5    suspect discrimination of religion, which violates one or both of the Religion Clauses. A court

6    would likely have rejected, for example, a claim by Hialeah that its ordinances, which prohibited

7    almost exclusively a religious practice of the Santeria church, were permissible in light of

8    Hialeah's interest in observing the Establishment Clause. *See Good News Club*, 533 U.S. at 112-

9    19 ("[A]corrding to Milford, its restriction was required to avoid violating the Establishment

10   Clause. We disagree.").

11   Our point is therefore not that a refusal to subsidize a religious practice, sought to be

12   justified as an effort to comply with the Establishment Clause, necessarily defeats a claim of

13   violation of the Free Exercise Clause. It is rather that *Lukumi*'s invocation of presumptive

14   unconstitutionality and strict scrutiny cannot reasonably be understood to apply to rules that

15   focus on religious practices in the interest of observing the concerns of the Establishment Clause.

16   The constitutionality of such rules must be assessed neutrally on all the facts and not under strict

17   scrutiny.

18   *c) Discrimination against particular religions.*

19   We also disagree with the District Court's view that Reg. I.Q. is a constitutionally suspect

20   discrimination *among religions* because it affects religions that conduct worship services and

21   does not affect religions that do not. Reg. I.Q. treats all religions in the same fashion. It leaves all

18

12-2730
**Bronx Household v. Board of Education**

1    religions free to engage in whatever practices they wish anywhere other than the Board's school

2    facilities. Furthermore, to the extent that different religions choose to avail themselves of the

3    Board's subsidized facilities, Reg. I.Q. treats them all similarly as to what they may do and may

4    not do. The "religious worship services" prohibition bars all conduct of religious worship

5    services in the school facilities. The activities not prohibited are likewise permitted to all users.

6          Religions that conduct religious worship services are not excluded by Reg. I.Q. from the

7    use of school facilities. They may use the facilities for the same purposes and in the same manner

8    as the facilities are used by religions that do not conduct religious worship services. They may

9    use the facilities to teach religion, read from and discuss the Bible, advocate their religious

10    views, sing hymns, say prayers, and do all things that must be permitted under the rule of *Good*

11    *News Club.* Such religions, it is true, may not use the school facilities for the conduct of religious

12    worship services. While Reg. I.Q. thus treats these two classes of religions equally, its impact on

13    them will be different to the extent that religions that do not conduct religious worship services

14    will not apply to conduct religious worship services and will therefore not be refused something

15    they might have wanted, while religions that do conduct religious worship services, such as

16    Bronx Household, may ask to conduct religious worship services and be denied.

17          It does not follow, however, that such a disparate impact violates the Free Exercise

18    Clause. "[I]t is a basic tenet of First Amendment law that disparate impact does not, in itself,

19    constitute viewpoint discrimination." *Christian Legal Soc. Chapter of the Univ. of California,*

20    *Hastings Coll. of the Law v. Martinez,* 130 S.Ct. 2971, 2996 (2010). In *Lukumi,* the reason for

21    striking down the Hialeah ordinances was not that the Santeria religion wished to practice animal

19

12-2730
**Bronx Household v. Board of Education**

1   sacrifice while other religions did not. The prohibition of Santeria's ritual animal sacrifice was

2   struck down because the evidence showed that the prohibition was motivated exclusively by

3   discriminatory disapproval of that religious practice, and that the city's claim that the ordinances

4   were motivated by public health and other neutral concerns was false. It is the clear implication

5   of the Supreme Court's opinion that, if the prohibition had applied across-the-board, affecting

6   religious and secular practice equally, and had not been motivated by hostility to Santeria's

7   religious practice, the prohibition would have been upheld, notwithstanding that it would have

8   burdened the Santeria religion without similarly burdening other religions that do not practice

9   animal sacrifice. *See Lukumi*, 508 U.S. at 547 ("Those in office must be resolute in resisting

10  importunate demands and must ensure that the sole reasons for imposing the burdens of law and

11  regulation are secular. Legislators may not devise mechanisms, overt or disguised, designed to

12  persecute or oppress a religion or its practices. The laws here in question were enacted contrary

13  to these constitutional principles, and they are void.").

14         Thus, it is clear that the Free Exercise Clause would not prohibit the Board from denying

15  permits to those seeking to use school facilities for the killing of animals, or for boxing, or other

16  martial arts contests, so long as the Board's restriction applies to secular usage as well as

17  religious, and was not motivated by discriminatory disapproval of any particular religion's

18  practices. The Board is not compelled to permit a practice it has a justifiable reason for excluding

19  just because the exclusion may affect one religion that practices the excluded conduct while not

20  affecting other religions that do not.

20

12-2730
**Bronx Household v. Board of Education**

1        Nothing in this record remotely supports a finding that the Board disapproves of

2   religious worship services or wishes to favor religions that do not practice religious worship

3   services over those that do. The Board's only motivation is to act consistently with its

4   establishment concerns and protect itself against reasonable Establishment Clause challenges.[7]

5        We conclude that *Lukumi*'s invocation of strict scrutiny has no application to these facts,

6   and that Reg. I.Q. does not impose an unconstitutional burden on Bronx Household's right of

7   free exercise of religion.[8]

---

[7] Nor was the District Court correct in its view that Reg. I.Q. discriminates against "religions that fit the 'the ordained' model." *Bronx Household*, 876 F. Supp. 2d at 431. There is no evidence whatsoever that the Board applies Reg. I.Q. only where the proposed religious worship service would be conducted by an ordained minister. The District Court perhaps based this finding on our earlier observation in *Bronx Household IV* that "[r]eligious worship services are conducted according to the rules dictated by the particular religious establishment and are *generally* performed by an officiant of the church or religion." 650 F.3d at 41 (emphasis added). This passage was descriptive, rather than prescriptive, and included the word "generally" to make clear that the presence of an officiant was merely a common feature, and not a definitional requirement of a religious worship service. Far from specifying that an ordained officiant is an essential feature of services to which Reg. I.Q. applies, the Board has essentially left it to applicants to state whether they will conduct religious worship services.

[8] Alternatively, the same sensible result could be reached through two other routes of interpretation. First, the *Lukumi* "principle" that "government, in pursuit of legitimate interests, cannot in a selective manner impose *burdens* only on conduct motivated by religious belief," 508 U.S. at 543 (emphasis added), might be deemed inapplicable to the present case on the ground that a government decision not to subsidize a religious activity is not deemed to constitute a "burden" on that activity, within the meaning of *Lukumi*. Or, the "strict scrutiny" test may apply, but be deemed satisfied when government decides not to subsidize a religious practice acting on a good faith and reasonable concern that such subsidizing would present a meaningful risk of being found in violation of the Establishment Clause. Regardless of which of these three analytical formulas is used, the validity of Reg. I.Q. would be sustained against Bronx Household's *Lukumi*-based challenge.

21

12-2730
**Bronx Household v. Board of Education**

1        3) *If the Board has a reasonable, good faith concern that making its school facilities*

2        *available for the conduct of religious worship services would give rise to a substantial*

3        *risk of violating the Establishment Clause, the permissibility of the Board's refusal to do*

4        *so does not turn on whether such use of school facilities would in fact violate the*

5        *Establishment Clause.*

6        As in *Bronx Household IV*, we do not reach the question whether the Board would violate

7 the Establishment Clause by allowing the subsidized use of the school facilities for religious

8 worship services because we believe it is unnecessary to do so. The District Court acknowledged

9 that a motivation to avoid violation of the Establishment Clause would justify the Board's

10 exclusion of religious worship services *if* allowing the conduct of religious worship services

11 would in fact violate the Establishment Clause. But the court expressed the view that, unless the

12 excluded practice would in fact constitute a violation of the Establishment Clause, steering clear

13 of conduct that might be reasonably suspect under the Establishment Clause does not furnish

14 adequate reason for declining to offer the school facilities for the conduct of religious worship

15 services. *Bronx Household*, 876 F. Supp. 2d at 433-37. The Board contends this was error.

16        We cannot accept the District Court's rule for two reasons. First, this rule would unfairly

17 put the Board in an impossible position of being compelled at its peril to risk violating one

18 Religion Clause or the other if it wrongly guessed the Establishment Clause's exact contours.

19 Second, the District Court's rule contradicts the most nearly comparable Supreme Court

20 authority, as well as clear Second Circuit authority.

22

12-2730
**Bronx Household v. Board of Education**

1    No extant decision by the Supreme Court permits the Board to predict with confidence

2    whether it might be found in violation of the Establishment Clause if it offers its school facilities

3    to Bronx Household, as well as numerous other churches, for the conduct of subsidized worship

4    services (virtually all of which would be Christian services held on Sundays, as that is when the

5    school facilities are most available for such use). Essentially two choices are open to the Board. It

6    can either make its facilities available for worship services, or decline to do so. If the rule were as

7    the District Court proposed, a wrong guess as to what the Supreme Court will eventually hold

8    would put the Board in violation of one of the two Religion Clauses. If the Board declines to host

9    and subsidize religious worship services, and the Supreme Court eventually rules that allowing

10   religious worship services would not violate the Establishment Clause, the Board would have

11   committed years of violations of the Free Exercise Clause rights of rejected permit applicants. On

12   the other hand, if the Board offers its facilities for subsidized religious worship services, and the

13   Supreme Court eventually rules that the practice causes sufficient appearance of endorsement to

14   constitute a violation of the Establishment Clause, the Board would have committed years of

15   violation of that clause. Under the District Court's rule, the Board would be compelled to

16   speculate with little guidance which way the Supreme Court will eventually go, and if it guesses

17   wrong, it would have committed extensive violations of one of the Religion Clauses. Such a rule

18   would be exceedingly unfair to the Board. In our view, the better rule allows the Board, if it

19   makes a reasonable, good faith judgment that it runs a substantial risk of incurring a violation of

23

12-2730
Bronx Household v. Board of Education

1    the Establishment Clause by hosting and subsidizing the conduct of religious worship services, to

2    decline to do so.[9]

3              Furthermore, the Supreme Court in *Locke* expressly rejected the District Court's rule. As

4    we explained above, in *Locke* the Court was ruling on the question whether the State of

5    Washington, acting pursuant to constitutional and historical concerns about government funding

6    of religious practices, could lawfully exclude students seeking degrees in theology from

7    eligibility for state scholarship grants. In ruling that the exclusion did not violate the free exercise

8    rights of the plaintiff who was ineligible for grant funds because he was pursuing a degree in

9    theology, the Court explicitly considered and rejected the argument that establishment concerns

10   could justify the religion-based exclusion only if the reviewing court concluded that granting the

11   subsidy for the excluded religious purpose would in fact violate the Establishment Clause. It

12   explained, as set forth above, that "there is room for play in the joints between [the Religion

13   Clauses]. . . . [S]ome state actions permitted by the Establishment Clause . . . [are] not required

14   by the Free Exercise Clause. . . . If any room exists between the two Religion Clauses, it must be

15   here." 540 U.S. at 718-19, 725 (internal quotation marks omitted). If it was clear that the State of

16   Washington was free in service of establishment interests to exclude theology students from

17   eligibility for its scholarships, even though making them eligible would not have violated the

18   Establishment Clause, we see no reason why the Board may not similarly in service of the

---

[9] *Cf. Ricci v. DeStefano*, 557 U.S. 557, 585 (2009) ("[U]nder Title VII, before an employer can engage in intentional discrimination for the asserted purpose of avoiding or remedying an unintentional disparate impact, the employer must have a strong basis in evidence to believe it will be subject to disparate-impact liability if it fails to take the race-conscious, discriminatory action.").

24

12-2730
**Bronx Household v. Board of Education**

1   establishment interests decline to subsidize religious worship services, even if subsidizing them

2   would not violate the Establishment Clause.

3          Furthermore, our court has repeatedly rejected the District Court's rule. In *Marchi v. Bd.*

4   *of Coop. Educ. Servs. of Albany*, 173 F.3d 469 (2d Cir. 1999), we considered a teacher's claim

5   that his First Amendment rights were violated by a school board directive that he "cease and

6   desist from using any references to religion in the delivery of [his] instructional program unless it

7   is a required element of a course of instruction for [his] students and has prior approval by [his]

8   supervisor." *Id*. at 472-73. We decided that the school board "d[id] not impermissibly infringe

9   Marchi's free exercise rights" in interpreting the directive to prohibit communications that

10  "sufficiently intruded religious content into a curricular matter, not involving religion, such that

11  the school authorities could reasonably be concerned that communications of this sort would

12  expose it to non-frivolous Establishment Clause challenges." *Id*. at 477. We recognized that

13  "when government endeavors to police itself and its employees in an effort to avoid transgressing

14  Establishment Clause limits, it must be accorded some leeway, even though the conduct it

15  forbids might not inevitably be determined to violate the Establishment Clause" because "[t]he

16  decisions governmental agencies make in determining when they are at risk of Establishment

17  Clause violations are difficult." *Id*. at 476; *see id*. ("[I]n dealing with their employees,

18  [governmental agencies] cannot be expected to resolve so precisely the inevitable tensions

19  between the Establishment Clause and the Free Exercise Clause that they may forbid only

20  employee conduct that, if occurring, would violate the Establishment Clause and must tolerate all

21  employee conduct that, if prohibited as to non-employees, would violate the Free Exercise

22  Clause.").

12-2730
**Bronx Household v. Board of Education**

1    And in *Skoros v. City of New York*, 437 F.3d 1 (2d Cir. 2006), we considered a Free

2    Exercise Clause challenge to New York City Department of Education's school holiday display

3    policy, which had been promulgated in light of Establishment Clause concerns. The policy

4    permitted the display of "secular" holiday symbols including Christmas trees, menorahs and the

5    star and crescent but did not permit a crèche to be displayed as a symbol of Christmas. *Id*. at 5-6.

6    We decided that the holiday display policy did not violate the Free Exercise Clause and, in doing

7    so, recognized that even though the policy might have permitted a crèche to be displayed without

8    violating the Establishment Clause, "we afford the government some leeway in policing itself to

9    avoid Establishment Clause issues, even if it thereby imposes limits that go beyond those

10   required by the Constitution." *Id.* at 34-35.

11   Returning to the present case, as we explained at length in *Bronx Household IV*, the

12   Board has substantial reasons for concern that hosting and subsidizing the conduct of religious

13   worship services  would create a substantial risk of liability under the Establishment Clause.

14   "[T]he Supreme Court has warned that violation of the Establishment Clause can result from

15   *perception* of endorsement. The Establishment Clause, at the very least, prohibits government

16   from *appearing* to take a position on questions of religious belief." 650 F.3d at 41 (internal

17   quotation marks omitted). As we explained, during Sunday services, under the District Court's

18   injunction, the Board's schools are dominated by church use: "Church members post signs,

19   distribute flyers, and proselytize outside the school buildings. In some schools, no other outside

20   organizations use the space. Accordingly, on Sundays, some schools effectively become churches

21   [as] both church congregants and members of the public identify the churches with the schools."

26

**12-2730**
**Bronx Household v. Board of Education**

1   *Id*. at 42. We noted also that the fact that school facilities are available for such use primarily on

2   Sundays results in an unintended bias in favor Christian religions, which prescribe Sunday as the

3   principal day for worship services, while Jews and Muslims, for example, hold worship services

4   on days during which school facilities are less available for such use. *Id.* at 43. All of this, which

5   we explained in greater detail in our earlier opinion, supports a reasonable concern on the part of

6   the Board that hosting and subsidizing the conduct of religious worship services might support a

7   non-frivolous claim that the Board is creating a public perception of endorsement of religion. *Id.*

8   at 42.

9        In view of (1) the absence of discriminatory animus on the part of the Board against

10   religion, or against religions that conduct worship services; (2) the bona fides and the

11   reasonableness of the Board's concern that offering school facilities for the subsidized conduct of

12   religious worship services would create a substantial risk of incurring a violation of the

13   Establishment Clause claim; and (3) the fact that the Board's policy (a) leaves all persons and

14   religions free to practice religion without interference as they choose, (b) treats all users, whether

15   religious or secular, in identical fashion, and (c) imposes no burden on any religion, leaving all

16   free to conduct worship services wherever they choose other than the Board's schools; as well as

17   the other reasons recited in this opinion and in *Bronx Household IV*, we conclude that Reg. I.Q.

18   does not violate Plaintiffs' rights to free exercise of religion, whether or not it is subject to strict

19   scrutiny.

27

12-2730
**Bronx Household v. Board of Education**

1   B. *The Establishment Clause*

2       *1) The District Court erred in concluding that Reg. I.Q. violates the Establishment*

3       *Clause because it compels the Board to become excessively entangled with religion by*

4       *deciding what are religious worship services.*

5       The District Court ruled that the Board's very act of determining whether a proposed use

6   of the school facilities is a religious worship service (and therefore is prohibited by Reg. I.Q.)

7   would constitute an excessive entanglement with religion, which violates the Establishment

8   Clause. *Bronx Household*, 876 F. Supp. 2d at 440-45; *see Lemon v. Kurzman*, 403 U.S. 602, 612-

9   13 (1971). We disagree for a number of reasons.

10      When this case was before us in *Bronx Household IV*, Bronx Household presented us

11  with the same argument. We rejected it. First, we noted that whatever merit the argument might

12  have in other circumstances, it could have no application here because Bronx Household

13  acknowledged its intention to conduct religious worship services in the school facilities. Its

14  application for an extended use permit specified its intention to conduct "Christian worship

15  services." 650 F.3d at 35. Furthermore, we noted that Bronx Household's argument

16  "overlook[ed] the nature of the duties placed on government officials by the Establishment

17  Clause." *Id.* at 47. The Establishment Clause prohibits government officials from taking action

18  that would constitute an establishment of religion. In many circumstances, especially when

19  dealing with applications to conduct arguably religious exercises on public property, government

20  officials cannot discharge their obligations under the Establishment Clause without examining

21  the conduct to determine whether it is in fact religious and, if so, whether the conduct is of such

28

12-2730
**Bronx Household v. Board of Education**

1    nature that allowing it to take place on public property would constitute a prohibited

2    establishment of religion. If public officials were not permitted to undertake such inquiries, they

3    could not discharge their duties to guard against violation of the Establishment Clause. Thus, the

4    Constitution, far from forbidding government examination of arguably religious conduct, at times

5    compels government officials to undertake such inspection in order to draw constitutionally

6    necessary distinctions. We concluded that "the mere act of inspection of religious conduct" did

7    not constitute excessive entanglement, observing that to prohibit such inspection "would

8    effectively nullify the Establishment Clause." *Id.*

9         On remand, the District Court concluded that "[f]actual and legal developments since

10   [*Bronx Household IV*] merit reconsideration of Plaintiffs' Establishment Clause claim." *Bronx*

11   *Household*, 855 F. Supp. 2d at 60-61. In particular, the District Court pointed to "new facts

12   documenting how the Board's current policy fosters excessive governmental entanglement" and

13   the Supreme Court's recent decision in *Hosanna-Tabor*. *Id.* at 64. The District Court believed

14   this decision pertinent because the Supreme Court "emphasized the wide berth religious

15   institutions are to be given with respect to their core activities, including worship." *Id.* at 63.

16   Upon reconsidering Bronx Household's Establishment Clause claim, the District Court

17   concluded that Reg. I.Q. compels Board officials to become excessively entangled with religion

18   by requiring them "to make their own bureaucratic determinations as to what constitutes

19   'worship,'" contravening *Hosanna-Tabor*'s prohibition of such government involvement in

20   ecclesiastical decisions. *Bronx Household*, 876 F. Supp. 2d at 440.

29

12-2730
**Bronx Household v. Board of Education**

1    We respectfully disagree. The evidentiary record does not sustain the district court's

2    findings that the Board makes its own determination whether an applicant's proposed activities

3    constitute a religious worship service. And, in any event, *Hosanna-Tabor* does not support the

4    proposition that it would be improper for the Board to make such a determination.

5        The Board's policy is *not* to make its own determination whether conduct proposed by an

6    applicant constitutes a religious worship service. To the contrary, the Board's policy is to rely on

7    the applicant's own characterization as to whether the applicant will conduct religious worship

8    services. Under Reg. D-180, every extended use applicant must submit an application for a

9    permit. The application form requires the applicant to provide a "Description of Activities to be

10   conducted," and to sign a certification that "the Information I have provided . . . is complete and

11   accurate to the best of my knowledge," and that "the activities to be conducted . . . do not include

12   any of the prohibited uses described . . . in Chancellor's Regulation D-180." App. 996.[15] The

13   Board reviews the applicant's "Description of Activities to be conducted" to see whether the

14   applicant has stated an intention to conduct religious worship services. It does not consider

15   whether proposed activities that the application does not describe as a religious worship service

16   in fact constitute a religious worship service. The Board may, however, look beyond the

17   application at the applicant's website and other public materials. If the applicant states on its

18   website or in other public materials an intention to conduct a religious worship service without

---

[15] *See also* Reg. D-180 § II.L ("Providing incorrect, incomplete, or misleading information on the Permit Application or the failure to conform to any of the guidelines and/or limitations contained in this regulation, as well as any other applicable laws and regulations governing the use of school buildings and grounds, may lead to the revocation of the permit, the denial of future Permit Applications and other legal actions by the [Board].").

30

12-2730
**Bronx Household v. Board of Education**

1 having acknowledged that intention in its application, the Board may either request an

2 explanation of the apparent discrepancy or deny the application pursuant to § II.L of Reg. D-180.

3 As with respect to the application itself, in reviewing an applicant's website or other public

4 materials, the Board does not make its own assessment whether the described activities constitute

5 a religious worship service but limits its inquiry to the applicant's own characterization. The

6 Board, furthermore, makes no attempt to define, or impose on applicants a definition of, what

7 constitutes a "religious worship service."

8       Although it is uncontradicted that the Board's policy is not to make its own determination

9 whether an applicant's proposed activities constitute a religious worship service, but rather to

10 rely exclusively on the applicant's own characterization, the District Court nonetheless concluded

11 that Reg. I.Q. compels excessive entanglement because the Board acknowledged that its policy of

12 not making its own determination had not in every instance been properly carried out. *Bronx*

13 *Household*, 876 F. Supp. 2d at 440-41. For example, the Board acknowledged an instance (not

14 involving Bronx Household) in which, contrary to Board policy, a permit applicant who

15 indicated that the activities to be conducted included "Prayer" and "Bible Study" was told by a

16 Board representative that "Bible study would be ok, but not prayer meetings." The fact that there

17 have been instances, none involving Bronx Household, in which Board personnel improperly

18 deviated from the Board's policy cannot justify the District Court's conclusion that Reg. I.Q.

19 compels excessive entanglement and is therefore unconstitutional.

31

12-2730
**Bronx Household v. Board of Education**

1    The District Court also justified its finding based on the fact that the Board's policy

2   permits the Board to inspect an applicant's website and other public materials. The court

3    explained,

4           While this approach of looking beyond the four corners of the Extended Use
5           Application may be proper for purposes of verifying a political or commercial
6           applicant's compliance with Ch. Reg. D–180, the same cannot be said of
7           verifying whether a religious applicant is complying with the worship-related
8           provisions of the regulation. This is because it is the religious adherents alone
9           who can determine for themselves how to "shape their own faith,"
10          *Hosanna–Tabor,* 132 S.Ct. at 706, and no amount of bureaucratic second-
11          guessing—even if based solely on the adherents' own words—may invade
12          their province.

13   *Bronx Household*, 876 F. Supp. 2d at 442 (citation, brackets and internal quotation marks

14   omitted).

15    We believe the District Court's reasoning was flawed in two respects. First, as explained

16   above, the Board's policy providing that it may examine an applicant's website and other public

17   materials (in addition to the application) was not a deviation from the Board's policy of accepting

18   an applicant's own characterization of whether its activities constitute a religious worship

19   service. According to the Board's policy, it is only when an applicant itself characterizes its

20   conduct as a religious worship service that the Board will consider it to be such. The aspect of the

21   Board's policy that allows it to look at an applicant's website and other public materials in

22   addition to the application does not represent a deviation from the policy of using only an

23   applicant's own characterization.

32

12-2730
**Bronx Household v. Board of Education**

1    Because the Board does not make its own determinations whether an applicant's

2    proposed activities constitute worship services, the District Court's interpretation of *Hosanna-*

3    *Tabor* as prohibiting a governmental authority from making such determinations has no

4    pertinence. But, even if the Board were making its own determinations, *Hosanna-Tabor* would

5    not prohibit such a policy. The Supreme Court's ruling rather supports the opposite conclusion.

6    In *Hosanna-Tabor*, the plaintiff Perich, who was employed by a church to teach in a

7    capacity regarded by the church as that of a minister, was dismissed from her employment after

8    developing an illness and taking a period of disability leave. 132 S.Ct. at 700. The plaintiff sued

9    for reinstatement, alleging that her dismissal violated the Americans with Disabilities Act (the

10   "ADA"), 42 U.S.C. § 12101 *et seq.* (1990). *Id.* at 701. The Supreme Court ruled in favor of the

11   church, holding that, because the plaintiff was employed by the church as a minister, she had no

12   claim against the church under the employment discrimination laws. *Id*. at 707-10. The Court

13   reasoned that, because the Free Exercise Clause requires that religions be free to select their own

14   ministers, and because the Establishment Clause is offended by giving the state the power to

15   determine which individuals will minister to the faithful on behalf of a church, there is an

16   implicit, constitutionally mandated  "ministerial exception" to the employment discrimination

17   laws. The Court explained,

18           Requiring a church to accept or retain an unwanted minister, or punishing a
19           church for failing to do so, intrudes upon more than a mere employment
20           decision. Such action interferes with the internal governance of the church,
21           depriving the church of control over the selection of those who will personify
22           its beliefs. By imposing an unwanted minister, the state infringes the Free

33

12-2730
**Bronx Household v. Board of Education**

1    Exercise Clause, which protects a religious group's right to shape its own

2    faith and mission through its appointments. According the state the power to

3    determine which individuals will minister to the faithful also violates the

4    Establishment Clause, which prohibits government involvement in such

5    ecclesiastical decisions.

6    *Id.* at 706.

7    In the present case, even if the Board were making its own determination whether an

8    applicant's proposed conduct constitutes a religious worship service, *Hosanna-Tabor* would not

9    support the conclusion that the Establishment Clause prohibits a governmental entity from

10   making that determination. This is for two reasons.

11   First, the constitutional impropriety that led the Supreme Court to read a ministerial

12   exception into the employment discrimination statutes is not present on these facts. The problem

13   in *Hosanna-Tabor* was that, unless the employment discrimination laws are read not to apply to a

14   claim against a church by a minister asserting a right to employment, the consequence would be

15   that a governmental authority – a judge, or a jury, or an administrative agency – would dictate to

16   the church whom it must employ to serve as minister, communicating its teachings to its faithful.

17   The governmental authority would, to a significant extent, be directing, shaping and controlling

18   the ecclesiastical actions of the church.

19   The Board deciding for itself whether an applicant's proposed conduct constitutes a

20   religious worship service would not entail imposing any such control over a church's religious

21   activity. Unlike *Hosanna-Tabor*, where a government authority would be requiring a church to

22   communicate the tenets of its faith through a minister not of its own choosing, under no

34

12-2730
Bronx Household v. Board of Education

1  circumstances would the Board under Reg. I.Q. be telling any person or entity how to conduct

2  worship services. The only practical consequences that would turn on the Board's decision would

3  be whether the Board would make its subsidized school facilities available to the applicant. The

4  applicant would remain free to shape its religious worship services in any way it chose.[16]

5       *Hosanna-Tabor*, moreover, does not merely fail to support Bronx Household's claim of

6  Establishment Clause violation due to excessive entanglement by the Board; it actively

7  contradicts the argument. This is because in *Hosanna-Tabor* the Supreme Court itself did

8  precisely what the District Court found a governmental entity prohibited from doing.

9       The conclusion that there is an implicit ministerial exception that bars a minister from

10 suing the church that employs her under the ADA did not resolve the case. The question

11 remained whether the plaintiff was a minister and thus subject to the ministerial exception. It was

12 undisputed that, according to the church's classification, the plaintiff served in the role of a

13 commissioned minister.[17] If the District Court were correct, the church's classification of the

---

[16]Nor could a decision by the Board overruling an applicant's own understanding of whether proposed activities constituted a religious worship service ever deprive an applicant of the opportunity to conduct what it deemed to be a religious worship service. The denial of a permit application based on the Board's rejection of the applicant's own characterization of the proposed activities would occur only when the Board deemed activities that the applicant did not consider a religious worship service to be a religious worship service. In that circumstance, by definition, the denial would only prohibit use for activities that the applicant did not consider to be a religious worship service. The application would have lost no opportunity to conduct a religious worship service because of the Board's own characterization of the proposed activities.

[17] "The Synod classifies teachers into two categories: 'called' and 'lay.' . . . Once called, a teacher receives the formal title 'Minister of Religion, Commissioned'. . . . Hosanna-Tabor asked [the plaintiff] to become a called teacher. [She] accepted the call and received a 'diploma of vocation' designating her a commissioned minister." 132 S.Ct. at 699-700.

35

12-2730
**Bronx Household v. Board of Education**

1    plaintiff as a minister would have ended the matter; the Supreme Court, a governmental

2    authority, would have been compelled (so as to avoid excessive entanglement) to accept the

3    church's designation. The Court did not do so. It undertook to make its own determination

4    whether the plaintiff was a minister subject to the ministerial exception. Based on its own

5    assessment of the pertinent facts (including the nature of the duties assigned to her), the Court

6    determined that she was a minister. *See* 132 S.Ct. at 707-08 ("As a source of religious

7    instruction, Perich performed an important role in transmitting the Lutheran faith to the next

8    generation. In light of . . . the formal title given Perich by the Church, the substance reflected in

9    that title, her own use of that title, and the important religious functions she performed for the

10   Church—we conclude that Perich was a minister covered by the ministerial exception.").[18]

11          For all the reasons outlined above and as well as those we discussed in our earlier

12   decision in *Bronx Household IV*, which we now reaffirm without need to repeat them, we

13   conclude that the District Court erred in concluding that Reg. I.Q. violates the Establishment

---

[18] Nor was the Supreme Court's undertaking to determine for itself whether the plaintiff was a minister, rather than accept the church's characterization, done carelessly without recognition of its implications for the excessive entanglement argument. Justice Thomas, who concurred in the judgment, wrote separately, espousing the very arguments Bronx Household makes here, to reject the aspect of the Court's decision that refused to regard the church's characterization as conclusive. Justice Thomas argued that, in order not to intrude on theological decision, he would have deemed the plaintiff's ministerial status conclusively established by the fact that the church deemed her a minister. *Id.* at 711 (Thomas, *J.*, concurring) ("Hosanna-Tabor sincerely considered Perich a minister. That would be sufficient for me to conclude that Perich's suit is properly barred by the ministerial exception."). No justice joined in Justice Thomas's objection. All of the eight other justices joined in one or both of the Chief Justice's opinion for the Court, and the concurring opinion of Justice Alito, both of which explicitly justified the judgment on the Supreme Court's determination, rather than the church's designation, that the plaintiff was in fact performing in the role of a minister.

36

12-2730
**Bronx Household v. Board of Education**

1    Clause by compelling the Board to make decisions that constitute excessive entanglement with

2    religion.[19] We have considered Bronx Household's other arguments and find no merit in them.[20]

3    **CONCLUSION**

4    For the foregoing reasons, the judgment of the district court is REVERSED, and the

5    injunction barring enforcement of Reg. I.Q. is VACATED.

---

[19] We similarly reject Bronx Household's claim that Reg. I.Q. causes excessive entanglement by requiring the Board to take an official position on religious doctrine.  Unlike in *Commack Self-Service Kosher Meats, Inc. v. Weiss*, 294 F.3d 415 (2d Cir. 2002), where we held laws defining "kosher" according to the dictates of Orthodox Judaism "excessively entangle government and religion because they (1) take sides in a religious matter, effectively discriminating in favor of the Orthodox Hebrew view of dietary requirements; (2) require the State to take an official position on religious doctrine; and (3) create an impermissible fusion of governmental and religious functions by delegating civic authority to individuals apparently chosen according to religious criteria," *id.* at 425, the Board had not engaged in any comparable practices.

[20] In his dissent, Judge Walker advances many of the same arguments he advanced in *Bronx Household IV*, 650 F.3d at 52-65. Our responses are contained in previous *Bronx Household* opinions and set forth in this opinion.

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit

12-2730

*Bronx Household v. Board of Education*

JOHN M. WALKER, JR., Circuit Judge, dissenting:

The majority states that the "Free Exercise Clause . . . has never been understood to require government to finance a subject's exercise of religion." Maj. Op. at 9. Allowing an entity to use public school space open to all others on equal terms is hardly the financing of that entity. However, shutting the door to religious worship services in such a setting when every other activity is permitted strikes at the Clause's core. "Indeed, it was historical instances of religious persecution and intolerance that gave concern to those who drafted the Free Exercise Clause." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993) (internal quotation marks omitted). To this end, "[a]t a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Id*. In my view, the Board of Education's policy that disallows "religious worship services" after hours in public schools—limited public fora that are otherwise open to all— violates the Free Exercise Clause because it plainly discriminates against religious belief and cannot be justified by a compelling government interest. I would affirm the district court's permanent injunction.

1

CERTIFIED COPY ISSUED ON 04/03/2014

12-2730
*Bronx Household v. Board of Education*

Department of Education Regulation of the Chancellor D-180 § I.Q. ("Reg. I.Q.") prohibits the use of school facilities outside of school hours by outside groups "for the purpose of holding religious worship services, or otherwise using a school as a house of worship."  The last time this case was before this court, we were asked to decide whether Reg. I.Q. violates the Free Speech Clause of the First Amendment.  *See Bronx Household of Faith v. Bd. of Educ. of N.Y.*, 650 F.3d 30 (2d Cir. 2011) ("*Bronx Household IV*").  In my view, it does.  The majority concluded that Reg. I.Q. is not viewpoint discriminatory because it excluded "the *conduct of an event or activity* that includes expression of a point of view," not "the *expression* of that point of view."  *Id*. at 37.  The majority held that Reg. I.Q. is a content-based exclusion that is constitutionally permissible because "it was objectively reasonable for the Board to worry that use of the City's schools for religious worship services . . . [would] expose[] the City to a substantial risk of being found to have violated the Establishment Clause."  *Id*. at 43.

I dissented and now incorporate that dissenting opinion into this one by reference.  It has never been disputed that the Department of Education's policies for the after-hours use of public school spaces created a limited public forum.  *Id*. at 36.  I concluded in *Bronx Household IV* that, under *Good News Club v. Milford*

2

12-2730
*Bronx Household v. Board of Education*

*Central School*, 533 U.S. 98 (2001), *Lamb's Chapel v. Center Moriches Union Free School District*, 508 U.S. 384 (1993), and *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819 (1995), Reg. I.Q. is viewpoint discriminatory because it disallows expression solely because the expression is from a religious viewpoint.  *Bronx Household IV*, 650 F.3d at 54-59 (Walker, J., dissenting). Moreover, I believed that the "majority's attempt to differentiate between the conduct of an event, here labeled 'services,' and the protected viewpoints expressed during the event is futile because the conduct of 'services' *is* the protected expressive activity." *Id*. at 56.  I thus would have required the Board of Education to show a compelling justification for its viewpoint discrimination.

Particularly relevant to the current appeal, I also concluded that permitting religious groups to use school facilities for religious purposes pursuant to a neutral policy creating a limited public forum would not violate the Establishment Clause because such a policy would "neither promote[] nor endorse[] a religious message." *Id.* at 61.  Such a policy would not provide impermissible aid to religion; rather, it simply would provide a neutral forum for religious and non-religious expression alike.  *Id.* at 64.  I noted that, in *Rosenberger*, the Supreme Court stated that "'[i]t does not violate the

3

12-2730
*Bronx Household v. Board of Education*

Establishment Clause for a [school] to grant access to its facilities on a religion-

neutral basis to a wide spectrum of student groups, including groups that use

meeting rooms for sectarian activities, accompanied by some devotional

exercises.'" *Id.* at 63 (second alteration in original) (emphasis removed) (quoting

*Rosenberger*, 515 U.S. at 842). I thus concluded that the Board of Education could

not raise the specter of Establishment Clause concerns as either a reasonable

justification (under the majority's holding) or a compelling justification (under

my view that strict scrutiny applied) for Reg. I.Q.'s disallowance of religious

worship services. *Id.* at 64.

I now turn to the issues presented in the current appeal.

**I.      Reg. I.Q.'s Ban on Religious Worship Services Must Be Justified by a
          Compelling Governmental Interest**

A law that is not "neutral and of general applicability" and that affects

religion "must be justified by a compelling governmental interest and must be

narrowly tailored to advance that interest." *Lukumi*, 508 U.S. at 531-32 (citing

*Emp't Div. v. Smith*, 494 U.S. 872 (1990)). Reg. I.Q. is neither neutral nor generally

applicable.

4

12-2730
*Bronx Household v. Board of Education*

Reg. I.Q. is not neutral or generally applicable because it explicitly conditions use of school facilities on whether an organization is engaging in "religious worship services," a term that by definition has no secular meaning and only burdens religious conduct. Such facial discrimination alone establishes that Reg. I.Q. is not neutral. *See Lukumi*, 508 U.S. at 533. Moreover, it is not generally applicable because in both effect and operation it targets only religious conduct. By disallowing "religious worship services" as the majority has defined that term, Reg. I.Q. burdens many, although not all, religions and no secular organizations. It is thus "an impermissible attempt to target . . . religious practices." *Lukumi*, 508 U.S. at 535.

Concluding that Reg. I.Q. is neither neutral nor generally applicable in its treatment of religion is an easy call: the Department of Education states that its purpose in creating the policy was to "avoid both the fact and appearance of government endorsement of religion presented when plaintiffs and other congregations use public schools to engage in worship services." Appellants' Br. 39**.** The Department thus effectively concedes that its object "is to infringe upon or restrict practices because of their religious motivation." *Lukumi*, 508 U.S. at 533 (citing *Smith*, 494 U.S. at 878-79).

5

12-2730
*Bronx Household v. Board of Education*

Moreover, contrary to the majority's contention, Bronx Household is sufficiently burdened by Reg. I.Q. to require that strict scrutiny apply.  The question is "whether the [government action] imposes any burden on the free exercise of appellant's religion."  *Sherbert v. Verner*, 374 U.S. 398, 403 (1963).  We need not ask whether Bronx Household is "substantially burdened" because the government action here, in specifically targeting religious conduct, is not neutral and not generally applicable.  *See, e.g., Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981); *Sherbert*, 374 U.S. at 403; *Tenafly Eruv Assoc. v. Borough of Tenafly*, 309 F.3d 144, 170 (3d Cir. 2002) ("[T]here is no substantial burden requirement when government discriminates against religious conduct."); *Brown v. Borough of Mahaffey*, 35 F.3d 846, 849-50 (3d Cir. 1994) (holding that requiring plaintiffs to show a substantial burden from "non-neutral government actions would make petty harassment of religious institutions and exercise immune from the protection of the First Amendment").

As the district court found, "the unopposed testimony is that P.S. 15 is the '*only* location in which [Bronx Household] can afford to gather as a *full* congregation without having to curtail other of their religious practices.'"  *Bronx Household of Faith v. Bd. of Educ. of N.Y.*, 876 F. Supp. 2d 419, 427 (S.D.N.Y. 2012).

It is further undisputed that "no other location besides P.S. 15 currently facilitates the Church's religious mandate to worship as an *entire* congregation." *Id.* The burden on Bronx Household is made crystal clear "given the uniquely expensive and crowded real estate market in which the Church resides." *Id.* at 428. In my view, forcing Bronx Household to relocate or suspend its services sufficiently burdens the free exercise of religion to require strict scrutiny.

The majority believes that this case should be decided under *Locke v. Davey*, in which strict scrutiny was not applied to a state-funded scholarship program for post-secondary education that allows students to attend qualified religiously affiliated institutions but disallows students to pursue a degree in theology while receiving the scholarship. 540 U.S. 712, 716 (2004). *Locke* is not applicable here, however, because it dealt only with a government subsidy. The Court in *Locke* explicitly acknowledged that the scholarship at issue "is not a forum for speech," and thus "cases dealing with speech forums are simply inapplicable." *Id.* at 720 n.3. As discussed, Reg. I.Q. plainly creates a limited public forum. *See Bronx Household IV*, 650 F.3d at 36. Reg. I.Q. is not a government subsidy: the Department of Education charges the same rate to all organizations using its facilities. Whereas *Locke* dealt with directly funding the

7

12-2730
*Bronx Household v. Board of Education*

training of religious clergy, here we are dealing with discriminating against religious exercise in a forum set aside for community-based expression.

Because I believe that Reg. I.Q. is neither neutral nor generally applicable and places a burden on religious conduct, I would apply strict scrutiny.

## II.   Reg. I.Q. Fails Strict Scrutiny

The last time this case was before this panel, I explained that in my view, because Reg. I.Q. was viewpoint discriminatory, it must be justified by a compelling governmental interest. *Bronx Household IV*, 650 F.3d at 59 (Walker, J., dissenting). I further explained that the government's interest in avoiding an Establishment Clause violation was not sufficiently compelling because "the neutrality of the forum is preserved when religious speech, like non-religious speech, is allowed. Accordingly, . . . I would hold that the Board has failed to demonstrate that granting Bronx Household Sunday access to P.S. 15 for worship services would have the principal or primary effect of advancing religion or otherwise conveying a message of endorsement." *Id*. at 64. My position on this point need not be repeated in full. It is as true now as it was then: the Board's interest in enforcing Reg. I.Q. to avoid an Establishment Clause violation is not compelling because it does not violate the Establishment Clause to allow Bronx

8

12-2730
*Bronx Household v. Board of Education*

Household to worship in public school facilities made broadly available to the public on neutral terms.  I would thus hold that Reg. I.Q. violates the Free Exercise Clause.[1]

The majority contends that Reg. I.Q. is permissible because the Board made a "reasonable, good faith judgment that it runs a risk of a non-frivolous charge of violation of the Establishment Clause by hosting and subsidizing the conduct of religious worship services."  Maj. Op. at 24.  The Board's belief, however, is not reasonable because Supreme Court precedent has foreclosed the possibility that an Establishment Clause violation would result if religious worship services were allowed in school facilities in these circumstances.  The Supreme Court has repeatedly "rejected the position that the Establishment Clause even justifies, much less requires, a refusal to extend free speech rights to religious speakers who participate in broad-reaching government programs neutral in design."  *Rosenberger*, 515 U.S. at 839 (citing *Lamb's Chapel*, 508 U.S. at

---

[1] Because I believe that Reg. I.Q. violates the Free Exercise Clause, I would not reach the district court's additional holding that Reg. I.Q. "calls for official and continuing surveillance leading to an impermissible degree of government entanglement with religion, in violation of the Establishment Clause."  *Bronx Household*, 876 F. Supp. 2d at 445 (internal quotation marks and alterations omitted).

9

12-2730
*Bronx Household v. Board of Education*

393-94; *Bd. of Educ. v. Mergens*, 496 U.S. 226, 248, 252 (1990); *Widmar v. Vincent*, 454 U.S. 263, 274-75 (1981)); *see also Good News Club*, 533 U.S. at 112-19.  The City's Establishment Clause justification has no greater purchase under the Free Exercise Clause than it has under the Free Speech Clause.

This conclusion is bolstered by an empirical survey submitted to this court by *amicus curiae* The New York City Council Black, Latino, and Asian Caucus, in support of appellees.  Of the fifty largest school districts in the United States, New York City alone entirely excludes religious worship from its facilities.  Brief of Amicus Curiae the New York City Council Black, Latino, and Asian Caucus at 9.  Twenty-five of these school districts expressly allow religious worship in their facilities.  *Id*. at 10.  An additional eighteen implicitly allow religious worship services on the same terms as other community organizations.  *Id*.  Finally, an additional six districts permit religious worship services under certain conditions.  *Id*.  Of course, the status quo does not ipso facto render government action constitutional, but it bears on whether the City's position is a reasonable one.  It is striking that none of these other school districts appear to have the slightest concern about violating the Establishment Clause, nor have any of their community use policies been found to violate the Clause.

10

12-2730
*Bronx Household v. Board of Education*

Even if there were a real concern that allowing religious services in public schools pursuant to a neutral policy that creates limited public fora would violate the Establishment Clause, and even if Reg. I.Q. were intended to address that problem, Reg. I.Q. would still fail strict scrutiny because it is impermissibly underinclusive to serve that interest. *See Lukumi*, 508 U.S. at 546. Reg. I.Q. permits extensive religious conduct in public schools, such as a Quaker meeting service or a Buddhist meditation service, so long as it is not following a prescribed order or led by an ordained official. *See Bronx Household IV*, 650 F.3d at 56 (Walker, J., dissenting).

> Moreover, as the majority in *Bronx Household IV* made clear:
>
> The "religious worship services" clause does not purport to prohibit use of the facility by a person or group of persons for "worship." What is prohibited by this clause is solely the conduct of a particular type of event: a collective activity characteristically done according to an order prescribed by and under the auspices of an organized religion, typically but not necessarily conducted by an ordained official of the religion.

*Id*. at 37. Indeed, Reg I.Q. "prohibits use of school facilities to conduct worship services, but does not exclude religious groups from using schools for prayer, singing hymns, religious instruction, expression of religious devotion, or the discussion of issues from a religious point of view." *Id*. at 38. A regulation that

11

12-2730
*Bronx Household v. Board of Education*

bans worship services but not worship in any of its manifestations is thus not

sufficiently tailored to accomplish the interest that the School Board has

advanced, namely, avoiding the risk of being perceived as establishing religion.

*   *   *   *   *   *

This case presents substantial questions involving the contours of both

religion clauses and the Free Speech Clause of the First Amendment, the

resolution of which are ripe for Supreme Court review. In the meantime,

because the "First Amendment mandates governmental neutrality between

religion and religion, and between religion and nonreligion," *Epperson v.*

*Arkansas*, 393 U.S. 97, 104 (1968), I respectfully dissent.

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit

12